**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for MEE Apparel LLC and MEE Direct LLC,
Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>MEE APPAREL LLC and MEE DIRECT LLC,<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NO. 14-<br><br>Chapter 11<br>(Joint Administration Pending) |

### AFFIDAVIT OF JEFFREY L. GREGG IN SUPPORT OF DEBTORS' "FIRST DAY MOTIONS"

STATE OF NEW YORK    )
                     )SS.
COUNTY OF NEW YORK   )

JEFFREY L. GREGG, of full age, being duly sworn according to law, upon his oath, deposes and states:

1.    On the date hereof (the "**Filing Date**"), MEE Apparel LLC ("**MEE Apparel**") and MEE Direct LLC ("**MEE Direct**"), as debtors and debtors-in-possession herein (collectively, the "**Company**" or the "**Debtors**"), each commenced in this Court a case under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**").  I am the Chief Restructuring Officer and have served in that capacity since February 2014.  I am fully familiar with the Debtors' day-to-day operations, businesses and financial affairs, and am duly authorized to make this Affidavit on the Debtors' behalf.

52721/0001-10378141v2

2. To minimize the potentially adverse effects which the commencement of these Chapter 11 cases may have on the Debtors' ability to continue operations and to facilitate an orderly transition into Chapter 11, the Debtors have filed certain "first day" motions and applications with the Court (individually, a "**First Day Motion**" and collectively, the "**First Day Motions**"). I am familiar with each of the First Day Motions and believe the relief sought therein is required to facilitate an orderly transition into Chapter 11 and avoid the immediate and irreparable harm the Debtors will suffer if they are not authorized to make certain essential payments and otherwise continue their business operations as requested in the First Day Motions.

3. In accordance with the Local Rules and given the nature of these Chapter 11 cases, the Debtors have requested that the Court schedule a hearing at its earliest convenience to consider the First Day Motions. The Debtors will continue to operate their businesses and manage their assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4. I submit this Affidavit to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these Chapter 11 cases and in support of the Debtors' voluntary Chapter 11 petitions and various motions and applications filed with the Court contemporaneously herewith. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' professional advisors, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit.

5. This Affidavit is divided into three (3) parts. Part I describes the Debtors' businesses, history, and prepetition organizational and debt structure. Part II describes the circumstances leading to the Chapter 11 filings. Part III sets forth the purpose of the Chapter 11 filings and the relief requested in the First Day Motions.

### I.   FACTUAL BACKGROUND

**A.   The Debtors' Organizational Structure**

6. MEE Apparel f/k/a Ecko Complex LLC is a limited liability company organized pursuant to the New Jersey Limited Liability Act. MEE Apparel's sole member is Holton99, LLC ("**Holton99**"), of which Seth Gerszberg ("**Gerszberg**") is the 99% member and Holton 1, Inc. ("**Holton1**") is the 1% owner. Holton 1 is owned 100% by Gerszberg.

7. MEE Direct f/k/a Ecko Direct, LLC is a limited liability company organized pursuant to the Delaware Limited Liability Act. MEE Direct's members are also Holton99 and Holton1.

**B.   General Overview of the Debtors' Business Operations**

8. Founded in 1993 by Marc Ecko, Gerszberg and Marci Tapper, the Debtors are leading providers of youth apparel and streetwear under the "Ecko Unltd." and "Unltd." brands. Evolving from just six t-shirts and a can of spray paint, the Debtors have become a full scale global fashion and lifestyle company.

9. Before consummating the West Loop Transaction (defined below), MEE Apparel managed the Debtors' wholesale operations. In particular, MEE Apparel developed, sourced and delivered clothing apparel and accessories to approximately 400 retail establishments throughout the United States including, among others, Dillard's and Burlington Coat Factory. In 2013, MEE Apparel generated gross sales of approximately $50 million.

3

10. MEE Direct conducts the Debtors' retail store operations and sales through its e-commerce platform.  It develops and manufactures apparel and accessories to be sold in its directly owned and operated "Ecko Unltd." retail stores in Arizona, California, Florida, Hawaii, Texas, Nevada, New Jersey, New York, Illinois, Oregon, Michigan and Washington as well as online at www.ecko.com.  MEE Direct also sells licensed products from third parties at certain of its retail locations.  MEE Direct's retail operations began in 2005 and quickly expanded to over 100 stores by 2012.  As of the Filing Date, MEE Direct had approximately thirty (30) operating locations consisting of both full price and premium outlet stores.  For the 2013 calendar year, MEE Direct had gross sales in excess of $100 million in its retail stores and $400,000 with respect to its e-commerce platform.

11. The Debtors sell "Ecko Unltd." and "Unltd." merchandise pursuant to a non-exclusive Sublicense Agreement with a related entity, 3TAC, LLC ("**3TAC**"), who in turn licenses on a non-exclusive basis, the intellectual property from IP Holdings Unltd LLC ("**IPHU**"), a subsidiary of Iconix Brand Group, Inc. ("**Iconix**").  The Debtors are obligated to pay royalties for the use of that intellectual property.

12. The Debtors' headquarters are located in New York.  The Debtors manufacture most of their products internationally in factories located in Asia, Mexico and South America.  A small percentage of products, namely t-shirts, are manufactured in the United States.

13. As of the Filing Date, the Debtors had approximately 970 employees, of which approximately 110 employees are full-time salaried employees and 860 are part-time hourly employees.

14. As of the Filing Date, the Debtors had assets of approximately $30 million and liabilities of approximately $62 million.

**C.      Capital Structure**

      **(a)      Rosenthal & Rosenthal, Inc.**

15.     On September 24, 2013, each of the Debtors entered into separate factoring agreements (the **"Factoring Agreements"**) with Rosenthal & Rosenthal, Inc. (the "**Factor**"). Pursuant to the Factoring Agreements, the Debtors assign certain receivables to the Factor. Additionally, pursuant to the Factoring Agreements, the Factor provides a revolving credit facility (the "**Factoring Facility**") to the Debtors for sums up to:

> (a)     The lesser of (i) the sum of (A) 80% of the aggregate net amount of Eligible Receivables[1] arising from wholesale sales; plus (B) 50% of the lower of cost or market value of Landed Eligible Inventory of the Debtors' wholesale division, not to exceed $3,500,000, plus (C) 25% of the lower of cost or market value of In-Transit Eligible Inventory of the wholesale division, not to exceed $2,000,000; minus (D) 50% of the undrawn Face Amount of all letters of credit opened or guarantees issued for the account, and (ii) $20,000,000; and

> (b)     The lesser of (i) 50% of the lower of cost or market value of Landed Eligible Inventory of the Debtors' retail division, not to exceed 75% of the net ordinary liquidation value based on a third party appraisal, and (ii) $12,500,00.

16.     To secure repayment of the Factoring Facility and all other obligations of the Debtors incurred in connection with the Factoring Facility, the Debtors granted the Factor a blanket security interest in and lien against substantially all assets in the Debtors.

17.     As additional security for the Factoring Facility, Gerszberg and entities he owns and controls, Suchman, LLC ("**Suchman**"), 3TAC, Holton99 and Holton1, Inc. ("**Holton1**"), provided guarantees of the Debtors' obligations thereunder. Additionally, Suchman pledged to

---

[1] Capitalized terms used in this paragraph but not otherwise defined shall have the meanings ascribed to them in the Factoring Agreements.

the Factor an aggregate of $6 million in cash as security for the Debtors' liabilities and obligations under the Factoring Facility.

18. As of the Filing Date, approximately $6 million is outstanding under the Factoring Facility.

**(b)    Suchman**

19. On October 30, 2009, Suchman, an entity owned by Gerszberg, loaned MEE Apparel up to $50 million pursuant to the terms of the Loan Agreement and Promissory Note, as amended by a First Amendment to Loan Agreement and Promissory Note dated May 18, 2013 (the "**Initial Suchman Loan**"). As of the Filing Date, approximately $27.28 million was outstanding on the Initial Suchman Loan.

20. On July 6, 2011, the Debtors entered into a $50 million credit facility with Wells Fargo, N.A. (the "**WF Facility Lenders**"), as subsequently amended (the "**WF Credit Facility**"). The WF Credit Facility was secured by (i) substantially all of the Debtors' assets (the "**WF Collateral**"), (ii) a pledge of certain equity owned by Gerszberg and (iii) guarantees of Holton1, Holton99, 3TAC and Gerszberg. On July 6, 2011, Wells Fargo Bank, N.A., as the agent for the WF Facility Lenders (the "**WF Facility Agent**"), properly perfected its security interests in the WF Collateral by filing UCC-1 financing statements with the New Jersey Department of Treasury and the Delaware Secretary of State.

21. Pursuant to an Assignment dated May 17, 2013, the WF Facility Agent assigned the WF Credit Facility to Suchman. As of the Filing Date, the Debtor owes Suchman approximately $20.38 million on account of the WF Credit Facility (the "**Suchman Secured Debt**"). The Suchman Secured Debt is subordinate to the Factor's liens.

  **(c)  Unsecured Debt.**

22. As of the Filing Date, the Debtors have approximately $25 million of debt outstanding to unsecured creditors.

## II. FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILING

23. Since the beginning of 2009, the Debtors have suffered declining sales and reduced profitability. Like many of their competitors, a shift in market trends to a cleaner more main stream look available at mass-market retailers negatively impacted the Debtors' sales. In addition, the economic recession had a devastating impact on higher-end fashion apparel brands, including the Debtors. Over the last several years, the Debtors' targeted young consumers, which tend to have fickle tastes generally, have moved away from expensive labels in favor of lower priced brands.

24. In October 2009, in an effort to address the Debtors' liquidity constraints and increased debt, Suchman and Gerszberg, among others, entered into a Contribution and Sale Agreement with Iconix pursuant to which they sold and/or contributed to IPHU, a joint venture between Suchman and Iconix (the "**Iconix Joint Venture**"), the Ecko portfolio of brands in exchange for Suchman receiving a 49% membership interest in the Iconix Joint Venture and $63.5 million. In accordance with that agreement, the Iconix Joint Venture borrowed $90 million to repay certain indebtedness of the Debtors. Additionally, as described above, following the October 2009 sale, Suchman made the Initial Suchman Loan to the Debtors. While the funds received by the Debtors as a result of the 2009 Iconix transaction improved the Debtors' balance sheet, it did not restore the business to profitability.

25. After 2009, the Debtors' sales continued to drastically decline as their brands remained less desirable to the targeted urban youth customer. The market shift in trends caused Macy's and TJ Maxx, two of the Debtors' largest wholesale customers, to slowly reduce

7

purchases and ultimately cease doing business with the Debtors altogether in 2013. The effect on the Debtors' business was further compounded by the loss of key licenses with third parties that accounted for approximately $20 million of annual revenue for the Debtors. Moreover, after moving warehouses in July 2012, the Debtors lost millions of dollars as a result of reduced inventory control and deficient system integration.

26. As a result of the Debtors' poor financial performance from 2009 through 2013, the Debtors defaulted on the WF Credit Facility. Additionally, the Debtors were unable to meet the terms of their license agreements with the Iconix Joint Venture prompting Suchman and Gerszberg in May 2013 to sell their remaining 49% interest in the Ecko portfolio of brands for $45 million and the assumption of certain debt. Suchman used the proceeds of that sale (i) to pay the WF Facility Lenders and take assignment of the WF Credit Facility and (ii) to provide additional loans to the Debtors aggregating approximately $12.54 million. Despite efforts to address their liquidity constraints with these additional borrowings, the Debtors continued to be plagued with cash flow shortfalls that hampered their business operations.

27. Additionally, the Debtors' license agreements only allow the Debtors to use the "Ecko Unltd." and "Unltd." trade names until September 30, 2015. Certain of the Debtors' real property leases have use restrictions in them that require MEE Direct to sell only "Ecko Unltd." brand merchandise or operate a store under the "Ecko Unltd." brand name. Despite the Debtors' best efforts, the Debtors were unable to negotiate modifications to those use provisions with their landlords before the Filing Date. As a result, the Debtors were confronted with uncertainty as to future of their retail business operations.

28. Before the Filing Date, the Debtors effectively worked to address their liquidity crisis. For example, in November 2013, the Debtors retained Hilco Merchant Services ("**Hilco**")

to conduct store closing sales at 66 of their retail locations. Those sales were completed by January 2014 and the Debtors vacated and surrendered the vast majority of the locations in which those sales were conducted. Even with the surrender of these locations and the sale of the excess inventory from those locations, the Debtors were unable to satisfactorily alleviate the liquidity crisis they have been facing.

29. Indeed, that crisis caused the Debtors to fall significantly behind to most of its key suppliers, including the Debtors' warehouse and distribution providers as well as their foreign product producers and freight forwarders. Without funds to meet these obligations, the inventory became subject to a $1.2 million warehouseman's lien,[2] and caused Fairway to both refuse the Debtors access to their inventory and to make deliveries to the Debtors' retail locations.

30. To address this latest challenge, the Debtors solicited proposals for the purchase of their warehouse inventory. On March 14, 2014, the Debtors entered into an agreement with West Loop South to, among other things, sell all of their warehouse inventory located at the warehouses (the "**West Loop Transaction**"). The proceeds of approximately $5.6 million that the Debtors received from the West Loop Transaction were used to pay down the Factoring Facility. In conjunction with the West Loop Transaction, the Debtors entered into a Supply Chain Services Agreement with West Loop South whereby West Loop South will provide letter of credit, freight forwarding, duties and third party logistics services to the Debtors and the

---

[2] In the ordinary course of their business, the Debtors utilized the services of Fairway Logistic NJ Inc. and Fairway Logistics Inc. (collectively "**Fairway**") to provide warehousing and distribution services to the Debtors in Dayton, New Jersey and Carson, California, respectively. As of the closing of the West Loop Transaction, the Debtors owed Fairway approximately $1.2 million and Fairway asserted a warehouseman's lien on the Debtors' inventory in its possession. In connection with the West Loop Transaction, West Loop agreed to assume that obligation to Fairway.

Debtors will be able to acquire products for sale in their retail locations and through their e-commerce platform.

31. In addition to solving the immediate shipping freeze and allowing MEE Direct access to inventory that it can now purchase for sale in its stores, the West Loop Transaction serves to reduce overhead (*e.g.*, staffing, warehousing and other logistical costs) and interest costs due to lower investment in working capital, resulting in savings to totaling approximately $2 million per year. The Debtors, however, remain unable to manage their existing debt.

32. Although liquidity will likely improve and expenses will be substantially reduced as a result of the West Loop Transaction, the Debtors will continue to suffer liquidity constraints and indeed access to working capital is limited. Thus, the Debtors believe a Chapter 11 filing, and the pursuit of an expedited sale process involving substantially all of the Debtors' remaining assets under Section 363 is the best option for maximizing the value of the Debtors' estates, preserving hundreds of jobs and is in the best interest of the Debtors' creditors and other stakeholders..

### III.    THE PURPOSE OF THE CHAPTER 11 FILINGS

33. As described above, the Debtors have evaluated their various restructuring options and determined that the best way to preserve the Debtors' going concern value for the benefit of all stakeholders was to commence these Chapter 11 cases. To avoid the potentially disruptive impact the commencement of these Chapter 11 cases might have on the Debtors' operations, to facilitate the Debtors' orderly transition into Chapter 11 and to maintain going concern value of the Debtors' businesses and assets while the Debtors pursue a sale of their assets, the Debtors have requested the Court to consider, on an expedited basis, the following First Day Motions:

10

    (a)    Application for Complex Case Designation;

    (b)    Motion for an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Granting Other Related Relief;

    (c)    Motion for an Order Extending the Debtors' Time to File Schedules and Statements of Financial Affairs Pursuant to Bankr. P. 1007(a)(4) and 1007(c);

    (d)    Motion for an Order: (a) Granting Interim Relief Pursuant to 11 U.S.C. § 366(b); (b) Authorizing the Payment of Adequate Assurance for Post-Petition Utility Services; (c) Fixing Final Hearing Date to Determine Adequate Assurance; and (d) Granting Other Related Relief;

    (e)    Motion for an Order Approving the Debtors' Retention Of Prime Clerk LLC as Claims and Noticing Agent Pursuant to 28 U.S.C § 156(c);

    (f)    Motion for an Order (A) Approving Modified Cash Management System; (B) Authorizing the Debtors to Continue Using Their Bank Accounts and Business Forms; and (C) Waiving Compliance with Investment Guidelines Under 11 U.S.C. § 345(b);

    (g)    Motion for an Order: (I) Authorizing the Debtors to (A) Satisfy and, to the Extent Applicable, Directing Any Payroll Banks to Honor, Pre-Petition Gross Salaries, Payroll Taxes And Related Obligations to or for the Benefit of the Debtors' Employees, And (B) Honor, In Their Discretion, Pre-Petition Sick, Vacation, Personal, and Similar Themed Days; and (II) Granting Other Related Relief;

    (h)    Motion for an Administrative Order Establishing Procedures for Allowance and Payment Of Interim Compensation And Reimbursement of Expenses to Professional Persons;

    (i)    Motion for an Order Authorizing the Retention and Compensation of Non-Legal Professionals Utilized By the Debtors In The Ordinary Course of Their Business *Nunc Pro Tunc* to the Filing Date;

    (j)    Motion for an Order Authorizing the Retention and Compensation of Non-Bankruptcy Legal Professionals *Nunc Pro Tunc* to The Filing Date;

    (k)    Motion Pursuant to 11 U.S.C. § 105(a) for an Order Authorizing Them to Honor Customer-Related Claims, Programs and Obligations;

    (l)    Motion For an Interim and Final Order: (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c) and (e); (II) Authorizing Use Of Cash Collateral; (III) Scheduling a

                Final Hearing Pursuant To Fed. R. Bankr. P. 4001; and (IV) Granting Other Related Relief;

(m)    Motion for an Order Directing Their Credit Card Processors to Honor Their Processing Agreements With The Debtors Pending Assumption Or Rejection Pursuant To 11 U.S.C. §§ 365 And 105(a);

(n)    Motion for Entry of an Order Authorizing the Debtors to Pay Pre-Petition Sales And Use Taxes Pursuant to 11 U.S.C. §§ 507(a)(8) and 105(a);

(o)    Motion for an Order Authorizing Rejection Of Certain Unexpired Nonresidential Real Property Leases and Abandonment of Personal Property *Nunc Pro Tunc* to the Filing Date;

(p)    Motion for an Order Authorizing and Approving the Employment of Jeffrey L. Gregg As Chief Restructuring Officer for the Debtors *Nunc Pro Tunc* to the Filing Date Pursuant To 11 U.S.C. § 363; and

(q)    Motion for an Order (A) Authorizing the Interim and Final Use Of Cash Collateral Pursuant to 11 U.S.C. §§ 361 and 363 and Granting Adequate Protection and (B) Scheduling Final Hearing Pursuant To 11 U.S.C. § 363(c)(2) and Fed. R. Bankr .P. 4001.

34.    The purposes of the First Day Motions include, among other things, to: (a) enable the Debtors to operate effectively, ease the Debtors' transition into Chapter 11 and mitigate potentially adverse effects of the Chapter 11 filings; (b) minimize disruption of the Debtors' ability to continue providing quality service to their customers and, thus, preserve the customers' confidence and ensure their continued patronage; (c) maintain and bolster employee morale so as to reduce employee attrition during the Debtors' Chapter 11 proceedings, which would have a detrimental impact on the Debtors' business and customer service; and (d) maintain vital vendor relationships. Each of the First Day Motions is crucial to the Debtors' restructuring efforts and preservation of the Debtors' assets and estates.[3]

---

[3] For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court and parties-in-interest to the respective First Day Motions.

52721/0001-10378141v2

## IV. CONCLUSION

35. The First Day Orders will enable the Debtors to stabilize and continue their operations in the ordinary course while they seek to sell their assets pursuant to Section 363 of the Bankruptcy Code. Accordingly, the Debtors respectfully request that the Court enter those Orders and the Emergency Interim Order.

                                                                */s/ Jeffrey L. Gregg*
                                                                JEFFREY L. GREGG

Sworn and subscribed to
before me this 2nd day of
April, 2014

  */s/ Gregg R. Donnenfeld*
Notary Public, State of New York
My Commission Expires
December 11, 2017