**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for MEE Apparel LLC and
MEE Direct LLC, Debtors-in-Possession

|  |  |
|---|---|
| | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NO. 14-16484 (CMG) |
| In re:<br><br>MEE APPAREL LLC and MEE DIRECT LLC,<br><br>    Debtors-in-Possession. | Chapter 11<br>(Joint Administration Pending)<br><br>**HEARING DATE AND TIME:**<br>April \_\_\_\_, 2014, at \_\_\_:\_\_\_ \_\_.m.<br><br>**ORAL ARGUMENT REQUESTED** |

**VERIFIED APPLICATION IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND TO ASSUME AND ASSIGN CERTAIN RELATED EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES; AND (5) GRANTING OTHER RELATED RELIEF</u>**

TO: Honorable Judge
   of the United States Bankruptcy Court

MEE Apparel LLC and MEE Direct LLC, the within debtors and debtors-in-possession

(collectively, the "**Debtors**"), by and through their proposed counsel, Cole, Schotz, Meisel,

Forman & Leonard, P.A., respectfully represent:

## I.    INTRODUCTION AND JURISDICTION

1.      This Verified Application is submitted in support of the Debtors' motion (the

"**Motion**") for an Order pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004

and 6006: (1) Approving a "Stalking Horse" Asset Purchase Agreement for the Sale of

Substantially All the Debtors' Assets; (2) Approving Bidding Procedures and Form, Manner and

Sufficiency of Notice Thereof; (3) Scheduling (a) an Auction Sale and (b) a Hearing to Consider

Approving the Highest and Best Offer; (4) Authorizing the Debtors to Sell Substantially All

Their Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and

Assign Related Executory Contracts and Unexpired Leases; and (5) Granting Other Related

Relief (the relief requested in subparts (1) through (3) is referred to as "**Part I of the Motion**"

and the proposed Order granting Part I of the Motion, submitted herewith, is referred to as the

"**Bidding Procedures Order**"; the relief requested in subparts (4) and (5) is referred to as "**Part

II of the Motion**" and the proposed Order granting Part II of the Motion, submitted herewith, is

referred to as the "**Sale Order**").

2.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and

157(b).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## II.    BACKGROUND

4.      On April 2, 2014 (the "**Filing Date**"), the Debtors filed voluntary petitions for

relief pursuant to Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

Since the Filing Date, the Debtors have remained in possession of their assets and continued

management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of

the Bankruptcy Code.

5.      A detailed description of the Debtors' business and the facts precipitating the

filing of these Chapter 11 proceedings are set forth in the Affidavit of Jeffrey L. Gregg in support

of the Debtors' various "First Day Motions" (the "**Gregg Affidavit**").  Those facts are

incorporated herein by reference.

6.      As set forth in the Gregg Affidavit, the Debtors are leading providers of youth

apparel and streetwear under the "Ecko Unltd." and "Unltd." brands.  Before the Filing Date, the

Debtors developed, manufactured and sourced clothing apparel and accessories for wholesale

customers and their own retail locations.  On March 31, 2014, the Debtors consummated a

transaction with West Loop South pursuant to which they sold substantially all of their

inventory in their warehouse locations.  The Debtors, however, retained the inventory within

and continue to operate their retail business from approximately thirty (30) full-priced and

premium outlet stores as well as through their e-commerce platform.  In conjunction with the

West Loop Transaction, the Debtors entered into a Supply Chain Services Agreement with West

Loop South whereby West Loop South will provide letter of credit, freight forwarding, duties

and third party logistics services to the Debtors in connection with the operation of their retail

business.  As of the Filing Date, the Debtors had assets of approximately $30 million and

liabilities of approximately $62 million.

**A.**      <u>**Factors that Precipitated Section 363 Sale of the Debtors' Assets**</u>

7.      The Debtors have experienced liquidity issues since 2009.  Since that time, the

Debtors have explored all options to address their financial condition and provide them with a

sustainable capital structure.  Notwithstanding their efforts, the Debtors, in consultation with

their advisors, determined that a sale of the Debtors' assets was in their best interests.

Accordingly, before the Filing Date, the Debtors retained Innovation Capital, LLC

("**Innovation**") as investment banker to market the assets for sale.

8.      In the meantime, the Debtors were also in discussions with Suchman, LLC

("**Suchman**" or "**Buyer**"), one of the Debtors' pre-petition lenders, indirect equity owner, and

proposed DIP lender, concerning, among other things, the possibility of a credit bid to serve as

the "stalking horse" for the sale of the Debtors' assets.  In February 2014, the Debtors and their

advisors met with Suchman, its principals and advisors, to discuss these issues.  As a result of

these efforts, Suchman announced it would make a credit bid for the Debtors' assets.  Following

that meeting, the Debtors and their advisors and Suchman and its advisors engaged in

negotiations of a credit-bid asset purchase agreement.  Those negotiations culminated in a

credit-bid asset purchase agreement (the "**APA**"), a true copy of which is attached hereto as

**Exhibit A**.

9.      The Debtors currently do not have sufficient cash resources or committed

financing to operate the Debtors and service ordinary course obligations for an extended time

period.  Accordingly, and after consultation with their advisors, the Debtors ultimately

determined the best course of action would be to commence Chapter 11 cases, secure DIP

financing and implement a marketing and auction process with the APA serving as the baseline

bid.  The proposed APA, the only option currently available to the Debtors to maximize their

value as a going concern, provides the platform for a competitive sale process subject to higher

and better offers.  Moreover, the APA, while not ideal, affords the Debtors the best opportunity

to stay in business, for significant liabilities to be assumed by the Buyer and to preserve

hundreds of jobs.

52721/0001-10370409v1

## III.    SUMMARY OF THE MATERIAL TERMS OF THE APA [1]

10.    Pursuant to the terms and subject to the conditions of the APA, the Debtors,

subject to a Court-approved auction and sale process and any higher and better offers in

accordance with the proposed bidding procedures outlined below (the "**Bidding Procedures**"),

will sell to Buyer their right, title and interest in and to the Purchased Assets and, in connection

therewith, to assign to the Buyer the Purchased Contracts.  The Buyer will purchase the

Purchased Assets and acquire the Purchased Contracts free and clear of Liens and Claims (as

defined in the Sale Order) pursuant to Sections 363 and 365 of the Bankruptcy Code.

11.    The terms of the Buyer's offer to purchase the Purchased Assets are set forth in

the APA, and are summarized herein:

(a)    Buyer.  The APA provides that if the credit-bid is successful, the Purchased Assets will be acquired by Suchman.  Suchman is an insider of the Debtors.  Suchman is owned 100% by Seth Gerszberg ("**Gerszberg**").  Gerszberg is also the indirect owner of the Debtors;

(b)    Purchased Assets.  Pursuant to Section 2.1 of the APA, the Buyer shall acquire the Purchased Assets, which shall include, among other things, accounts receivable, cash, cash equivalents, bank deposits and similar cash items, Inventory, all deposits and other prepaid charges and expenses of the Debtors, all rights of the Debtors under each Real Property Lease, Furniture and Equipment, Purchased Intellectual Property and Purchased Contracts.  See APA, § 2.1.

(c)    Excluded Assets.  Section 2.2 of the APA sets forth the Excluded Assets, which include, but are not limited to: all customer and security deposits relating to Real Property Leases that are Excluded Assets; Excluded Contracts; all obligations, Liabilities and Indebtedness, including any

---

[1] The foregoing is only a summary of the APA.  The reader is urged to consult the APA for a complete and accurate description of its terms.  Any capitalized terms used but not otherwise defined in Section III hereof shall have the meanings ascribed to them in the APA.

note Indebtedness, owed to or by any Debtor to or by any Affiliate of any Seller; any Intellectual Property rights other than Purchased Intellectual Property; any causes of action under Chapter 5 of Title 11 of the United States Code other than causes of action that are Purchased Assets; any equity interests in the Debtors or any subsidiary; and the Assets set forth on Schedule 2.2(i) of the APA.  See APA, § 2.2.

(d)   Assumed Liabilities.  Subject to the terms and conditions of the APA, immediately after the Closing, Buyer shall assume and thereafter pay, perform and discharge when due the Assumed Liabilities that have not been paid, performed or discharged as of the Closing, which are, among other things: all Cure Amounts required to be paid in respect of the Purchased Contracts; all Liabilities under the Purchased Contracts arising after the Closing; all Liabilities arising from the sale of Products after the Closing pursuant to product warranties, product returns, rebates and otherwise; all Liabilities with respect to the Business or the Purchased Assets arising after the Closing; all allowed pre-petition Liabilities to Qualified Critical Trade Vendors to the extent that such Liabilities have not previously been paid by Sellers; all undisputed post-petition Liabilities to Critical Trade Vendors that have not agreed to the terms and conditions set forth in the Critical Trade Vendor Motion to the extent that such Liabilities have not previously been paid by Sellers; all Liabilities under Sellers' gift cards relating to the Purchased Assets; all Liabilities associated with (i) Employee vacation and sick leave accruals with respect to Transferred Employees and (ii) severance benefits, determined in accordance with Sellers' severance policy as set forth on Schedule 5.13, for any Employee who is not a Transferred Employee, in each case only to the extent that any such Liability is an allowed administrative claim in the Bankruptcy Cases; the Rosenthal Agreements and all Liabilities of Sellers thereunder; all real property Taxes to the extent required for Buyer to assume any Real Property Lease that is a Purchased Contract; Transfer Taxes; and certain all WARN Act Liabilities.  See APA, § 2.3.

(e)   Excluded Liabilities.  Buyer will not assume or have any responsibility, however, with respect to any other obligation or liability of Sellers not included within the definition of Assumed Liabilities, including, without limitation: (i) Taxes (x) imposed on any Seller for any period or (y) related to the Business or the Purchased

6

Assets for all Tax periods (or portions thereof) ending on or prior to the Closing (except, in each case, as expressly provided below); (ii) any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases (except as expressly provided below); (iii) liabilities to the extent relating to the Excluded Assets, including Liabilities relating to Excluded Contracts; (iv) Liabilities and obligations of Sellers under this Agreement; (v) all Liabilities and obligations arising under any Purchased Contract (and all liabilities for any breach, act or omission under any Purchased Contract) arising prior to the Closing other than any Cure Amounts paid in respect thereof pursuant to Section 3.1; (vi) all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed by any Seller to any Affiliate of any Seller; (vii) other than as set forth in Section 2.3(i), any Employee Obligations to any Employee arising out of such Employee's employment by Sellers prior to the Closing; (viii) any Employee Claim of any Employee arising out of such Employee's employment by Sellers prior to the Closing; (ix) other than as set forth in Section 2.3(o), any WARN Act Liabilities; and (x) all other Liabilities and obligations for which Buyer does not expressly assume any liability.  See APA, § 2.3.

(f)    Cure Payments.  The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed at Closing, shall be paid by Buyer, and Sellers shall have no liability therefor.  See APA, § 3.1.

(g)    Purchase Price.  In consideration of the transfer of the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price for the Purchased Assets shall be (i) 11.3 million to be satisfied in the form of a credit pursuant to Section 363(k) of the Bankruptcy Code against the amount of Sellers' debt under the DIP Financing and a portion of Suchman's pre-petition secured indebtedness under the Existing WF Facility, plus (ii) the assumption of the Assumed Liabilities by Buyer at Closing. See APA, § 3.1.

52721/0001-10370409v1

(h)     Closing Date.  The closing of the purchase and sale of the
Purchased Assets and the assumption of the Assumed
Liabilities shall take place as soon as practicable following
the satisfaction or waiver of the conditions set forth in
Article IX of the APA.

(i)      Representations and Warranties.  The APA contains
representations and warranties of the Debtors in Article V,
and of Buyer in Article VI.

(j)      Covenants.  The APA contains covenants of the Debtors in
Article VIII.

(k)     Bankruptcy Court Matters.  The APA provides that the
Buyer shall be entitled to an Expense Reimbursement in the
amount of Two Hundred Thousand Dollars ($200,000)
upon the effective date of termination of the APA
consistent with the terms set forth in the APA.  See APA,
§ 7.1.  The APA is subject to approval by the Bankruptcy
Court and the consideration by the Debtors of higher or
better competing bids.  See APA, § 7.2.

(l)      Conditions to Closing.  The APA contains conditions to
Closing in Article IX.

(m)    Termination.  The APA contains termination provisions in
Section 4.4.

12.     The Debtors seek authority to sell the Purchased Assets to the Buyer on the terms

and conditions set forth in the APA or to a higher and better bidder to be determined in

accordance with the Bidding Procedures.  The Debtors believe that the sale of the Purchased

Assets as a going concern will result in a higher price for those assets than a piecemeal

liquidation, will result in the assumption of material obligations of the Debtors and their estates,

and will provide a continuing business operation for the benefit of vendors, customers and

employees.  The Debtors further believe that its securing the Buyer as a "stalking horse" bidder

and Innovation's marketing of the Purchased Assets over the time period contemplated by the

Bidding Procedures and the holding of the Auction will result in the highest and best price for

the Purchased Assets.

52721/0001-10370409v1

## IV.    RELIEF REQUESTED AND BASIS THEREFOR

13.    The Debtors request that this Court, inter alia, (i) authorize the sale of the

Purchased Assets (the "**Sale**") to the Buyer pursuant to the APA or to another Successful Bidder

(as defined below) pursuant to a competing asset purchase agreement entered into with such

Successful Bidder in accordance with the Bidding Procedures, free and clear of all liens, claims,

encumbrances, and interests pursuant to Section 363(b), (f), (k), and (m), (ii) approve the

assumption and assignment of the Purchased Contracts pursuant to Section 365 of the

Bankruptcy Code, (iii) approve the APA as a stalking horse bid, the Bidding Procedures and the

form, manner and sufficiency of notice of the Sale, and (iv) grant such other and further relief as

set forth in the Sale Order

### A.    The Debtors Should Be Authorized to Sell their Assets Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code

14.    Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the

ordinary course of business and provides as follows:

> The trustee [or debtor-in-possession], after notice and a hearing,
> may use, sell, or lease, other than in the ordinary course of
> business, property of the estate.

11 U.S.C. § 363(b)(1).[2]

15.    Section 105(a) provides, in relevant part, that "[t]he court may issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).

16.    Although the Bankruptcy Code does not articulate the standard for approving a

sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for

---

[2] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary course of business to
be conducted privately or by public auction.  Fed. R. Bankr. P. 6004(f)(1).

the Third Circuit in the seminal case of <u>In re Abbotts Dairies of Pa., Inc.</u>, 788 F.2d 143, 149-50

(3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the

acquirer of a debtor's assets be a good faith purchaser.  The Third Circuit construed the "good

faith purchaser" standard to mean one who purchases "in good faith" and for "value."  <u>Abbotts</u>

<u>Dairies</u>, 788 F.2d at 147.

      17.     The Third Circuit in <u>Abbotts Dairies</u> then analogized the bona fides of a Section

363(b)(1) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

<u>Abbotts Dairies</u>, 788 F.2d at 147 (<u>quoting</u> In re <u>Rock Indus. Mach. Corp.</u>, 572 F.2d 1195, 1198

(7th Cir. 1978)).

      18.     Finally, the Court noted that '[t]raditionally, courts have held that "[f]air and

valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the

appraised value of the assets."  <u>Abbotts Dairies</u>, 788 F.2d at 149; <u>In re Karpe</u>, 84 B.R. 926, 933

(Bankr. M.D. Pa. 1988).

      19.     Respectfully, the sale of the Purchased Assets in accordance with the APA and

Bidding Procedures satisfies the <u>Abbotts Dairies</u> test.  First, the Debtors have fully disclosed and

requested the Court's approval of the Bidding Procedures and all the terms and conditions of the

Sale and proposed Auction (as defined below), and intend to provide comprehensive notice of

the Sale as discussed below.  <u>See</u> <u>In re Colony Hill Assoc.</u>, 111 F.3d 269 (2d Cir. 1997)

(determination of "good faith" is based on traditional equitable principles, including whether

there has been full disclosure to the Bankruptcy Court).  In addition, the Debtors retained

Innovation to market the Sale of the Purchased Assets post-petition.  Given the prospect of

securing a viable third-party bidder before the Filing Date, the Debtors negotiated with Suchman

for a commitment to buy the Purchased Assets pursuant to a credit bid.  After that commitment

was secured in principle, the APA was negotiated by the Debtors, their advisors, Suchman and

its advisors at arms' length, for several weeks, and the Debtors believe that the Purchase Price

and other consideration being provided under the APA such as, for example, the assumption of

the Assumed Liabilities, represent reasonably equivalent value and fair consideration for the

Purchased Assets.  Lastly, the Debtors are hopeful that as a result of their intended notice of the

Sale to all potentially interested parties identified by Innovation, interested purchasers will be

encouraged to submit bids, attend the Auction and generate a spirited bidding process.

      20.    In addition to the <u>Abbotts Dairies</u> requirements (which, respectfully, the Debtors

clearly satisfy), courts typically require a sound business purpose to sell assets outside of a plan

of reorganization.  <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983); <u>In re Del. & Hudson Ry.

Co.</u>, 124 B.R. 169, 175-76 (D. Del. 1991); <u>In re Titusville Country Club</u>, 128 B.R. 396, 399

(Bankr. W.D. Pa. 1991); <u>In re Sovereign Estates, Ltd.</u>, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989);

<u>In re Conroe Forge & Mfg. Corp.</u>, 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); <u>In re Indus.

Valley Refrigeration & Air Conditioning Supplies, Inc.</u>, 77 B.R. 15,21 (Bankr. E.D. Pa. 1987).

Courts consider the following non-exhaustive list of factors in determining whether a sound

business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable

notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the

amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be

proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future

plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the

property sold; and (h) whether the asset is decreasing or increasing in value.  Lionel Corp., 722

F.2d at 1071; Del. & Hudson Ry., 124 B.R. at 176; In re Weatherly Frozen Food Grp., Inc., 149

B.R. 480, 483 (Bankr. N.D. Ohio 1992).  A debtor's showing of sound business justification

need not be unduly exhaustive.  Rather, a debtor is "simply required to justify the proposed

disposition with sound business reason."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr.

S.D. Ohio 1984).

   21. Consideration of the above factors here unequivocally establishes that the Sale

should be approved.  As discussed above, the Debtors will solicit proposals for the purchase of

the Purchased Assets before the proposed bid deadline and, based on the Debtors' marketing

efforts, the Debtors will have, under the circumstances, amply marketed the Purchased Assets

before the proposed date of the Sale Hearing (as defined below).  The Debtors have proposed

Bidding Procedures designed to maximize the purchase price for the Purchased Assets.  Those

Bidding Procedures and the form and manner of notice of the Sale have been submitted for

approval to the Court and will ensure that any and all interested parties will receive adequate

notice of the Auction to allow for a competitive sale process.

   22. Absent the Sale, whether to the Buyer or another Successful Bidder, it is possible

that the Debtors might be forced to cease operations.  In such event, employees will lose their

jobs, businesses will lose the Debtors as a customer from which to generate revenue and the pre-

petition lenders, as creditors, might incur significantly greater losses if they had to liquidate their

collateral in a disorderly, piecemeal fashion.  To the contrary, the Sale affords the Debtors the

opportunity to stay in business, for significant liabilities to be assumed by the Buyer or otherwise

paid at or about the Closing and preserves jobs.

23.     Furthermore, the terms of the APA satisfy not only the business judgment test but also the higher scrutiny applied to insider transactions in Chapter 11 cases.  In light of the value attributable to the Buyer's proposal, the involvement of the recently hired independent Chief Restructuring Officer and the Debtors' advisors in the negotiation and documentation of the APA, and the terms of the APA itself, the Debtors submit the proposed sale to Suchman (an insider) satisfies this heightened scrutiny.  See, e.g., In re Summit Global Logistics, Inc., No. 08-11566, 2008 WL 819934, at *11-l2 (Bankr. D.N.J. Mar. 26, 2008) (approving sale of assets to insider affiliate where the selling debtors demonstrated transparent process led by independent director and reasonableness of consideration, among other factors); see also In re Crown Village Farm, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (where a debtor seeks to enter into a transaction with an insider (as defined under section 101(31) of the Bankruptcy Code), the transaction is subject to heightened scrutiny, as required by non-bankruptcy law); In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (holding that sales to insiders were "necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse").

24.     For all these reasons, the Debtors respectfully submit that the Sale of the Purchased Assets is supported by sound business reasons and is in the best interests of the Debtors and their estates.  Accordingly, the Debtors request approval of the Sale to the Buyer, or the Successful Bidder, pursuant to Section 363(b) of the Bankruptcy Code.

**B.      The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman**

25.     The Sale of the Purchased Assets will not necessitate the appointment of a consumer privacy ombudsman in accordance with Section 332 of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that:

> if the debtor in connection with offering a product or a service
> discloses to an individual a policy prohibiting the transfer of
> personally identifiable information about individuals to persons
> that are not affiliated with the debtor and if such policy is in effect
> on the date of the commencement of the case, then the trustee may
> not sell or lease personally identifiable information to any person
> unless . . . such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(1).

26.     Section 101(41A) defines "personally identifiable information" as an individual's name, residence address, email address, telephone number, social security number or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual." 11 U.S.C. § 101(41A).

27.     In the ordinary course of business, the Debtors advise their customers purchasing goods in their retail stores and on-line that their personal information will not be disclosed to third-party vendors outside of the Debtors.  The information collected from the customers includes "personally identifiable information" as that term is defined in Section 101(41A).

28.     The buyer of the Purchased Assets will serve as a successor-in-interest to the Debtors' privacy policy and utilize the "personally identifiable information" in exactly the same fashion as the Debtors.  Accordingly, this Court may authorize the proposed Sale without appointing a privacy ombudsman because the transfer of the "personally identifiable information" is consistent with the Debtors' privacy policy as provided in 11 U.S.C. § 363(b)(1).

**C.      The Debtors Should be Authorized to Sell their Assets Free and Clear of Liens, Claims and Interests Pursuant to Section 363(f) of the Bankruptcy Code**

29.     The Bankruptcy Code authorizes a debtor-in-possession to sell property of the estate under Section 363(b) free and clear of any interest or lien in such property if one of the following five criteria is met:

52721/0001-10370409v1

1.      applicable non-bankruptcy law permits sale of such
        property free and clear of such interest;

2.      such entity consents;

3.      such interest is a lien and the price at which such property
        is to be sold is greater than the aggregate value of all liens
        on such property;

4.      such interest is in bona fide dispute; or

5.      such entity could be compelled, in a legal or equitable
        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.     This statute authorizes the sale of assets "free and clear of any interest."  The term

"any interest," as used in Section 363(f), is not defined in the Bankruptcy Code.  The Third

Circuit Court of Appeals specifically addressed the scope of the term "any interest" in Folger

Adam Sec. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258 (3d Cir. 2000).  The Third Circuit

observed that while some courts have "narrowly interpreted that phrase to mean only in rem

interests in property," the trend in modern cases is towards a "broader interpretation which

includes other obligations that may flow from ownership of the property." Id. at 258.  In turn,

the Folger Adam Court cited with approval the Fourth Circuit's ruling in In re Leckie Smokeless

Coal Co., 99 F.3d 573, 58 1-82 (4th Cir. 1996) for the proposition that debtors "could sell their

assets under § 363(f) free and clear of successor liability that otherwise would have arisen under

federal statute." Folger Adam, 209 F.3d at 258.

31.     The Debtors submit that one or more of the conditions set forth in Section 363(f)

of the Bankruptcy Code will be satisfied with respect to the sale of the Purchased Assets.  In

particular, Section 363(f)(2) will be met in connection with the transactions proposed because the

Debtors expect that each of the parties holding liens, claims or encumbrances on the Purchased

Assets will consent, or absent any objection to this Motion, will be deemed to have consented to,

the Sale.

32.     Accordingly, the Debtors request that the Purchased Assets be sold and

transferred to the Buyer or the Successful Bidder free and clear of all Liens and Claims pursuant

to Section 363(f) of the Bankruptcy Code (other than Liens and Claims specifically assumed or

created by Buyer and Permitted Exceptions), including Liens and Claims of any Governmental

Body.

**D.     Suchman Should Be Allowed To Credit Bid The Full Value Of Its Pre-Petition and
DIP Secured Claims**

33.     Section 363(k) of the Bankruptcy Code states: "[a]t a sale under subsection (b) of

[Section 363] of property that is subject to a lien that secures an allowed claim, if the holder of

such claim purchases such property, such holder may offset such claim against the purchase

price of such property."  11 U.S.C. § 363(k).  Indeed, "[i]t is beyond peradventure that a secured

creditor is entitled to credit bid its allowed claim."  See In re Fisker Auto. Holdings, Inc., 2014

WL 210593, *4 (Bankr. D. Del. Jan. 17, 2014)[3] (citing Radlax Gateway Hotel, LLC v.

Amalgamated Bank, 132 S.Ct. 2065 (2012); In re Philadelphia Newspapers, LLC, 599 F.3d 298

(3d Cir. 2010)).  Where a secured creditors' claim is allowed, as is the case here, it is well settled

in the Third Circuit that secured creditors can bid up to the full face value of their secured claims

---

[3] In Fisker, Chief Judge Gross recently observed that the language in Section 363(k) that the Bankruptcy
Court may "for cause order[] otherwise" justified limiting a secured creditor's credit bidding rights to the amount it paid
for its secured claim.  See Fisker, 2014 WL 210593, *4.  In that case, and critical to the court's ruling, the
parties stipulated to the following facts (among others): "the assets offered for sale" would include "material assets
that are not subject to properly perfected liens in favor of [the proposed credit bidder] and … material assets where
there is a dispute as to whether [the proposed credit bidder] has a properly perfected lien, which dispute is not likely
subject to quick or easy resolution."  See Fisker, 2014 WL 210593, *3.  Here, however, the Buyer will credit bid the
amount of the debt under the DIP Financing on assets that constitute its collateral under the DIP financing.  Thus,
the concerns that the court in Fisker confronted simply do not apply here.  Suchman, whether as DIP lender or as
assignee of the Existing WF Facility, clearly has a lien on *all* of the assets it is acquiring under its credit bid and
there can be no reasonable dispute as to the validity of Suchman's liens and claims.

52721/0001-10370409v1

under Section 363(k).  In re Submicron Sys. Corp., 432 F.3d 448 (3d Cir. 2006); In re GWLS

Holdings, Inc., Slip Copy, 2009 WL 453110 (Bankr. D. Del. 2009).  This proposition is

supported by other district and bankruptcy courts.  See, e.g., In re SunCruz Casinos, LLC, 298

B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("[T]he plain language of [Section 363(k)] makes clear

that the secured creditor may credit bid its *entire claim*, including any unsecured deficiency

portion thereof." (emphasis in original)); In re Morgan House Gen. P'ship, Nos. 96-MC-l84 &

96-MC-185, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (holding that secured creditors may

bid "to the extent of [their] claim" under § 363(k)); In re Midway Invs., Ltd., 187 B.R. 382, 391

n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's

allowed claim, including the secured portion and any unsecured portion thereof" (citing

legislative history) (alteration in original) (internal quotation marks omitted)); In re Realty Invs.,

Ltd. V, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987) (same); see also Criimi Mae Servs. Ltd. P'ship

v. WDH Howell, LLC (In re WDH Howell, LLC), 298 B.R. 527, 532 n. 8 (Bankr. D.N.J. 2003).

34.    Further, a plain reading of Section 363(k) would permit a DIP lender that

maintains a lien on property securing its allowed claim to credit bid its debt to purchase property

subject to that lien.  There have been numerous orders entered in the lower courts in the Third

Circuit and outside the Third Circuit permitting DIP lenders to credit bid.  See, e.g., In re PTC

Alliance Corp., Case No. 09-13395 (CSS), 2010 WL 5054210, at * 1 (Bankr. D. Del. March 10,

2010), Bidding Procedures Order (authorizing, among other parties, the DIP lender to credit bid

the DIP credit facility pursuant to section 363(k)); In re Champion Enters., Inc., Case No. 09-

14019, 2010 WL 2723820, at *4 (Bankr. D. Del. March 2, 2010), Sale Order (finding that the

credit bid from the DIP lender constitutes a valid, effective and enforceable credit bid pursuant to

Sections 363(b), 363(k) and 363(n)); In re KLCG Prop., LLC, Case No. 09-14418, 2010 WL

52721/0001-10370409v1

5093146, at *17 (Bankr. D. Del. Jan. 28, 2010), Final DIP Order (holding that DIP Lender may

exercise its rights to credit bid its indebtedness under Section 363(k) of the Bankruptcy Code); In

re Delphi Corp., 2009 WL 2482146, at * 6 (Bankr. S.D.N.Y. July 30, 2009), Order Approving

Modifications to First Amended Plan (noting that at the auction of the debtor's assets, the DIP

agent on behalf of the DIP lenders made a credit bid for the debtor's assets, which was submitted

in conformity with Section 363(k) of the Bankruptcy Code, in an amount equal to 100% of the

principal and interest due and owing in respect of the DIP loan under the DIP credit agreement);

In re Chrysler LLC, Case No. 09-50002, 2009 WL 1360863, at * 10 (Bankr. S.D.N.Y. May. 4,

2009), Interim DIP Order (the DIP Lenders may credit bid the loans and the additional notes

under the DIP credit facility pursuant to Section 363(k) of the Bankruptcy Code).

35.      Accordingly, Suchman can bid any portion, or the full face value, of its secured

pre-petition loan and DIP loan claims under and to the fullest extent permitted by Section 363(k)

of the Bankruptcy Code.

**E.      Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of
Section 363(n) of the Bankruptcy Code**

36.      Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

37.      Section 363(n) of the Bankruptcy Code, among other things, provides that a

trustee may avoid a sale under such section if the sale price was controlled by an agreement

among potential bidders at the sale.  The Third Circuit in <u>Abbotts Dairies</u> noted the kind of

misconduct that would destroy a buyer's good faith.  <u>Abbotts Dairies</u>, 788 F.2d at 147.

38.     While Suchman is owned by Gerszberg, the APA represents a negotiated, arms'-

length transaction, in which the Buyer has acted in good faith, without collusion or fraud of any

kind.  The terms of the APA were primarily negotiated by Jeffrey L. Gregg, the Debtors' newly

hired, independent Chief Restructuring Officer, the Debtors' professionals and Suchman's

professionals.  Additionally, the Purchase Price is significantly higher than what the Debtors

believe they could recover in a liquidation (or in any sale where a purchaser did not have a

license to sell the Debtors' inventory).  Therefore, the Debtors respectfully request that the Court

find that the Buyer has purchased the Purchased Assets in good faith within the meaning of

Section 363(m) of the Bankruptcy Code, and is entitled to the protections of Sections 363(m) and

363(n) of the Bankruptcy Code as reflected in the Sale Order.  If a party other than the Buyer

emerges as the Successful Bidder, the Debtors intend to make the appropriate showing at the

Sale Hearing that such Successful Bidder satisfies the requirements of "good faith" and similarly

is entitled to relief under Sections 363(m) and 363(n).

**F.     The Debtors Should Be Authorized to Assume and Assign the Purchased Contracts
and Real Property Leases**

39.     Section 365 allows the debtor in possession to "maximize the value of the

debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate" and

by rejecting those that do not.  <u>Cinicola v. Scharffenberger</u>, 248 F.3d 110, 119 (3d Cir. 2001)

(quotations omitted).

40.     Under Section 1.1 of the APA and Schedule 1.1(c), the Debtors shall assume and

assign the Purchased Contracts to the Buyer on the Closing Date.  The Cure Amounts, as

determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all

19

actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts
assumed at Closing, shall be paid by Buyer, and the Debtors shall have no liability therefor.  See
APA, § 3.1.

      41.    In addition, under Section 2.6(c) of the APA, the Debtors agree that from the date
of the APA through the date that is one hundred and twenty (120) days after the Closing Date, or
such other date mutually agreed to by Buyer and the Debtors, provided, that in no event shall
such date exceed two hundred and ten (210) days after the Petition Date, the Debtors will
provide Buyer, at Buyer's expense, with the rights and benefits under the Real Property Leases
set forth on Schedule 2.6(c) of the APA.  In addition to the Purchase Price, Buyer shall promptly
pay the reasonable and actual incremental costs or administrative claims incurred by the Debtors
as a result of providing such rights and benefits to Buyer or due to the deferral of the decision to
reject such unexpired leases in order to provide such use or access.  See APA, § 2.6(c).  The
Debtors shall, upon the written request of Buyer, promptly make a motion in these cases to
assume and assign to Buyer any Real Property Lease listed on Schedule 2.6(c) and any such Real
Property Lease shall be deemed to be a Purchased Contract.  See id.  The Cure Amounts, as
determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all
actual or pecuniary losses that have resulted from any defaults under those Real Property Leases
set forth on Schedule 2.6(c) to be assumed and assigned to Buyer shall be paid by Buyer, and
Sellers shall have no liability therefor or thereafter.  See id.

      42.    Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume
any executory contract or unexpired lease, subject to Court approval.  11 U.S.C. § 365(a).  The
requirements for assumption of executory contracts and unexpired leases, if there has been a
default thereunder, are set forth in Section 365(b)(1):

52721/0001-10370409v1

(b)(1) If there has been a default in an executory contract or
unexpired lease of the debtor, the trustee [debtor-in-possession]
may not assume such contract or lease unless, at the time of
assumption of such contract or leases, the trustee -

(A)    cures, or provides adequate assurance that the trustee will
promptly cure, such default . . . .;

(B)    compensates, or provides adequate assurance that the
trustee will promptly compensate, a party other than the debtor to
such contract or lease, for any actual pecuniary loss to such party
resulting from such default; and

(C)    provides adequate assurance of future performance under
such contract or lease.

11 U.S.C. § 365(b).

43.    Section 365 further provides that a debtor-in-possession may assign an executory

contract or unexpired lease if: (i) it assumes the contract in accordance with the provisions of

Section 365(b) of the Bankruptcy Code; and (ii) adequate assurance of future performance by the

assignee is provided.  11 U.S.C. § 365(f)(2).  The Bankruptcy Code does not define the meaning

of "adequate assurance of future performance."  Courts have held that the words "adequate

assurance of future performance" must be given a "practical, pragmatic construction" in "light of

the proposed assumption."  In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (quoting Cinicola,

248 F.3d at 120 n. 10 (3d Cir. 2001)). See also Carlisle Homes, Inc. v. Arrari (In re Carlisle

Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R.

436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean

absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc.,

53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case,

the required assurance will fall considerably short of an absolute guarantee of performance.").

44.    Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  See In re Bygaph, Inc., 56 B.R. 596,605-06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of a lease from debtor has

financial resources and has expressed a willingness to devote sufficient funding to business in

order to give it strong likelihood of succeeding; chief determinant of adequate assurance is

whether rent will be paid).  See also In re Vitanza, Case No. No. 98-19611-DWS, 1998 WL

808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply whether it

appears that the rent will be paid and other lease obligations met.")

45.     In addition, where the premises are in a shopping center, a debtor assigning such

lease must meet the additional provisions set forth in Section 365(b)(3) of the Bankruptcy Code

to ensure that "[t]he essential terms of a debtor's lease in a shopping center [are] not . . . changed

in order to facilitate assignment." L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home

Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir.), cert. denied, 531 U.S. 873 (2000) (internal quotations

and citations omitted).  That Section provides that adequate assurance of future performance of a

shopping center lease includes adequate assurance:

> (A) of the source of rent and other consideration due under such
> lease, and in the case of an assignment, that the financial condition
> and operating performance of the proposed assignee and its
> guarantors, if any, shall be similar to the financial condition and
> operating performance of the debtor and its guarantors, if any, as
> of the time the debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline
> substantially;
>
> (C) that assumption or assignment of such lease is subject to all the
> provisions thereof, including (but not limited to) provisions such as
> a radius, location, use, or exclusivity provision, and will not breach
> any such provision contained in any other lease, financing
> agreement, or master agreement relating to such shopping center;
> and
>
> (D) that assumption or assignment of such lease will not disrupt
> any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

46.      Here, the assumption and assignment of the Purchased Contracts are a necessary

part of the APA, and the Debtors satisfy all the relevant requirements of Section 365 of the

Bankruptcy Code.  First, pursuant to Sections 2.6 and 3.1 of the APA, all cure amounts required

to be paid to the counterparties to the Purchased Contracts and Real Property Leases must be

paid by the Buyer.  As reflected in the Bidding Procedures Order, the counterparties to the

Purchased Contracts and Real Property Leases will have sufficient opportunity to review and

object to the Debtors' cure statement (the "**Cure Statement**"), which reflects the amounts the

Debtors believe are due and owing to the non-debtor parties as of the Filing Date and will be

filed with the Court and served on the counter-parties within two (2) weeks after entry of the

Bidding Procedures Order.  In the event any potential disputes to the updated Cure Statement

cannot be resolved consensually, the Debtors will request that the Court schedule a hearing to

adjudicate the dispute and will escrow sufficient funds to pay those amounts pending Court

Order.

47.      The Debtors also request approval of the proposed Notice to Counterparties to

Executory Contracts and Unexpired Leases That May Be Assumed and Assigned (the "**Notice of

Assumption and Assignment**") substantially in the form attached as **Exhibit B**.  The Notice of

Assumption and Assignment is intended to provide counterparties to the Purchased Contracts

with the Cure Statement for their applicable Purchased Contracts and simplified instructions of

how they need to proceed with respect to the proposed assumption and assignment of their

respective Purchased Contracts to Buyer or the Successful Bidder.

48.      The Buyer or Successful Bidder will demonstrate at the Sale Hearing adequate

assurance of future performance under the Purchased Contracts, including to the extent required

by Section 365(b)(3).  With respect to the Real Property Leases, likewise, after the Closing, upon

the written request of Buyer to promptly make a motion in these cases to assume and assign to

Buyer any Real Property Lease listed on Schedule 2.6(c), the Debtors will make the appropriate

adequate assurance of future performance showing consistent with Section 365(b)(3), as

applicable.

49.    Accordingly, given the requirements of Section 365 of the Bankruptcy Code are

satisfied, the Debtors should be authorized to assume and assign the Purchased Contracts to the

Buyer or Successful Bidder.

**G.    The Debtors Should Be Permitted to Modify the Use Provisions in the Real Property
Leases Upon Assumption and Assignment to Buyer**

50.    To assist in the sale of the Purchased Assets, the Debtors request that the Sale

Order provide that certain contractual anti-assignment provisions within the Real Property

Leases be modified to the extent necessary to ensure that the Buyer will be permitted to continue

to use the premises.  Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign

unexpired leases and contracts free from such anti-assignment restrictions.[4]  Specifically, §

365(f)(1) of the Bankruptcy Code provides, in relevant part, that:

> *[N]otwithstanding a provision in an . . . unexpired lease of the
> debtor*, or in applicable law, that *prohibits, restricts, or conditions*
> the assignment of such contract or lease, the trustee may assign
> such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1) (emphasis added).

---

[4] It is anticipated that certain landlords may assert that a 2005 amendment to the Bankruptcy Code that
specifically excluded Section 365(b) from the protection of Section 365(f) prohibit the Court from making *any*
modification to the use provisions set forth in the Real Property Leases.  As set forth below, the Debtors respectfully
submit that such a reading is too narrow and this Court still has authority notwithstanding the amendment to Section
365(f) to grant the relief requested by the Debtors.

52721/0001-10370409v1

51.     Section 365(f)(2) provides safeguards for landlords incident to the assumption and assignment of unexpired leases by requiring a debtor which assumes and assigns a lease to provide adequate assurance of future performance.

52.     On the other hand, Section 365(f) prohibits three distinct types of anti-assignment provisions and the law provides that: (1) provisions that "prohibit" the assignment of a lease are unenforceable; (2) provisions that "condition" the ability of a debtor to assume and assign a lease are stricken; and (3) provisions that seek to "restrict" the ability of a debtor to assume and assign unexpired leases are not given effect.  Indeed, Section 365(f)(1) is not limited to those lease provisions that expressly prohibit, restrict or condition assignments outright; rather, all clauses – including those which purport to limit the ability of a new tenant to modify an existing facility – that have the effect of prohibiting or hindering assignments are unenforceable.  In re Rickel Home Ctrs., Inc., 240 B.R. 826, 832 (D. Del. 1999), aff'd, L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir.), cert. denied, 531 U.S. 873 (2000) (to facilitate assignment, court will prohibit enforcement of lease provisions that prevent alterations necessary for the business operations of new tenants); In re Jamesway Corp., 201 B.R. 73, 77-78 (Bankr. S.D.N.Y. 1996) (recognizing "clear Congressional policy of assisting the debtor to realize the equity in all of its assets," and "Congressional policy favoring the assumption and assignment of unexpired leases as a means of assisting the debtor in its reorganization or liquidation efforts"); In re Brentano's Inc., 29 B.R. 881, 882 (Bankr. S.D.N.Y. 1983) (Code section 365 "express[es] a clear Congressional policy that potentially valuable assets inure to the benefit of a reorganizing debtor.")

53.     Landlords who seek to restrict a debtor's assignment rights by preserving in their underlying leases such anti-assignment provisions run counter to the plain language of § 365(f),

which provides that assignments may take place for the benefit of creditors.  As one

commentator aptly observed:

> Perhaps the most subtle area of section 365(f)(1) concerns clauses that do not categorically forbid assignment but are so restrictive that *de facto* they do forbid assignment to such an extent that the Code will not enforce them.  Such clauses are often called *de facto* anti-assignment clauses…  Courts have also gone to some length to construe a way around clauses that could have an anti-assignment effect.

Collen, Buying and Selling Real Estate in Bankruptcy, 27 Real Est. L.J. 10 (1997) 7.06[3].

54.    Thus, courts in this Circuit and others have recognized that contract provisions

that have the effect of restricting assignments cannot be enforced.  See In re Joshua Slocum Ltd.,

922 F.2d 1081, 1090 (3d Cir. 1990); Rickel Ctrs., 240 B.R. at 831-32 ("In interpreting Section

365(f), courts and commentators alike have construed the terms to not only render unenforceable

lease provisions which prohibit assignment outright, but also lease provisions that are so

restrictive that they constitute *de facto* anti assignment provisions."); Vornado Realty Trust v.

Bradlees Stores, Inc. (In re Bradlees Stores, Inc.), No. M47 (LMM) (S.D.N.Y. Feb. 9, 2001); In

re Bradlees Stores Inc., Case Nos. 00-16033, 00-16035, and 00-16036 (BRL) (Bankr. S.D.N.Y.

March 28, 2001); In re Boo.com N. Am., Inc., Case No. 00-15123 (JHG), 2000 Bankr. LEXIS

1559 (Bankr. S.D.N.Y. Dec. 15, 2000); Robb v. Schindler, 142 B.R. 589, 591 (D. Mass. 1992)

("Courts have consistently invalidated anti-assignment clauses . . . because such clauses restrict

the ability of the [debtor] to realize the full economic value upon assignment pursuant to §

365(f)(1)"); South Coast Plaza v. Standor Jewelers W., Inc. (In re Standor Jewelers W., Inc.),

129 B.R. 200, 203 (B.A.P. 9th Cir. 1991) ("Pursuant to § 365(f) of the Bankruptcy Code, a

provision which conditions or restricts the ability of a debtor to fully realize the economic value

of its lease upon assignment is invalid"); In re Howe, 78 B.R. 226, 229-30 (Bankr. D.S.D. 1987)

(the "essence of [section 365(f)(1)] is that all contractual provisions, not merely those entitled

'anti-assignment clauses,' are subject to the court's scrutiny regarding their anti-assignment effect") (citation omitted); In re U.L. Radio Corp., 19 B.R. 537, 543 (Bankr. S.D.N.Y. 1982) ("Any lease provision, not merely one entitled 'anti-assignment clause,' would be subject to the court's scrutiny regarding its anti-assignment effect"); see also Crow Winthrop Dev. Ltd. P'ship v. Jamboree LLC (In re Crow Winthrop Operating P'ship), 241 F.3d 1121 (9th Cir. 2001).

55.    Similarly, in In re Mr. Grocer, the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso-facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

In re Mr. Grocer, 77 B.R. 349, 354 (Bankr. D.N.H. 1987).

56.    As noted above, the district court affirmed the bankruptcy court in connection with an appeal in Bradlees, in which the district court expressly upheld the broad scope of § 365(f) of the Bankruptcy Code to invalidate provisions of a debtor's leases that have the effect of chilling the debtor's ability to assign its leases.  The district court stated that "[t]he practical effect of the [anti-assignment] provision of the [lease] agreement would not only limit the debtor's ability to realize the intrinsic value of the relevant leases, but would do so relatively severely and that would frustrate the Congressional policy of assisting the debtor in realizing the equity in all of its assets."  Vornado Realty Trust v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.), No. M47 (LMM) (S.D.N.Y. Feb. 9, 2001).

57.    In In re Peaches Records & Tapes, 51 B.R. 583, 590 (BAP 9th Cir. 1985), the landlord sought, among other things, to take back the lease from the tenant, arguing that the terms of the lease permitted the landlord to recapture the premises in the event the tenant ceased

to do business on the premises as the same entity.  The Bankruptcy Appellate Panel of the Ninth

Circuit denied the landlord the right to cancel the lease.  It ruled:

> "To the extent that [the cancellation provision] would go beyond
> merely precluding such a cessation of business and prevent [the
> debtor] from assigning its lease to another party, pursuant to a sale
> of its business, we believe that it would be unenforceable as a *de
> facto* nonassignment clause, under 11 U.S.C. § 365(f)."

Id. at 590.

58.     Similarly, in In re Paul Harris Stores, Inc., No. 91-2100-RLB-11, 1992 Bankr.

LEXIS 2418 (Bankr. S.D. Ind. Feb. 14, 1992), the court allowed the assignment of leases for

women's apparel stores to a maternity apparel store chain.  Id. at *18–19.  The court found that

lease provisions requiring the tenant to operate under the name "Paul Harris" were *de facto*

anti-assignment provisions and that other lease restrictions, including a provision restricting the

use to selling "women's apparel," would not be violated by the proposed assignment.  Id. at *23–

24, 29.  The court looked at testimony and the mall's own brochures to determine that maternity

apparel was women's apparel.  Id. at *10; but see In re Sun TV & Appliances, Inc., 234 B.R. 356

(Bankr. D. Del. 1999); In re Trak Auto Corp. v. W. Town Ctr., LLC, 367 F.3d 237 (4th Cir.

2004).

59.     Here, certain Real Property Leases have use restrictions in them that require MEE

Direct to sell only eckō unltd.  brand merchandise or operate a store under the eckō unltd. brand

name.  The Debtors submit those use restrictions should be tempered in the context of an

assumption and assignment to the Buyer so that the Buyer may sell merchandise in the future

under the brand name eckō unltd., unltd., and/or SlamXHype, as well as any logos and/or

derivative marks directly associated with any of the foregoing.

60.     The Debtors recognize that through the BAPCPA amendments, "Section 365(f)(1)

[was] amended to make sure that all of the provisions of Section 365(b) are adhered to and that

365(f) of the code does not override Section 365(b)."  Floor Statement of Senator Orrin Hatch,

151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005).  In explaining the change to

Section 365(f)(1), Senator Hatch stated:

> The bill helps clarify that an owner should be able to retain control
> over the mix of retail uses in a shopping center. When an owner
> enters into a use clause with a retail tenant forbidding assignments
> of the lease for a use different than that specified in the lease, that
> clause should be honored. Congress has so intended already, but
> bankruptcy judges have sometimes ignored the law.

151 Cong. Rec. S. 2459, 24.

61.    However, the legislative history to former Section 365 cautions: "use clauses are

not intended to prevent assignment of leases . . .  Any attempt to preclude assignment by drafting

a use clause which would apply only to the original tenant would be *de facto* prohibitions of

assignment, and, therefore, would be unenforceable under Section 365(f)(1)."  S. Rep. No. 70,

98th Cong. 1st Sess. 16 (1983) quoted in In re Vista VI, Inc., 35 Bankr. at 564, 568 (permitting

debtor to change name of store even though shopping center lease required it to operate under

particular name).  Indeed, when enacting the shopping center provisions, Congress affirmatively

contemplated certain latitude in the enforcement of otherwise valid lease provisions.  For

example, according to Senator Hatch, the 1984 amendments to Section 365(b)(3)(C) clearly were

"not intended to enforce requirements [that tenants] operate under a specified trade name." 130

Cong. Rec. S. 8891 (June 29, 1984) (statement of Sen. Hatch) (emphasis added), reprinted in

1984 U.S. Code Cong. & Admin. News 590, 600.  Thus, provision of adequate assurance of

future performance does not require an assignee's literal compliance with each and every term of

a shopping center lease enforceable and certainly not those that require the tenant "operate under

a specified trade name."  The necessary deviations in this instance are *de minimis* and not

material to this Court's examination of whether the assumption and assignment complies with

52721/0001-10370409v1

the requirements of Section 365(b)(3).  Thus, those provisions can and should be excised from

any lease in favor of the Buyer and nothing in the 2005 amendment changes that result.

62.    Moreover, assignment to the Buyer will not disrupt any of the applicable malls'

"tenant mix or balance."  Section 365(b)(3)(D) requires that assignment to the Buyer at each

shopping center subject to the Real Property Leases will not disrupt such shopping center's

"tenant mix or balance."  Section 365(b)(3)(D) is intended to prevent assignments which change

the entire nature of the tenant's business.  Examples mentioned in the congressional record

include shifts from a men's wear to women's wear store, or from a grocery to a toy store.

S. Rep. No. 70, 98th Cong. 1st Sess. 16 (1983).

63.    The basic tenant mix and competitive structure of each of the shopping centers

subject to the Real Property Leases will not be affected by the assignment to the Buyer.  Here,

the Buyer will continue to operate an apparel store geared at the same youth culture customer as

the Debtors, albeit shifting in the future away from the "Ecko Unltd." and "Unltd." brands (as

those licenses expire), but continuing with the same product line and market demographic as

currently exists.  Even if the assignment to the Buyer and operating under a different trade name

in the future somehow could be construed as a different "use," mere changes in or effects upon

tenant mix that do not rise to the level of a "disruption" will not bar a proposed assignment under

Section 365(b)(3).  Paul Harris, 1992 Bankr. LEXIS 2418, *27.  There is not a stated or implied

requirement under Section 365(b)(3)(D), in other words, that a proposed assignee be the perfect

or "best replacement," from the landlord's perspective, for the former tenant.  Instead, the

Bankruptcy Code requires only that the tenant mix not be "disrupted."  Id.

30

64.     The assignment to the Buyer will not disrupt the "tenant mix or balance" at any of the malls at which the Debtors operate.  Accordingly, the Purchaser has demonstrated compliance with Section 365(b)(3)(D)'s "tenant mix and balance" requirement.

65.     Any argument that a use provision based solely on continuing under that existing trade name must be enforced would deprive the Debtors from the opportunity to "maximize the value of the debtor's estate" by assuming executory contracts or unexpired leases that "benefit the estate," see Cinicola, 248 F.3d at 119, and run expressly counter to the provisions that even Senator Hatch indicated could not be enforced.  See also Paul Harris, 1992 Bankr. LEXIS 2418, *23-24 (in reviewing what it deemed "inconsequential use restrictions" that required the tenant to (i) operate under the Pasta trade name, and (ii) operate under the Paul Harris trade name, court found that "[t]hese so-called 'use restrictions' actually are thinly veiled 'anti-assignment' clauses which are intended to circumvent the assignability provisions of the Bankruptcy Code.  These very narrow use clauses, if enforced, would directly bar the Debtor from assigning the Leases to any entity) (emphasis in original).

66.     By refusing to enforce these so-called "use" provisions of non-material import, the assignment to the Buyer will by no means upset "the very essence of the contract, i.e., the bargained for exchange."  See Joshua Slocum, 922 F.2d at 1092.  Indeed, and despite the strict statutory scheme relating to the assignment of these shopping center leases, the quality and nature of apparel sold by the assignee of the MEE Direct retail leases (whether under the "unltd.," "SlamXHype" or other brand) will not be materially different than the eckō unltd. brand and could not be reasonably argued to upset the tenant "mix" within a mall or otherwise materially deprive a landlord of the benefit of its bargain.  In addition, the Debtors and Buyer will be able to satisfy the other Section 365(b)(3) elements.  Accordingly, the case law permits

the bankruptcy court to approve the assignment of the retail leases with the applicable *de facto* anti-assignment provisions excised therefrom.

67.    Granting such relief is wholly consistent with relief granted by other courts after the 2005 amendments, including those within this District and Circuit.  See, e.g., 155 Route 10 Assocs., Inc., Case No. 12-24414 (NLW) (Bankr. D.N.J. July 20, 2012) [Docket No. 261] (excising several "Anti-Assignment Provisions"); In re TSIC, Inc. f/k/a Sharper Image Corp., Case No. 08-10322 (KG), (Bankr. D. Del. July 29, 2008) [Docket No. 1078] (authorizing the assumption and assignment of Sharper Image store leases to American Apparel for its "Proposed Use" which was defined to include "for fashion retail, including but not limited to, the sale of women's and men's apparel (of all ages), dog apparel, accessories, gifts and related items (such as bedding, home furnishings, wall décor, books, and magazines) despite provisions in leases that limited the use of premises to the sale of gift items); In re Blockbuster Inc., et al., Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. April 14, 2011) [Docket No. 1602] (declaring provisions prohibiting or conditioning assignment as void and of no force and effect).

**H.    The Bidding Procedures Are Reasonable and Appropriate**

68.    The Debtors propose and respectfully request approval of the Bidding Procedures attached as **Exhibit C** to govern the Auction and proposed Sale of the Purchased Assets.

69.    In addition, the Debtors respectfully request that the Court schedule a hearing to confirm the results of the Auction, if any, and to approve the Sale (the "**Sale Hearing**") no later than two (2) days after the date of the Auction.  As set forth above, the Debtors retained Innovation to market the Assets.  The Debtors firmly believe that Innovation's efforts to sell the Purchased Assets will have been maximized and, therefore, any delay in the date of the Auction or the Sale Hearing will serve no meaningful purpose.  To the contrary, such delay will only

32

cause the further decline in value of the Purchased Assets to the detriment of the Debtors, their

creditors and estates.

## I.    The Expense Reimbursement Should Be Approved

70.    Approval of the Expense Reimbursement is governed by general administrative

expense jurisprudence under Section 503(b) of the Bankruptcy Code.  In re Reliant Energy

Channelview LP, 594 F.3d 200, 206 (3d Cir. 2009); Calpine Corp. v. O'Brien Envtl. Energy, Inc.

(In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999).  In O'Brien, the Third

Circuit concluded that the determination as to whether to approve break-up fees or expense

reimbursements "depends upon the requesting party's ability to show that the fees [or expenses]

were actually necessary to preserve the value of the estate."  O'Brien, 181 F.3d at 535.

71.    The O'Brien court identified at least two instances in which bidding incentives

may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee

promoted more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited."  Id. at 537.  Second, where the

availability of bidding incentives induce a bidder to research the value of the debtor and submit a

bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have

provided a benefit to the estate by increasing the likelihood that the price at which the debtor is

sold will reflect its true worth."  Id.

72.    Here, the Expense Reimbursement and Overbid Protection (each as defined in the

APA) should be approved because they will provide a clear benefit to the Debtors' estates.  The

Expense Reimbursement is a necessary prerequisite to the Debtors securing the stalking horse

APA that will further secure an adequate "floor" for the solicitation of higher or otherwise better

bids.  Thus, the Debtors' ability to offer the Expense Reimbursement enables them to ensure the

sale of substantially all of the Assets to a contractually-committed bidder at a price they believe

33

to be fair while, at the same time, providing them with the potential of even greater benefit to their estates.

73.    The amounts of the Expense Reimbursement and Overbid Protection are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Buyer.  Moreover, should the Debtors determine that providing an Expense Reimbursement is necessary, only documented, reasonable costs and expenses will be reimbursed.

74.    Finally, payment of the Expense Reimbursement will not diminish the Debtors' estate.  The Debtors do not intend to terminate the APA if to do so would incur an obligation to pay the Expense Reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by the Buyer by an amount sufficient to pay the Expense Reimbursement. Therefore, even if the Buyer is ultimately determined not to be the Successful Bidder, the Debtors will still have benefited from the higher price established by the improved bid and thereby increase the likelihood that the price at which the Purchased Assets are sold reflects their true value.

75.    The Debtors submit that the Expense Reimbursement and Overbid Protection will not chill bidding on the Purchased Assets and will clearly benefit the Debtors' estates. Accordingly, the Debtors request that the Court approve and authorize the Expense Reimbursement and Overbid Protection.

**J.**    **The Notice Provisions and Procedures Are Reasonable and Appropriate**

76.    Pursuant to Fed. R. Bankr. P. 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the proposed sale, and the deadline for filing objections.

77.     The Debtors submit that the notice procedures described above fully comply with Fed. R. Bankr. P. 2002 and are reasonably calculated to provide timely and adequate notice of the proposed sale of the Assets, the Bidding Procedures, the Auction, the Cure Amount, and the Sale Approval Hearing to the Debtors' creditors and all other parities-in-interest that are entitled to notice, as well all those parties that have expressed a *bona fide* interest in acquiring the Purchased Assets.

78.     Based upon the foregoing, the Debtors respectfully request that the Court approve the notice procedure proposed above, including the form and manner of service of the Sale Notice attached as **Exhibit D**.

## K.     Relief Under Bankruptcy Rule 6004(h) and 6006(d)

79.     Pursuant to Fed. R. Bankr. P. 6004(h), unless the Court orders otherwise, all orders authorizing the sale of the assets pursuant to Section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  Additionally, Fed. R. Bankr. P. 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

80.     The purpose of Fed. R. Bankr. P. 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Fed. R. Bankr. P. 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIER ON BANKRUPTCY, ¶ 6004.10

at 6004-18 (L. King., 15th rev. ed. 2008).  The treatise further provides that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

81.    As described above, time is clearly of the essence in connection with the Debtors' sale process.  The Debtors' post-petition financing envisions a swift, but thorough marketing and sale of the Assets.  The Debtors lack the working capital or access to further financing to rehabilitate their operations.  Therefore, to maximize the value received for the Purchased Assets and minimize accruing liabilities, the Debtors seek to consummate the sale of the Purchased Assets to the Successful Bidder as soon as possible following the Sale Approval Hearing.

82.    Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Fed. R. Bankr. P. 6004(h) and 6006(d) or, in the alternative, if an objection to the proposed sale of the Purchased Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## V.    NOTICE

83.    Notice of this Motion is being provided to (i) the United States Trustee, (ii) the holders of the twenty largest unsecured claims against each of the Debtors, (iii) any entity known or reasonably believed to have asserted a security interest in or lien against any of the Debtors' assets, (iv) counsel to the DIP lender, (v) all counterparties to executory contracts and the unexpired leases, (vi) any entity that has expressed a *bona fide* interest in acquiring the Debtors' assets, (vii) the Securities and Exchange Commission, (viii) the Internal Revenue Service, (ix) the United States Department of Justice and (x) all parties having filed requests for notices in these Chapter 11 cases.

84.    Due to the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

## VI.    <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court grant the Motion by

entering the Bidding Procedures Order and Sale Order, and such other relief as the Court deems

just and appropriate under the circumstances.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Proposed Attorneys for MEE Apparel LLC and
MEE Direct LLC, Debtors-in-Possession

By:____*/s/ Michael D. Sirota*_____
       Michael D. Sirota, Esq.
       David M. Bass, Esq.
       Felice R. Yudkin, Esq.

DATED:  April 2, 2014

## <u>VERIFICATION</u>

JEFFREY L. GREGG, of full age, certifies as follows:

1.      I am the Chief Restructuring Officer f MEE Apparel LLC and MEE Direct LLC,

the within debtors and debtors-in-possession (the "**Debtors**").  As such, I have full knowledge of

the facts set forth in and am duly authorized to make this Verified Application on the Debtors'

behalf.

2.      I have read the foregoing Verified Application and certify that the statements

contained therein are true based upon my personal knowledge, information and belief.

3.      I am aware that if any of the factual statements contained in the Verified

Application are willfully false, I am subject to punishment.


DATED:  April 2, 2014

                                        _____*/s/ Jeffrey L. Gregg*_____
                                                JEFFREY L. GREGG