**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-2(c)**
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
Michael D. Sirota
David M. Bass
Felice R. Yudkin
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for Debtors-In-Possession

In re:

MEE APPAREL LLC,

      Debtor-in-Possession.

In re:

MEE DIRECT LLC,

      Debtor-in-Possession.

Case No. 14-16484 (CMG)
Judge:

Chapter 11
(Jointly Administered)

**INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING FINAL HEARING**

The relief set forth on the following pages, numbered two (2) through fifty-nine (59), is hereby **ORDERED**.

52721/0001-10400241v8

PAGE 2
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

THIS MATTER having been opened to the Court by MEE Apparel LLC and MEE Direct LLC, the within debtors and debtors-in-possession that are Borrowers and Guarantors (as such terms are defined below, collectively, the "Debtors"), by and through their proposed counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., upon motion (the "Motion") for entry of an interim order (the "Interim Order") and a final order (the "Final Order"):

(1)     authorizing the Debtors to obtain priming subordinated senior secured super-priority postpetition extensions of credit in an aggregate principal amount not to exceed $7 million (the "DIP Financing"), pursuant to this Interim Order and that certain Financing Agreement substantially in the form attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented, or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement" and together with any related documents and instruments delivered pursuant to or in connection therewith including, without limitation, documents as may be necessary or required to evidence the Debtors' obligations to the DIP Lender, to consummate the terms and provisions of the Motion and this Interim Order and to evidence perfection of the Liens (as defined in the Motion), the "DIP Loan Documents") by and among the Debtors and Suchman, LLC (the "DIP Lender");

(2)     authorizing the Debtors to execute and enter into the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)     authorizing the Debtors' use of Cash Collateral (as defined below), on the terms and conditions set forth in this Interim Order;

PAGE 3
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
             POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
             CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
             CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
             FINAL HEARING

(4)     granting, to the DIP Lender, certain security interests, liens and super-

priority claims pursuant to Section 364 of title 11 of the United States Code, 11 U.S.C. § 101, et

seq. (the "Bankruptcy Code");

(5)     validating the Existing Factoring Agreements, the Existing Factoring

Facility, and Existing WF Credit Facility (each as defined in the Motion) as valid, binding and

properly perfected obligations of the Debtors, enforceable against the Debtors in accordance with

their terms;

(6)     granting adequate protection;

(7)     modifying the automatic stay; and

(8)     setting a final hearing to be held before this Court to consider entry of a

Final Order authorizing and approving (a) the DIP Loan Documents on a final basis, (b) the Cash

Collateral use by the Debtors on a final basis, and (c) authorizing and approving the other relief

requested in the Motion to become effective pursuant to the Final Order; and

The Court having considered the Motion, the exhibits attached thereto including, without

limitation, the DIP Credit Agreement, and the arguments of counsel, together with all

declarations, exhibits and other evidence submitted at the hearing on this Interim Order (the

"Interim Hearing"); and in accordance with Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and the local rules of the Court (the "Local

Rules"), due and proper notice of the Motion and the Interim Hearing having been given; and it

appearing that upon all of the pleadings filed with this Court, and evidence submitted prior to and

in connection with the Interim Hearing it appearing that approval of the interim relief requested in

the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending a final

PAGE 4
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their

creditors, their estates, and is essential for the continued operation of the Debtors' businesses; and

all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or

overruled by this Court; and after due deliberation and consideration, and for good and sufficient

cause appearing therefor,

THE COURT HEREBY FINDS AS A MATTER OF FACT AND CONCLUDES AS A

MATTER OF LAW:

A.      Chapter 11 Petitions.  On April 2, 2014 (the "Petition Date"), each of the

Debtors filed with this Court a voluntary petition (each, a "Petition," and collectively, the

"Petitions") for relief under Chapter 11 of the Bankruptcy Code. The Debtors are operating their

businesses and managing their properties as debtors-in-possession pursuant to Sections 1107(a)

and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or

examiner. At the time of entry of this Interim Order a statutory committee of unsecured creditors

(the "Committee") was not appointed.

B.      Jurisdiction; Venue.  This Court has jurisdiction over the above captioned

cases (the "Chapter 11 Cases") and the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The

statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, 364 and 507 of

the Bankruptcy Code and Bankruptcy Rule 4001(b).  Venue of the Chapter 11 Cases and the

Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

PAGE 5
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

C.      <u>Priority of Existing Factoring Facility</u>.  The DIP Financing shall be junior

to the first priority lien of the Existing Factor (as defined in the Motion) under the Existing

Factoring Agreements and the Existing Factoring Facility but senior to the Prepetition Date liens

of Suchman, LLC as the successor to the Existing WF Facility Agent and the Existing WF

Facility Lenders under the Existing WF Credit Facility.

D.      <u>DIP Lender's Willingness to Extend Interim DIP Financing and Permit Use</u>
<u>of Cash Collateral</u>.  The Court has been advised that the DIP Lender is willing to advance the DIP

Financing in the form of a revolving loan (the "Postpetition Loan") to the Debtors and to permit

the Debtors to use Cash Collateral, in each case pursuant to the Initial Approved DIP Budget (as

defined below) from the date of this Interim Order through the earlier of the Termination Date (as

defined below) or entry of the Final Order (the "Interim Financing Period"), all as more fully set

forth in the DIP Credit Agreement and other DIP Loan Documents.  All capitalized terms used

herein without definition shall have the respective meanings given such terms in the DIP Credit

Agreement unless otherwise specified herein. It is a condition to the DIP Lender's willingness to

make the Postpetition Loan and to permit use of its Cash Collateral that this Interim Order shall

have been entered and that the Debtors and the DIP Lender shall have executed and delivered the

DIP Credit Agreement and the other DIP Loan Documents.

E.      <u>DIP Financing and Use of Cash Collateral Beyond the Interim Financing</u>
<u>Period</u>.  The DIP Lender has agreed to provide continued DIP Financing to, and permit the use of

its Cash Collateral by, the Debtors subsequent to the Interim Financing Period conditioned upon

PAGE 6
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.  14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
           POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
           CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
           CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
           FINAL HEARING

the entry of a Final Order authorizing continued extensions of credit to and borrowing and use of

its Cash Collateral by the Debtors on terms substantively consistent with this Interim Order and

otherwise in form and substance acceptable to the DIP Lender, including, without limitation, the

terms that are referenced herein as being contemplated by the parties to be included in such Final

Order.

       F.    <u>Budget for DIP Financing and Cash Collateral Use</u>.  Attached hereto as

**Exhibit B** is a rolling budget setting forth all projected cash receipts and cash disbursements (by

line item) on a weekly basis for the time period from the Petition Date through and including the

week ended May 17, 2014 (collectively, the "Initial Approved DIP Budget").  The Initial

Approved DIP Budget may be modified or supplemented from time to time by additional budgets

(covering any time period covered by a prior budget or covering additional time periods) prepared

by the Debtors and approved by the DIP Lender and the Existing Factor, without subsequent

order of the Court (each such additional budget, a "Supplemental Approved DIP Budget").  The

Debtors shall promptly provide a copy of any Supplemental Approved DIP Budget to counsel for

the statutory committee of unsecured creditors, if one is appointed, and the Office of the U.S.

Trustee and shall file a copy of any such Supplemental Approved DIP Budget.  The Initial

Approved DIP Budget and any and all Supplemental Approved DIP Budgets, without duplication,

shall constitute an "Approved DIP Budget."  The Initial Approved DIP Budget is an integral part

of this Interim Order and has been relied upon by the DIP Lender and Existing Factor in deciding

to agree to this Interim Order and to provide the DIP Financing and to permit the use of Cash

PAGE 7
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

Collateral.  The terms "business week," "week," "weekly period" and phrases to similar effect

mean each weekly period ending on a Saturday.

G.    Prepetition Indebtedness.  Without prejudice to the rights of any other

party, but subject to the time limitations specified below in paragraph 20 of this Interim Order, the

Debtors stipulate, and the Court finds based on the Debtors' stipulation, that as of the Petition

Date:

(1)    The Debtors are parties to the Existing Factoring Agreements, the Existing

Factoring Facility, and the Existing WF Credit Facility (the "Prepetition Credit Agreements" and

together with all other agreements, and documents relating thereto and executed prior to the

Petition Date (in each case, as amended, restated, supplemented or otherwise modified from time

to time) collectively, the "Prepetition Loan Documents").

(2)    The borrowings and extensions of credit under the Prepetition Credit

Agreements were used for working capital and general corporate purposes.

(3)    Each of the Debtors is a Borrower under the Prepetition Credit

Agreements.

(4)    The Debtors granted to and/or for the benefit of the Existing Factor first

priority and continuing Liens on the Existing Factor Collateral (as defined in the Motion),

including, for the avoidance of doubt, substantially all of the personal property of each of the

PAGE 8
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

Debtors.[1]  As of the Petition Date, the principal amount of indebtedness owed under the Existing

Factoring Agreement to the Existing Factor by the Debtors, exclusive of accrued but unpaid

interest, costs, fees and expenses, is approximately $6 million.  Without prejudice to the rights of

any other party, but subject to the time limitations specified below in paragraph 20 of this Interim

Order, the Debtors acknowledge and agree that the Liens and claims of the Existing Factor under

the Existing Factoring Agreements and the Existing Factoring Facility and any related agreements

and obligations, including the Debtors' obligation to reimburse the Existing Factor for its

reasonable professional fees herein (collectively, the "Existing Factor Lien Claims") are valid and

binding agreements and obligations of the Debtors, and the Debtors acknowledge and agree that

the Liens held by the Existing Factor constitute valid, binding, enforceable and perfected first-

priority Liens, and that such priority is not modified by this Order.  Without prejudice to the rights

of any other party, but subject to the time limitations specified in paragraph 20 of this Interim

Order, the Debtors further acknowledge and agree that (i) the Existing Factor Lien Claims and all

claims of the Existing Factor related thereto constitutes the legal, valid and binding obligation of

the Debtors, enforceable in accordance with its terms, (ii) no objection, offset, defense or

counterclaim of any kind or nature to the Existing Factor Lien Claims exists, and (iii) the Existing

Factor Lien Claims, and any amounts previously paid to the Existing Factor or the Existing WF

---

[1] The Existing Factor, in addition to its security interests, also owns certain of the receivables created by the Debtors under the terms of the Existing Factor Agreements.  Nothing herein, including the Existing Factor's consent to the characterization or use of such property as "collateral" or "cash collateral" shall in any way affect, alter, or impair the Existing Factor's ownership rights, and no inferences shall be drawn with respect thereto, provided however that the liens being granted hereunder for the use of the proceeds of said receivables shall be in full force and effect regardless of whether said proceeds constitute Cash Collateral or of property owned by the Existing Factor.

PAGE 9
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

Facility Agent or the Existing WF Facility Lenders are not subject to avoidance, reduction,

disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-

bankruptcy law.

      (5)     The Debtors granted to and/or for the benefit of the Existing WF Facility

Lender and the Existing WF Facility Agent priority and continuing Liens on the Existing WF

Collateral (as defined in the Motion), including, for the avoidance of doubt, substantially all of the

personal property of each of the Debtors, and such Liens were, prior to the Petition Date (i)

subordinated to the Liens of the Existing Factor under the Existing Factoring Agreements and the

Existing Factoring Facility, and (ii) assigned to the DIP Lender.  As of the Petition Date, the

principal amount of the Existing WF Credit Facility owed to Suchman, LLC as the successor to

the Existing WF Facility Agent and the Existing WF Facility Lenders under the Existing WF

Credit Facility by the Debtors, exclusive of accrued but unpaid interest, costs, fees and expenses,

is approximately $19.26 million.

      H.    Validity of Existing WF Credit Facility Obligations and Prepetition Credit

Facility Liens.  Without prejudice to the rights of any other party, but subject to the time

limitations specified below in paragraph 20 of this Interim Order, the Debtors acknowledge and

agree that the Existing WF Credit Facility and its related agreements and obligations are valid and

binding agreements and obligations of the Debtors, and the Debtors acknowledge and agree that

the Liens granted under the Existing WF Credit Facility constitute valid, binding, enforceable and

perfected Liens, with the respective priorities set forth above in paragraph G, as such have been

PAGE 10
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

modified by this Interim Order.  Without prejudice to the rights of any other party, but subject to

the time limitations specified in paragraph 20 of this Interim Order, the Debtors further

acknowledge and agree that (i) the Existing WF Credit Facility constitutes the legal, valid and

binding obligation of the Debtors, enforceable in accordance with its terms, (ii) no objection,

offset, defense or counterclaim of any kind or nature to the Existing WF Credit Facility exists,

and (iii) the Existing WF Credit Facility, and any amounts previously paid to the Existing Factor

or the Existing WF Facility Agent or the Existing WF Facility Lenders (or their successors and

assigns, including the DIP Lender) on account of the Existing WF Credit Facility, are not subject

to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy

Code or applicable non-bankruptcy law.

      I.     <u>Cash Collateral</u>.  For purposes of this Interim Order, "Cash Collateral"

shall mean and consist of all of the respective property of the Debtors that constitutes cash

collateral in which either of the Prepetition Lenders (as defined in the Motion) has an interest as

provided in Section 363(a) of the Bankruptcy Code.  All cash and cash equivalents currently in an

account of any Debtor or otherwise in the possession or control of any Debtor constitute proceeds

of Cash Collateral and DIP Collateral, subject to the liens of the Existing Factor and Suchman,

LLC as the successor to the Existing WF Facility Agent and the Existing WF Facility Lenders

under the Existing WF Credit Facility.

      J.     <u>DIP Financing</u>.  The Debtors have requested that, pursuant to the terms of

the DIP Loan Documents, the DIP Lender make loans and advances and provide other financial

PAGE 11
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

accommodations to the Debtors and consent to the use of its Cash Collateral, to be used by the

Debtors solely in accordance with the terms of the DIP Loan Documents.  As a condition to the

DIP Lender's agreement to enter into the DIP Credit Agreement subordinated to the Existing

Factoring Agreements and the Existing Factoring Facility, Suchman, LLC (as the successor to the

Existing WF Facility Agent and the Existing WF Facility Lenders) has agreed to subordinate the

Existing WF Credit Facility to the DIP Credit Agreement; provided, however, that as a condition

to such subordination and priming, Suchman, LLC as the successor to the Existing WF Facility

Agent and the Existing WF Facility Lenders under the Existing WF Credit Facility, requires that

the Existing WF Credit Facility be assumed and affirmed by the Debtors and shall continue and

remain outstanding as obligations of the Debtors as if such Existing WF Credit Facility had been

requested under and issued after the Petition Date (and all such obligations shall constitute

Postpetition Obligations under this Interim Order).

      K.     No Alternative Sources of Financing.  The Debtors have been unable to

obtain alternative sources of cash or credit either in the form of (i) unsecured credit allowable as

an administrative expense under Section 503(b)(1) of the Bankruptcy Code, (ii) unsecured credit

allowable under Sections 364(a) and 364(b) of the Bankruptcy Code, (iii) unsecured credit

allowable solely as a superpriority administrative expense under Section 364(c)(1) of the

Bankruptcy Code, or (iv) secured credit allowable pursuant to Sections 364(c)(2), (c)(3) and/or

(d)(1) of the Bankruptcy Code on terms and conditions more favorable to the estates created by

the filing of the Petitions (collectively, the "Estates") than those set forth in the DIP Loan

PAGE 12
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

Documents and this Interim Order. Under the circumstances, no other source of financing or

financial accommodations exists on terms more favorable than those offered by the DIP Lender.

Suchman, LLC as the successor to the Existing WF Facility Agent and the Existing WF Facility

Lenders under the Existing WF Credit Facility, and holder of a senior, secured priority Lien

(subject only to the Liens of the Existing Factor) is not willing to subordinate to the lien of any

other party.

L.    Collateral.  The DIP Credit Agreement contemplates that all advances and

extensions of credit under the DIP Credit Agreement and the other DIP Loan Documents shall

constitute one general obligation of the Debtors secured, until the Termination Date, by a first

priority Lien, senior to all other Liens, on all of the DIP Collateral (as defined below) (the

"Postpetition Liens") except for the Lien of the Existing Factor granted under the Existing

Factoring Agreements and with the understanding that the Postpetition Liens are intended to

prime all other Liens.

M.    Good Faith; Best Interests; Reasonably Equivalent Value.   The DIP

Lender in each of its capacities as the DIP Lender and as successor to the Existing WF Credit

Facility has acted in good faith in, as applicable, agreeing to extend credit and other financial

accommodations to, and permit the use of Cash Collateral by, the Debtors in accordance with the

DIP Loan Documents and this Interim Order.  The agreements and arrangements authorized in

this Interim Order have been negotiated at arms' length among the Debtors, the DIP Lender and

the Existing Factor, with all parties represented by experienced counsel, are fair and reasonable

PAGE 13
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

under the circumstances, are enforceable in accordance with their terms and have been entered

into in good faith.  Any credit extended and loans made by the DIP Lender to the Debtors, as well

as Cash Collateral used by the Debtors, pursuant to this Interim Order and/or the DIP Loan

Documents shall be deemed to have been extended in good faith, as that term is used in Section

364(e) of the Bankruptcy Code, and the DIP Lender is each entitled to the benefits of that

Section. The terms of the DIP Credit Agreement and other DIP Loan Documents, and this

Interim Order, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment

consistent with their fiduciary duties, and constitute reasonably equivalent value and fair

consideration. After considering all of their alternatives, the Debtors have concluded, in an

exercise of their business judgment, that the DIP Financing to be provided by the DIP Lender

pursuant to the terms of the DIP Loan Document and this Interim Order and the provisions

herein governing the Debtors' use of Cash Collateral represent the best financing presently

available to the Debtors.

N.     <u>Good Cause Shown; Exigency</u>.  Good, adequate and sufficient cause has

been shown for the entry of this Interim Order. An immediate and critical need exists for the

Debtors to borrow funds and/or obtain other extensions of credit and financial accommodations

pursuant to the DIP Loan Documents in order to continue the operation of their businesses. The

Debtors do not have sufficient available sources of working capital or financing to carry on the

operation of their businesses without access to the DIP Financing provided by the DIP Credit

Agreement and permission to use Cash Collateral. The ability of the Debtors to maintain business

PAGE 14
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.     14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
              POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
              CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
              CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
              FINAL HEARING

relationship with their vendors and suppliers so that they may be able to obtain services and

supplies and otherwise finance their business operations is essential to the Debtors continued

viability and ability to structure their business operations. Without the DIP Financing and the

right to use Cash Collateral, the Debtors' operations would be discontinued or severely disrupted,

and the Debtors would be unable to pay operating expenses, including expenses for necessary

inventory and payroll, and to operate their businesses in an orderly manner, thereby severely

impairing their ability to reorganize. Accordingly, the Debtors and their Estates will suffer

immediate and irreparable harm unless the Debtors are immediately authorized to obtain DIP

Financing and use Cash Collateral on an interim basis, subject to the terms and conditions set

forth in this Interim Order. Consequently, the relief requested in the Motion (i) is necessary,

essential and appropriate for the continued operation of the Debtors' businesses and the

management and preservation of their assets and properties, (ii) is in the best interests of the

Debtors, their Estates and creditors, and (iii) will facilitate the Chapter 11 Cases by providing the

parties and this Court with an opportunity to consider reorganization alternatives.

        O.     <u>No Liability to Third Parties</u>.  The Debtors stipulate and the Court finds

that in making decisions to advance loans and extend credit to the Debtors, in administering any

loans or extensions of credit, in permitting the Debtors to use Cash Collateral, in accepting the

Initial Approved DIP Budget or any future Supplemental Approved DIP Budget or in taking any

other actions permitted by this Interim Order or the DIP Loan Documents, neither the DIP Lender

nor the Existing Factor shall be deemed to be in control of the operations of the Debtors or to be

PAGE 15
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

acting as a "responsible person" or "owner or operator" with respect to the operation or

management of the Debtors.

        P.    <u>Notice</u>. Pursuant to Bankruptcy Rules 2002, 4001(b)(1) and 9014, and the

Local Rules of the Bankruptcy Court, notice of the Interim Hearing and the relief requested in the

Motion has been provided by the Debtors, whether by telecopy, email, overnight courier, or hand

delivery, to certain parties in interest including, but not limited to:  (i) the Office of the United

States Trustee for the District of New Jersey (the "U.S. Trustee"); (ii) those parties listed on the

List of Creditors Holding Largest Twenty Unsecured Claims Against the Debtors, as identified in

the Petitions; (iii) counsel to the DIP Lender; (iv) counsel to the Existing Factor; (v) the Internal

Revenue Service; (vi) the office of the United States Attorney General for the District of New

Jersey; (vii) counsel to the Committee, if appointed; (viii) the U.S. Securities and Exchange

Commission; and (ix) all other parties required to receive notice pursuant to the Bankruptcy Rules

2002, 4001 or 9014 or requesting to receive notice prior to the Interim Hearing (collectively, the

"Interim Notice Parties"). Under the circumstances, due and sufficient notice and opportunity for

a hearing has been given in accordance with the provisions of Sections 363 and 364 of the

Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, and any other applicable law, and

no other or further notice relating to the Motion, this Interim Order or this proceeding is necessary

or required.

**      BASED UPON THE FOREGOING FINDINGS AND CONCLUSIONS, AND UPON**

**THE RECORD MADE BEFORE THIS COURT AT THE HEARING ON THE MOTION,**

PAGE 16
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

**AND GOOD AND SUFFICIENT CAUSE APPEARING THEREFORE,**

**IT IS HEREBY ORDERED:**

1.    <u>Motion Granted</u>.  The Motion is granted on an interim basis on the terms

of this Interim Order. Any objections to the Motion or the interim relief sought therein that have

not been previously resolved or withdrawn are hereby overruled on their merits; *provided* that all

parties-in-interest reserve the right to object to entry of the Final Order. Subject to the terms

hereof, this Interim Order is valid immediately, binding on all parties-in-interest and fully

effective upon its entry. To the extent that there is a contradiction between the terms and

provisions of this Interim Order and the DIP Loan Documents, the terms and provisions of this

Interim Order shall control.

2.    <u>Authorization to Borrow; DIP Financing; DIP Loan Documents</u>.

The Debtors are authorized to enter into and be bound by the DIP Credit Agreement and all other

DIP Loan Documents, and to borrow money, incur debt, reimbursement obligations and other

obligations, grant Liens, make deposits, provide guaranties and indemnities and perform their

respective obligations hereunder and thereunder solely in accordance with, and subject to, the

terms and conditions of this Interim Order, the DIP Credit Agreement and the other DIP Loan

Documents. The Debtors are authorized and directed to comply with and perform all of the terms

and conditions contained in the DIP Loan Documents (except as provided herein).

With written consent of the DIP Lender and upon notice to the Existing Factor, the

Debtors are authorized to amend, modify or supplement any of the DIP Loan Documents or waive

PAGE 17
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

any of the provisions thereof in accordance with their terms, without further order of this Court or

notice to any party; provided, however, that notice of any (i) increase in the aggregate amount of

the DIP Lender's lending commitments, (ii) increase in the applicable interest rates, other than

increases described in the Motion, (iii) shortening of the maturity of the obligations under the DIP

Loan Documents or (iv) modification (other than any non-substantive modification) of the

financial covenants or events of default shall be provided to the U.S. Trustee and, counsel to any

Committee, if appointed, each of which shall have five (5) days from the date of such notice

within which to object in writing to such amendment, modification or supplement, and upon any

such timely written objection, such amendment, modification or supplement shall only be

permitted pursuant to an order of this Court. All obligations owed to DIP Lender, under or in

connection with the DIP Loan Documents, including, without limitation, all Obligations (as such

term is defined in the DIP Credit Agreement), loans, advances, other financial accommodations

and other indebtedness, obligations and amounts (contingent or otherwise) owing from time to

time under or in connection with the DIP Loan Documents, are defined and referred to herein as

the "Postpetition Obligations."

   3. <u>Valid and Binding Obligations</u>.  Upon execution and delivery of the DIP

Loan Documents, the DIP Loan Documents shall constitute valid and binding obligations of the

Debtors, enforceable against the Debtors in accordance with their terms, except as otherwise

expressly set forth in this Interim Order. Except as otherwise expressly set forth in this Interim

Order, no obligation, payment, transfer or grant of security under this Interim Order or the other

PAGE 18
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
             POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
             CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
             CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
             FINAL HEARING

DIP Loan Documents shall be stayed, restrained, voidable or recoverable under the Bankruptcy

Code or any applicable nonbankruptcy law, or subject to any defense, reduction, setoff,

recoupment or counterclaim.

4.      Maximum Amount of Borrowing.  The maximum aggregate outstanding

principal amount of the Postpetition Loans the Debtors may borrow from DIP Lender pursuant to

this Interim Order and the DIP Loan Documents during the Interim Financing Period shall be the

amount for such period reflected in the Approved DIP Budget, with such cushions as are

permitted in the DIP Loan Documents (for the avoidance of doubt, it being understood and agreed

that the presence of any "basket" or "carve-out" set forth in any negative covenant contained in

Section 6.02 of the DIP Credit Agreement shall not be, and shall not be deemed to be, an approval

or acceptance by the DIP Lender of any Line Item in any Approved DIP Budget, or portion

thereof, related to cash expenditures of the type described in such "basket" or "carve-out," which

shall remain subject to the approval rights of the DIP Lender with respect to each Approved DIP

Budget, as set forth herein), such amount being required by the Debtors to prevent immediate

and irreparable harm to the Debtors and their Estates, and the maximum amount of the

Postpetition Loan that may be outstanding at any time during the Interim Financing Period shall

not exceed $1,836,032.  For avoidance of doubt, any "basket" or "carve-out" agreed to between

the Debtors and the DIP Lender, or which may be agreed to in the future, shall not affect the

Existing Factor Lien Claims.

PAGE 19
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

5.    <u>Interest; Fees; Professional Expenses</u>.  The rate of interest to be charged for
the Postpetition Loan and other extensions of credit to the Debtors under the DIP Credit
Agreement shall be the rates set forth in the DIP Credit Agreement and shall be payable at the
times set forth in the DIP Credit Agreement.  Any and all fees paid or required to be paid in
connection with the DIP Loan Documents, including, without limitation, all title premiums and
recording fees and expenses in connection with the perfection or recordation of and title insurance
relating to the Postpetition Liens, are hereby authorized and shall be paid to the extent disclosed
in the Motion or contained in the DIP Loan Documents, and all reimbursable expenses set forth in
the DIP Credit Agreement may be paid by the Debtors (or charged to the loan account) in
accordance with the DIP Credit Agreement, each with the same priority as the Postpetition
Obligations and without further notice to or order of the Court and without the need or
requirement to file any motion or fee application. Notwithstanding any other provision of this
Interim Order (including, but not limited to, paragraph 12), any other order of this Court or any
other agreement, the Debtors shall pay the fees, costs and expenses of the DIP Lender as set forth
in the DIP Credit Agreement.

6.    <u>Cash Management System</u>.  The Debtors may use Cash Collateral
(including that of the Existing Factor) from and including the Closing Date to and including the
earlier of May 17, 2014 and the Final Maturity Date (as defined below), subject to compliance by
the Debtors with the covenants set forth in Section 6 of the DIP Credit Agreement and subject to
paragraph 7 below and further Order of the Court.  The Debtors' use of Cash Collateral shall be

PAGE 20
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

governed by the terms of this Interim Order and Section 7.02 of the DIP Credit Agreement

notwithstanding any provision under any blocked account agreement, deposit account control

agreement or other similar type of agreement ("Control Agreements") but subject to the terms of

the Existing Factoring Agreements and prepetition practices.  With respect to any dispute between

the provisions of any Control Agreements and this Interim Order, the provisions of this Interim

Order (through, to and including the Final Maturity Date) shall govern and this Interim Order

shall override any limitations in such Control Agreements with respect to the use of Cash

Collateral (through to and including the Termination Date).  Notwithstanding the Existing

Factoring Agreements or any Control Agreements, (a) the automatic sweep from the MEE Direct

Corporate Account to the Existing Factor shall immediately cease and the Debtors shall have,

subject to the terms of this Order, direct use of such funds and (b) subject to the Existing Factor's

receipt of good funds pursuant to paragraph 8(d)(i) of this Interim Order, (i) the Debtors shall be

permitted to use as Cash Collateral the proceeds of any payment received by Hilco Merchant

Resources, LLC and (ii) the Existing Factor shall release to the DIP Lender $5 million of the

Suchman Cash Dominion pledge, to be advanced to the Debtors in connection with the DIP

Financing.

      7.    Use of Proceeds and Cash Collateral.   Upon the occurrence of the Closing

Date, proceeds of the DIP Facility and Cash Collateral, pursuant to section 363(c)(2) of the

Bankruptcy Code, may be used by the Debtors to (i) pay fees and expenses associated with the

DIP Credit Agreement, (ii) fund the ongoing postpetition working capital needs and other general

PAGE 21
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
             POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
             CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
             CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
             FINAL HEARING

corporate purposes of the Debtors, (iii) pay expenses permitted by the Carve-Out, and (iv) fund

the payment of such prepetition and other out of the ordinary course of business expenses of the

Debtors as may be permitted under the DIP Credit Agreement and approved by the Bankruptcy

Court, including, without limitation, permitted capital expenditures, priority employee wage

claims, sales tax liability, and expenses associated with the assumption of executory contracts and

unexpired leases, in each case in amounts not to exceed in any weekly period the amounts in the

Approved DIP Budget (subject to increase within the cushions described in Sections 6.02(w) and

6.03 of the DIP Credit Agreement (for the avoidance of doubt, it being understood and agreed that

the presence of any "basket" or "carve-out" set forth in any negative covenant contained in

Section 6.02 of the DIP Credit Agreement shall not be, and shall not be deemed to be, an approval

or acceptance by the DIP Lender of any Line Item in any Approved DIP Budget, or portion

thereof, related to cash expenditures of the type described in such "basket" or "carve-out," which

shall remain subject to the approval rights of the DIP Lender with respect to each Approved DIP

Budget, as set forth herein)). The proceeds of the DIP Financing and Cash Collateral may not be

used:  (a) for the payment of interest and principal with respect to any debt, including, without

limitation, the Existing Factoring Facility; (b) to finance in any way any adversary action, suit,

arbitration, proceeding, application, motion or other litigation of any type relating to or in

connection with the Prepetition Credit Agreements or any of the loan documents or instruments

entered into in connection therewith, including, without limitation, any challenges to the Existing

WF Credit Facility, or the validity, perfection, priority, or enforceability of any lien securing such

PAGE 22
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

claims or any payment made thereunder; (c) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Existing Factor, the Existing WF Facility Agent, the Existing WF Facility Lenders, Suchman, LLC or the DIP Lender or their rights and remedies under the Existing Factor Agreement, the DIP Credit Agreement, the other DIP Loan Documents, the Existing WF Credit Facility, this Interim Order or the Final Order; (d) to make any distribution under a plan of reorganization in any Chapter 11 Case; and (e) to make any payment (in the aggregate, together with all other such payments) in excess of Fifty Thousand dollars ($50,000) in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender and the Existing Factor; provided that nothing in this subclause (e) shall prevent the Debtors from assuming or curing executory contracts and unexpired leases subject to an order of the Bankruptcy Court if otherwise permitted by the DIP Credit Agreement.

The Debtors shall provide the DIP Lender and the Existing Factor, with a copy to counsel for the DIP Lender and the Existing Factor (A) a weekly report of the Debtors' cash receipts, (B) a weekly report of the Debtors' cash disbursements for each of the Debtors' expense categories, (C) a weekly report concerning the review and comparison of the Debtors' use of Cash Collateral, including collections, revenues and expenses during the week and the amount of variance, if any, from the corresponding amounts set forth in the DIP Budget, (D) a copy of each monthly operating report filed by the Debtors in these Chapter 11 Cases as required by the Court, the U.S. Trustee or applicable law.  The weekly reports shall encompass the period of each week, ending

PAGE 23
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.  14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
           POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
           CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
           CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
           FINAL HEARING

on the close of business on Saturday, for every week until the Termination Date (as defined

herein), and shall be delivered to the DIP Lender and Existing Factor, by 5:00 p.m., Eastern time,

on Wednesday of the following week

      8.     <u>Adequate Protection for Existing Factor</u>.  the Existing Factor is hereby

provided with the following forms of adequate protection, each of which shall be a "Postpetition

Obligation" as defined herein (which the DIP Lender acknowledges as acceptable to it) pursuant

to sections 361, 363(c), 363(e) and 364(d) of the Bankruptcy Code for any diminution in value

of its interest in the Pre-Petition Collateral (including Cash Collateral) for any reason resulting

from (a) the Debtor's use, sale or lease of such Collateral (collectively, and solely to the extent

of any such diminution in value, the "Diminution in Value"):

      (a)     **Post-Petition Replacement Liens**. As adequate protection for any

Diminution in Value and as an inducement to the Existing Factor to permit the Debtors' use of the

Cash Collateral as provided in this Order, the Debtors hereby grant, assign and pledge to the

Existing Factor, post-petition replacement security interests in and liens (the "Post-Petition

Replacement Liens") on all of the Collateral whether acquired before, or after the Petition Date,

whether existing or hereafter acquired, created or arising, and all products and proceeds thereof,

including all accessions thereto, substitutions and replacements therefor, wherever located,

including accounts receivables.  Upon entry of this Order, the liens and security interests granted

hereunder to the Existing Factor as adequate protection shall be valid, perfected and enforceable

PAGE 24
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

against the Collateral without further filing or recording of any document or instrument or the

taking of any further actions.

(b)    **Adequate Protection, Super-Priority Claim**.  The Existing Factor

is hereby granted, to the extent of any Diminution in Value, a super-priority administrative claim

(the "Adequate Protection Super-Priority Claim") that shall have priority in the Chapter 11 Cases

under and in accordance with the provisions of sections 364(c)(1), 503(b) and 507(b) of the

Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims

against the Debtors and their estates, now existing or hereafter arising, of any kind or nature

whatsoever including, without limitation, administrative expenses of the kinds specified in or

ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of this

Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code.

(c)    **Payment of Fees, Costs and Expenses**.  The Existing Factor shall

be entitled to have the Debtors pay all reasonable out-of-pocket costs and expenses incurred by

the Existing Factor with respect to the Pre-Petition Obligations (including, without limitation, the

reasonable fees and disbursements of counsel and other professional advisers advising the

Existing Factor, including McElroy, Deutsch, Mulvaney & Carpenter, LLP, and any other

professionals retained by the Existing Factor, including any consultants) and in connection with

the protection and enforcement of the rights and interests of the Existing Factor, with respect to

such fees, costs, disbursements and expenses incurred on or after the Petition Date, within five (5)

business days of presentation (with copies to the United States Trustee and the DIP Lender) of an

PAGE 25
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

invoice therefor (which invoice may be redacted to remove privileged or case sensitive material)

without the requirement of prior Court approval or compliance with guidelines applicable to

retained professionals.

(d)    **Existing Factor Lien Claims Paydown Milestones**:  The Existing

Factor's consent for the Debtors to use its Cash Collateral herein is expressly conditioned upon

receipt of payments by the Debtors by the deadlines set forth below reducing the total

indebtedness of the Existing Factor Lien Claims to $4 million.  If the Debtors fail to make any

payment by the deadline set forth herein, unless the Existing Factor agrees in writing otherwise,

the Debtors' authority to use the Existing Factor's cash collateral shall be immediately

terminated, without requirement of any notice, and the Existing Factor may immediately re-

commence the automatic sweep from the MEE Corporate Account to the Existing Factor under

the Existing Factor Agreements.  The Debtors' authorization to continue using the Existing

Factor's Cash Collateral shall only be reinstated upon issuance of any such missed payment or

upon further Order of this Court.  The following paydown milestones are hereby established:

(i)    Within two (2) business days following entry of this Interim

Order, to the extent not previously received, the Existing Factor shall receive an

initial paydown payment of $5,300,000 in good funds.

(ii)    On or before April 12, 2014, the Existing Factor shall

receive paydown payments such that the total indebtedness under the Existing

Factor Lien Claims shall be reduced to not more than $5.5 million.

PAGE 26
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

       (iii)     On or before April 26, 2014, the Existing Factor shall receive paydown payments such that the total indebtedness under the Existing Factor Lien Claims shall be reduced to not more than $4.5 million.

       (iv)     On or before May 10, 2014, the Existing factor shall receive paydown payments such that the total indebtedness under the Existing Factor Lien Claims shall be reduced to not more than $4 million.

At all times after the total indebtedness under the Existing Factor Lien Claims has been reduced to $4 million, (A) the Debtors shall maintain a collateral base securing such indebtedness of not less than $1 million in cash collateral (i.e., the Suchman Cash Dominion pledge) and $8 million in inventory and (B) the collection or receipt of any receivables or other sums due to the Debtors by the Existing Factor shall be remitted to the DIP Lender.

       (e)     **Reservation of Rights**. The Existing Factor reserves the right to request additional or further adequate protection of its interests in the Pre-Petition Collateral. This Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair (a) any of the rights of the Existing Factor under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Existing Factor to seek (i) the appointment of a trustee under section 1104 of the Bankruptcy Code, (ii) relief from the automatic stay under section 362(d) of the Bankruptcy Code, (iii) dismissal or conversion of the Case under section 1112 of the Bankruptcy Code, (iv) to terminate the period during which the Debtors have the exclusive right to propose and/or obtain confirmation of a plan of reorganization pursuant to

PAGE 27
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

section 1121 of the Bankruptcy Code or (v) any other relief that the Existing Factor, in its sole

discretion, may deem appropriate.

9.      <u>Cash Collateral Events of Default</u>:  The post-petition occurrence of any of

the following shall constitute an Event of Default with respect to the Debtors' authorization to use

Cash Collateral of the Existing Factor and/or DIP Lender, as applicable:

(a)      Violation of any of the terms of this Order;

(b)      The occurrence of any default, Event of Default or violation of any of the
terms of the DIP Credit Agreement and/or any of the DIP Loan
Documents;

(c)      Any Debtor makes any distributions or payments to (A) any direct or
indirect holder (at any level of the ownership structure) of any of such
Debtor's capital stock or any person that holds a partnership or membership
interest in any Debtor or (B) any principals, shareholders, members and/or
partners of any Debtor, <u>provided</u>, <u>however</u>, that (i) distributions to Seth
Gerszberg in the same aggregate monthly amount as the Debtors made
prepetition and (ii) payments to the DIP Lender pursuant to this Order or
any Final Order shall not constitute an Event of Default;

(d)      The Debtors' failure to comply with the reporting requirements contained
in this Order within two (2) business days after receiving notice of such
failure from the Existing Factor and/or the DIP Lender;

(e)      Any Debtor shall fail to comply in any material respect with the DIP
Budget (after accounting for any cushion permitted under the DIP Credit
Facility);

(f)      The failure of the Debtors to reimburse the Existing Factor or the DIP
Lender for all professional fees, including, but not limited to, attorneys'
fees and consulting fees and related costs;

(g)      The failure by the Debtors to pay Existing Factor Lien Claims from the net
proceeds of Sale to the Existing Factor contemporaneously with the closing
of the Sale (except with respect to a sale to Suchman LLC currently
contemplated pursuant to Section 363 of the Bankruptcy Code (the

PAGE 28
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

"Suchman Sale"), in which case the Existing Factor Lien Claims shall be assumed);

(h)     The appointment of a Trustee pursuant to § 1104(a)(1) or (a)(2) of the Bankruptcy Code in any of the Cases;

(i)     The appointment of an examiner with expanded powers, other than a fee examiner;

(j)     Dismissal of any of the Debtors' Cases or any subsequent chapter 7 Case without the express written consent of the Existing Factor and DIP Lender, in their sole and absolute discretion;

(k)     The entry of any order materially modifying, reversing, revoking, staying, rescinding, vacating, or amending this Order without the express prior written consent of the Existing Factor and the DIP Lender, in their sole and absolute discretion;

(l)     Default in the payment of any amount owed by the Debtors to the Existing Factor and/or DIP Lender as and when due hereunder;

(m)     The rendering against any Debtor of an arbitration award, a final judgment, decree or order, in each case requiring the post-petition payment of money in excess of $100,000 in the aggregate or a post-petition lien on any of the Collateral, and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of thirty (30) consecutive days;

(n)     The filing by any Debtor of any motion or proceeding that could reasonably be expected to result in material impairment of the Existing Factor's or DIP Lender's rights under this Order, including any motion to surcharge the Existing Factor and/or DIP Lender, the Existing Factor Lien Claims or the DIP Loans, or the Collateral under section 506(c) of the Bankruptcy Code or otherwise;

(o)     The filing of a motion by any Debtor for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action or any motion or pleading seeking to challenge the Existing Factor's or DIP Lender's Liens or otherwise commencing any cause of action against the Existing Factor or the DIP Lender;

PAGE 29
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

(p)     Any Debtor (except following the Existing Factor and the DIP Lender's prior written request or with the Existing Factor's and the DIP Lender's express prior written consent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending this Order (no consent shall be implied from any other action, inaction, or acquiescence of the Existing Factor or the DIP Lender);

(q)     Any Debtor shall file, or any other person shall obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that seeks to treat the Claims of the Existing Factor and the DIP Lender in a manner that is materially inconsistent with the provisions of this Order;

(r)     This Order shall cease to be in full force and effect at any time after the date of entry thereof by the Bankruptcy Court;

(s)     The Existing Factor or the DIP Lender believe in good faith that the prospect of payment in full of any part of the Obligations to the extent required hereunder, or that full performance by the Debtors hereunder, is impaired, or that there has occurred any Material Adverse Effect in the business or financial condition of any Debtor, provided that the Court shall have power to determine whether such belief is objectively reasonable upon motion by any party in interest, filed within five (5) business days of the Existing Factor and/or the DIP Lender's filing and service of notice, rendering any non-reasonable belief ineffective;

(t)     If any creditor of any Debtor receives any adequate protection payment, other than as provided herein;

(u)     A Change in Control occurs with respect to any Debtor;

(v)     Any material impairment of the Collateral or the termination of any state or federal license or authorization or material contract;

(w)     Any misrepresentation of a material fact made after the Petition Date by any Debtor or its agents to the Existing Creditor and/or to the DIP Lender about the financial condition of such Debtor, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral, including Cash Collateral;

PAGE 30
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

(x)    A material default by any Debtor in reporting financial information as and
when required under this Order;

(y)    Except as set forth in paragraph 13 of this Interim Order, the sale of any
material portion of any Debtor's assets outside the ordinary course of
business without the prior written consent of the Existing Factor and the
DIP Lender, in their sole discretion (it being understood that the Suchman
Sale shall not be an Event of Default or a sale that requires the prior written
consent of the Existing Factor and the DIP Lender); or

(z)    Any Debtor fails to comply with any of the covenants, conditions and
agreements contained herein or in any other agreement, document or
instrument at any time executed by such Debtor in connection herewith.

(aa)   The failure of the Debtors to comply with any of the paydown milestones,
or to maintain the collateral base securing the indebtedness under the
Existing Factor Lien Claims as provided in paragraph 8(d) of this Interim
Order.

10.    <u>Limitations on the Use of Cash Collateral</u>:  From and after the date of

entry of this Order, the proceeds of the Collateral and Cash Collateral shall not, directly or

indirectly, be used to pay any expenses, payments, and/or disbursements of Debtors or incurred

by Debtors except for those items which are then due, expressly permitted under the Approved

DIP Budget or this Order, and in such amounts as clearly identified in the Approved DIP Budget

and/or this Order (including compensation and reimbursement of expenses allowed by this Court

to Court-approved professional persons to the extent that such fees and expenses are in

accordance with the line items for such professionals in the Approved DIP Budget (if any)).  In no

event shall any costs or expenses of administration be imposed upon the Existing Factor or any of

its Collateral pursuant to sections 105(a), 506(c) and/or 552 of the Bankruptcy Code or otherwise

PAGE 31
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

without the prior written consent of the Existing Factor, and no such consent shall be implied

from any action, inaction or acquiescence by the Existing Factor.

11.    <u>Security for the DIP Lender and under the Existing WF Credit Facility</u>.

(a)    <u>Postpetition Liens</u>.  As security for the Obligations, pursuant to

Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code for the sole benefit of the DIP Lender,

all revolving credit advances and all other Obligations of the Debtors under the DIP Credit

Agreement and the other DIP Loan Documents shall be secured, until the Final Maturity Date, by

valid, binding, enforceable, first priority and perfected Postpetition Liens in the DIP Collateral

(which includes, without limitation, but subject to entry of the Final Order, the proceeds of any

avoidance actions under Chapter 5 of the Bankruptcy Code), subject only to (i) the Carve-Out,

and (ii) Liens of the Existing Factor, it being agreed, however, that the DIP Lender shall have a

first priority and perfected Postpetition Liens senior to the Liens of the Existing Factor in the

Debtors' leasehold interests in real estate (the exceptions in subsections (i) and (ii) are referred to

herein collectively as, the "Exceptions").  For clarification purposes, it is understood that the

Postpetition Liens are not intended to prime any of the first priority liens of the Existing Factor

but are priming the Liens granted pursuant to the Existing WF Credit Facility.

(b)    In consideration for the consent to subordinate the Liens granted

pursuant to the Existing WF Credit Facility to the Liens of the DIP Lender, and the agreement for

the Debtors to use its Cash Collateral, the Liens granted pursuant to the Existing WF Credit

PAGE 32
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

Facility shall be deemed valid, enforceable, perfected, and secured third priority Postpetition

Liens.

Except as expressly set forth in this Order, the Postpetition Liens shall at all times be

senior to (i) the rights of the Debtors and any successor trustee or estate representative in the

Chapter 11 Cases and any subsequent proceedings under the Bankruptcy Code, including, without

limitation, any Chapter 7 proceedings if any of the Chapter 11 Cases are converted to a case under

Chapter 7 of the Bankruptcy Code (collectively, the "Successor Case"), (ii) any intercompany

claim of any Debtor or any subsidiary or affiliate of any Debtor, (iii) any Lien of any creditor or

other party in interest in these Chapter 11 Cases or any Successor Case, (iv) any Lien which is

avoided or otherwise preserved for the benefit of any Debtors' Estates under Section 551 or any

other provision of the Bankruptcy Code, and (v) any Liens granted on or after the Petition Date to

provide adequate protection to any party except the Existing Factor, but only up to the amount of

the outstanding Obligations to the Existing Factor as of the Petition Date plus such amounts

necessary to reimburse the Existing Factor for its reasonable professional fees herein.  The term

"DIP Collateral" shall include any and all prepetition and postpetition assets and properties

(which terms shall for the purposes of this Interim Order have the broadest meanings possible

including, without limitation, tangible, intangible, real, personal and mixed) of each of the

Debtors of any kind or nature, whether now existing, newly acquired or arising or hereafter

acquired or arising, and wherever located, including, without limitation, the "Prepetition

Collateral" (which shall include all collateral in connection with the Existing Factoring

PAGE 33
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

Agreements, Existing Factoring Facility, and the Existing WF Credit Facility and any other

collateral provided under any Prepetition Credit Agreements that existed as of the Petition Date

and all prepetition and, subject to Section 552 of the Bankruptcy Code, and postpetition proceeds,

products, offspring, rents and profits thereof), and all accounts, accounts receivable, chattel paper,

inventory, machinery, equipment, contract rights, goods, fixtures, intellectual property and other

general intangibles, intercompany notes, investment property, owned and leased real property,

causes of action, cash, deposit accounts, securities, securities accounts and all proceeds

(including, without limitation, but subject to entry of the Final Order, proceeds of any avoidance

actions under Chapter 5 of the Bankruptcy Code but not the avoidance actions themselves) and

products of all of the foregoing.

(c)      Superpriority Claims.  All Postpetition Obligations, subject only to

the Carve-Out, hereby constitute under Section 364(c)(1) of the Bankruptcy Code allowed

superpriority administrative expense claims against each of the Debtors (jointly and severally)

having priority over all administrative expenses of the kind specified in, or ordered pursuant to,

any provision of the Bankruptcy Code, including, without limitation, those specified in, or

ordered pursuant to, Sections 105, 326, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), and, to

the extent permitted by law, Sections 726 and 1114 or any other provision of the Bankruptcy

Code or otherwise, and shall at all times be senior to the rights of the Debtors, the Debtors'

Estates and any successor trustee or estate representative in the Chapter 11 Cases or any

Successor Case (the "Superpriority Claims"). Except as set forth in the preceding sentence and

PAGE 34
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

except for the Carve-Out, no cost or expense of administration under any provision of the

Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 363, 364, 503,

506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise

(whether incurred in these Chapter 11 Cases and any Successor Case), shall be senior to, equal to,

or *pari passu* with, the Superpriority Claims.  Notwithstanding the foregoing, any superpriority

administrative expense claims granted hereunder shall be subordinate to the Existing Factor Lien

Claims.

(d)      Restrictions on Liens.  Except for the Exceptions, the Postpetition

Liens shall not be (i) subject to any Lien that is avoided and preserved for the benefit of the

Debtors' Estates under Section 551 of the Bankruptcy Code (including, for the avoidance of

doubt, as a result of the avoidance, disallowance, termination or setting aside, by this Court or

otherwise, of any obligations under the Prepetition Credit Agreements), or (ii) subordinated to or

made *pari passu* with any other Lien under Section 364(d) of the Bankruptcy Code or otherwise.

Except as expressly set forth herein with respect to the Carve-Out and the Existing Factor Lien

Claims, no claim or Lien having a priority superior to or *pari passu* with those granted by this

Order with respect to the Obligations shall be granted or allowed until the indefeasible payment in

full in cash and satisfaction in the manner provided in the Postpetition Loan Documents of the

Obligations.

12.      Professional Fees; Carve-Out.  As used in this Order, "Carve-Out" means

claims relating to the Agreed Administrative Expense Priorities defined in the DIP Credit

PAGE 35
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

Agreement subject to the Carve Out Notice.  Notwithstanding anything set forth herein, the

Carve-Out shall not include any other claims that are or may be senior to or *pari passu* with any

of the Carve-Out or any professional fees and expenses of a Chapter 7 trustee and, <u>provided,</u>

<u>further,</u> that Carve-Out shall not include any fees or disbursements (A) arising after the

conversion of either or both of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy

Code, or (B) related to the investigation of, preparation for, or commencement or prosecution of,

any claims or proceedings against the Existing Factor, Suchman LLC (in its capacity as the DIP

Lender and as successor to the Existing WF Facility Agent and the Existing WF Facility Lenders

under the Existing WF Credit Facility), the Existing WF Credit Agent or the Existing WF Credit

Lenders or in any way relating to the Existing Factoring Agreement, the Existing WF Credit

Facility or their respective claims or Liens whether under the DIP Credit Agreement or any other

DIP Loan Document or any of the Prepetition Credit Agreements, or instruments entered into in

connection with the foregoing other than fees or disbursements of the Committee in connection

with such an investigation in an amount not to exceed $10,000.  Any payment or reimbursement

made either directly by the DIP Lender at any time, or by or on behalf of the Debtors on or after

the occurrence of an Event of Default or the Final Maturity Date shall permanently reduce the

Carve-Out Cap on a dollar-for-dollar basis. The DIP Lender's obligation to fund or otherwise pay

any fees or expenses under the Carve-Out shall be added to and made a part of the Postpetition

Obligations, secured by the Postpetition Collateral, and entitle the DIP Lender to all of the rights,

claims, liens, priorities and protections under this Interim Order, the DIP Loan Documents, the

PAGE 36
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
             POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
             CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
             CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
             FINAL HEARING

Bankruptcy Code or applicable law.  For avoidance of doubt, the Carve-Out shall be subordinate

and subject to the Existing Factor Lien Claims.  Payment of any fees or expenses under the

Carve-Out, whether by or on behalf of the DIP Lender or the Debtors, shall not and shall not be

deemed to reduce the Obligations, and shall not and shall not be deemed to subordinate any of the

DIP Lender's liens and security interests in the Postpetition Collateral or their Superpriority

Claims to any junior pre- or postpetition lien, interest or claim in favor of any other party.  Except

as otherwise provided herein with respect to the Carve-Out and the reasonable professional fees of

the Existing Factor (which shall, for the avoidance of doubt, include budgeted professional fees

and expenses), the DIP Lender shall not, under any circumstance, be responsible for the direct

payment or reimbursement of any fees or disbursements of any professionals incurred in

connection with the Chapter 11 Cases under any chapter of the Bankruptcy Code, and nothing in

this Interim Order shall be construed to obligate the DIP Lender in any way, to pay compensation

to or to reimburse expenses of any professional, or to ensure that the Debtors have sufficient

funds to pay such compensation or reimbursement.

        13.     Asset Dispositions.  Except with respect to a Suchman Sale, the Debtors

shall immediately pay, or cause to be paid to the Existing Factor for the Existing Factor Lien

Claims and, after payment in full thereof, to the DIP Lender for application to the Postpetition

Obligations, to the extent required by, and in the order set forth in, the DIP Credit Agreement, the

required portion of the proceeds of any sale, lease or other disposition of any DIP Collateral

outside of the ordinary course of business and shall comply with all other provisions in the DIP

PAGE 37
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

Loan Documents and this Interim Order in connection with any such sale, lease or other

disposition.  Except to the extent otherwise expressly provided in the DIP Loan Documents, the

Debtors shall not sell or otherwise dispose of any DIP Collateral outside the ordinary course of

business without the prior written consent of the DIP Lenders (unless permitted in the DIP Credit

Agreement) and an order of the Court after notice and a hearing. As provided in the DIP Credit

Agreement, the Debtors and the DIP Lender shall enter into a Stalking Horse APA for the sale of

substantially all of the Debtors' assets to Suchman, LLC.  The DIP Lender and Suchman, LLC as

the successor to the Existing WF Facility Agent and the Existing WF Facility Lenders are hereby

granted the right to credit bid the entirety of each of their Claims relating to the DIP Credit

Agreement and the WF Credit Facility (respectively) in connection with the Stalking Horse APA.

The rights of the DIP Lender and Suchman, LLC to credit bid all or any portion of the DIP Credit

Agreement or the obligations under the Existing WF Credit Facility shall be preserved through

the closing of such sale.

          14.    <u>Further Assurances; Indemnities</u>.  On notice to the Existing Factor before

execution and delivery, the Debtors shall execute and deliver to the DIP Lender all such

agreements, financing statements, instruments and other documents as the DIP Lender may

reasonably request to evidence, confirm, validate or perfect the Liens granted pursuant hereto, and

shall provide copies of all such executed and delivered documents to counsel for the Existing

Factor.  Further, the Debtors are authorized and directed to do and perform all acts, to make,

execute and deliver all instruments and documents (including, without limitation, the execution of

PAGE 38
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
             POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
             CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
             CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
             FINAL HEARING

additional security agreements, pledge agreements, control agreements, mortgages and financing

statements), and shall pay fees and expenses that may be required or necessary for the Debtors'

performance under the DIP Loan Documents, including, without limitation, (i) the execution of

the DIP Loan Documents, and (ii) the payment of the fees, costs and other expenses described in

the DIP Loan Documents as such become due. None of the reasonable attorneys', financial

advisors' and accountants' fees and disbursements incurred by the Existing Factor or the DIP

Lender and reimbursable by the Debtors shall be subject to the approval of this Court or the U.S.

Trustee guidelines, and no recipient of any such payment shall be required to file with respect

thereto any interim or final fee application with this Court; provided however, that the DIP

Lender and the Existing Factor shall provide notice to the Debtors, the Office of the United States

Trustee, and any Committee of the amount of fees it intends to pay its professionals and such

notice parties shall have five (5) business days to object to such payment and shall set the matter

for hearing within five (5) business days of such objection if the Existing Factor or DIP Lender,

as applicable, and the objecting party cannot resolve the objection.  In addition, the Debtors are

hereby authorized and directed to indemnify the DIP Lender against any liability arising in

connection with the DIP Loan Documents to the extent provided in the DIP Loan Documents.  All

such fees, expenses and indemnities of the DIP Lender shall constitute Postpetition Obligations

and shall be secured by the Postpetition Liens and afforded all of the priorities and protections

afforded to the Postpetition Obligations under this Interim Order and the other DIP Loan

Documents.

PAGE 39
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

15.     <u>Perfection of Liens</u>.  All Postpetition Liens on or in the DIP Collateral

granted by this Interim Order and the DIP Loan Documents shall be, and they hereby are, deemed

duly perfected and recorded under all applicable federal or state or other laws as of the date

hereof, and no notice, filing, mortgage recordation, possession, further order, or other act, shall be

required to effect such perfection; provided, however, that notwithstanding the provisions of

Section 362 of the Bankruptcy Code, (i) the DIP Lender may, at its sole option, file or record or

cause the Debtors to execute, file or record, at the Debtors' expense, such UCC financing

statements, notices of Liens and security interests, mortgages and other similar documents or

obtain landlord or warehousemen Lien waivers or other third party consents as such agent may

require, and (ii) the DIP Lender may, at its sole discretion, require the Debtors to deliver to such

agent any chattel paper, instruments or securities evidencing or constituting any DIP Collateral,

and the Debtors are directed to cooperate and comply therewith.  If the DIP Lender, in its sole

discretion, shall elect for any reason to cause to be obtained any landlord or warehousemen Lien

waivers or other third party consents or cause to be filed or recorded any such notices, financing

statements, mortgages or other documents with respect to such Liens, or if the DIP Lender, in its

sole discretion, shall elect to take possession of any DIP Collateral, all such landlord or

warehousemen Lien waivers or other third party consents, financing statements or similar

documents or taking possession shall be deemed to have been filed or recorded or taken in these

Chapter 11 Cases as of the Petition Date but with the priorities as set forth herein.  Subject to

Paragraph 13 below, neither the granting of the Liens in the DIP Collateral pursuant to this Order

PAGE 40
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

nor the exercise of any rights or remedies in connection therewith will result in any breach,

violation or infringement of (i) any trademark, copyright or other intellectual property right of the

Debtors or any third party, or (ii) any contract to which the Debtors or any of their properties are

subject.  In the event the DIP Lender elects to direct the Debtor to execute, file or record any

financing statement, notice, mortgage or similar document, or requires the Debtor to deliver any

chattel paper, instrument or security, or takes any other action contemplated in this paragraph,

notice shall first be given to the Existing Factor and the Debtors shall only take such actions if the

rights and first-priority status of the Existing Factor Lien Claims are clearly noted and preserved.

      16.    <u>Default Under Other Documents</u>.  The DIP Lender and the Existing Factor

shall have all rights and remedies with respect to the Debtors, the use of Cash Collateral and the

Postpetition Liens and claims granted herein and in the DIP Loan Documents as are set forth in

this Interim Order. Notwithstanding anything to the contrary contained in any prepetition or

postpetition agreement, contract, document, note or instrument to which any Debtor is a party or

under which any Debtor is obligated, except as otherwise provided herein, any provision that

restricts, limits or impairs in any way any Debtor from granting the DIP Lender Liens or any

other Postpetition Liens authorized herein upon any of its assets or properties or otherwise

entering into and complying with all of the terms, conditions and provisions of this Interim Order

and the DIP Loan Documents shall be unenforceable against such Debtor, and therefore, shall not

adversely affect the validity, priority or enforceability of the Postpetition Liens, claims, rights,

priorities and/or protections granted to such parties pursuant to this Interim Order.

PAGE 41
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.     14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
              POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
              CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
              CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
              FINAL HEARING

17.    <u>Waiver of DIP Rights; 506(c) Waiver</u>.  Each of the Debtors and their

Estates irrevocably waives, and any party in interest acting by, through or on behalf of the

Debtors or the Estates, are barred from asserting or exercising, any right, (a) without the prior

written consent of the DIP Lenders, the Existing Factor, and Suchman, LLC as the successor to

the Existing WF Facility Agent and the Existing WF Facility Lenders; or (b) without prior

payment and satisfaction in full of the Existing Factor Lien Claims, the Postpetition Obligations

in accordance with the DIP Credit Agreement, and the Existing WF Credit Facility:  (i) to grant or

impose, or request that the Court grant or impose, under Section 364 of the Bankruptcy Code or

otherwise, Liens on any DIP Collateral or Cash Collateral, equal or superior to the DIP Lender's

Liens on such DIP Collateral; (ii) to use Cash Collateral (other than as provided in this Interim

Order); (iii) to return any of its Inventory to any of its creditors for application against any

prepetition indebtedness under Section 546(h) of the Bankruptcy Code or allow any creditor to

take any setoff or recoupment against any of its prepetition indebtedness based upon any such

return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to

any such agreement, setoff or recoupment, the aggregate amount of prepetition indebtedness

subject to all such agreements, setoffs and recoupments since the Petition Date would exceed

$50,000; or (iv)  to modify or affect any rights granted under this Interim Order, the DIP Credit

Agreement or the other DIP Loan Documents by any plan of reorganization confirmed in these

Chapter 11 Cases or any order entered in these Chapter 11 Cases.  Subject to entry of the Final

Order, in consideration of the Existing Factor's, the DIP Lender's, and Suchman, LLC as the

PAGE 42
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.    14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

successor to the Existing WF Facility Agent and the Existing WF Facility Lenders' undertakings

in and pursuant to this Interim Order and the consideration provided by the Existing Factor, the

DIP Lender, and Suchman, LLC as the successor to the Existing WF Facility Agent and the

Existing WF Facility Lenders, and, subject to the terms and conditions of the Final Order, other

than as provided for in the Carve-Out and the Exceptions, no costs or expenses of administration

or other charge, Lien, assessment or claim incurred at any time (including, without limitation, any

expenses set forth in the Approved DIP Budget) by the Debtors or any other person or entity shall

under any existing or hereafter occurring circumstances be imposed against the DIP Lender,

Suchman, LLC, the Existing WF Facility Agent, the Existing WF Facility Lender, the Existing

Factor under the Existing Factoring Agreement for the Existing Factoring Facility, their claims, or

their collateral under Section 506(c) of the Bankruptcy Code or otherwise, and it is expressly

understood by all parties that in making all such undertakings and proceeding in compliance with

this Interim Order, the DIP Lender, Suchman, LLC as the successor to the Existing WF Facility

Agent and the Existing WF Facility Lenders, and the Existing Factor have relied on the foregoing

provisions of this sentence. Nothing in this Interim Order shall constitute the consent by the DIP

Lender, Suchman, LLC as the successor to the Existing WF Facility Agent and the Existing WF

Facility Lenders, the Existing WF Facility Agent, the Existing WF Facility Lender, and the

Existing Factor to the imposition of any costs or expense of administration or other charge, Lien,

assessment or claim (including, without limitation, any amounts set forth in the Approved DIP

Budget) against the DIP Lender, Suchman, LLC, the Existing WF Facility Agent, the Existing

PAGE 43
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

WF Facility Lender, and the Existing Factor, their claims or their collateral under Section 506(c)

of the Bankruptcy Code or otherwise.  The DIP Lender, Suchman, LLC, the Existing WF Facility

Agent, the Existing WF Facility Lender, and the Existing Factor shall not be subject to the

equitable doctrine of "marshaling" or any other similar doctrine with respect to any of their

Collateral.

      18.   <u>Remedies</u>.

      (a)   <u>Automatic Stay</u>.  The automatic stay provisions of Section 362 of

the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the

Existing Factor and the DIP Lender to exercise, upon the occurrence of the Termination Date (as

defined below), without further notice, application and motion to, hearing before, or order from,

the Bankruptcy Court, the following rights and remedies:  (i) the DIP Lender may suspend the

DIP Facility with respect to additional revolving credit advances, whereupon any additional

revolving credit advances shall be made or incurred in the DIP Lender's sole and absolute

discretion; (ii) the Existing Factor and the DIP Lender may, except as otherwise expressly

provided in the DIP Credit Agreement, increase the rate of interest applicable to the Existing

Factor Lien Claims, and the Loans to any applicable Default Rate; and (iii) the DIP Lender Agent

and, as applicable, the Existing Factor may:  (A) terminate the DIP Facility with respect to further

revolving credit advances or the incurrence of further Obligations; (B) reduce the Revolving

Credit Commitment from time to time; (C) declare all or any portion of the Existing Factor Lien

Claims and the Postpetition Obligations, including all or any portion of any Loan, to be forthwith

PAGE 44
DEBTORS:  MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.  14-16484 (CMG)
CAPTION:  INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

due and payable, all without presentment, demand, protest or further notice of any kind, all of

which are expressly waived by the Debtors; and (D) terminate the consent of the Existing Factor

and the DIP Lender to use its Cash Collateral.  In the event that the Termination Date arises from

one or more of the Events of Default set forth herein or in the DIP Credit Agreement, the Debtors

may within three (3) business days of receipt of notice of an Event of Default set the matter for

hearing before the Court for the sole purpose of disputing whether an Event of Default has

occurred.

(b)     No Waiver.  The failure or delay by the Existing Factor or the DIP

Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order,

under the Existing Factoring Agreements and the Existing Factoring Facility and any related

agreements and obligations, or any other DIP Loan Documents shall not constitute a waiver of

any of the applicable rights of the Existing Factor or the DIP Lender, and any single or partial

exercise of such rights and remedies against any Debtor, Cash Collateral or DIP Collateral shall

not be construed to limit any further exercise of such rights and remedies against any or all of the

other Debtors and/or Cash Collateral and/or DIP Collateral; provided, however, that except as set

forth in paragraph 18(a), nothing contained herein shall be deemed to be a modification of the

automatic stay.

(c)     Access.  Subject to entry of the Final Order and the terms thereof,

and notwithstanding anything contained herein to the contrary, and without limiting any other

rights or remedies of the Existing Factor and DIP Lender contained in this Interim Order, under the

PAGE 45
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.  14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

Existing Factoring Agreements and the Existing Factoring Facility and any related agreements

and obligations, or the DIP Loan Documents, or otherwise available at law or in equity, and

subject to the terms of the Existing Factoring Agreements and the Existing Factoring Facility and

any related agreements and obligations and the DIP Loan Documents, upon five (5) business days'

written notice to the Debtors and any landlord, lienholder, licensor or other third party owner of

any leased or licensed premises or intellectual property that an Event of Default under the DIP

Loan Documents or a default by the Debtors of any of its obligations under this Interim Order has

occurred and is continuing, the Existing Factor or the DIP Lender, as applicable (i) may, unless

otherwise provided in any separate agreement by and between the applicable landlord or licensor,

and the Existing Factor and/or the DIP Lender (the terms of which shall be reasonably acceptable

to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose

of exercising any remedy with respect to Cash Collateral or DIP Collateral located thereon, and

(ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the

applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents or

any other similar assets of the Debtors, which are owned by or subject to a lien of any third party

and which are used by Debtors in its businesses, in either the case of subclauses (i) or (ii) of this

paragraph without interference from lienholders or licensors thereunder, subject to such

lienholders' or licensors' rights under applicable law, provided, however, that the Existing Factor

or the DIP Lender, as applicable, shall pay only rent and additional rent, fees, royalties or other

obligations of the Debtors that first arise after the Existing Factor or DIP Lender's written notice

PAGE 46
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.  14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

referenced above and that are payable during the period of such occupancy or use by the Existing

Factor or DIP Lender, as the case may be, calculated on a *per diem* basis.

19.    <u>Restriction on Use of DIP Lender's Funds</u>.  None of the Loan

Parties shall be permitted to use the proceeds of the DIP Facility or Cash Collateral:  (a) for the

payment of interest and principal with respect to any debt, (b) to finance in any way any adversary

action, suit, arbitration, proceeding, application, motion, other litigation, examination or

investigation of any type relating to or in connection with the Prepetition Credit Agreements,

including, without limitation, any challenges to the Existing WF Credit Facility and the Existing

Factoring Agreements, or the validity, perfection, priority, or enforceability of any Lien securing

such claims or any payment made thereunder, (c) to finance in any way any action, suit,

arbitration, proceeding, application, motion, other litigation, examination or investigation of any

type adverse to the interests of the Existing Factor, Suchman, LLC, the Existing WF Facility

Agent, the Existing WF Facility Lenders, the DIP Lender or their rights and remedies under the

DIP Credit Agreement, the other DIP Loan Documents, this Interim Order or the Final Order

without the prior written consent of the DIP Lender and the Existing Factor, (d) to make any

distribution under a plan of reorganization in any Chapter 11 Case, and (e) to make any payment

(in the aggregate, together with all other such payments) in excess of Fifty Thousand Dollars

($50,000) in settlement of any claim, action or proceeding, before any court, arbitrator or other

governmental body without the prior written consent of the Existing Factor and the DIP Lender;

provided that nothing in this subclause (e) shall prevent the Debtors from assuming or curing

PAGE 47
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:     INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
                    POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
                    CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
                    CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
                    FINAL HEARING

executory contracts and unexpired leases subject to an order of the Bankruptcy Court if otherwise

permitted by the DIP Credit Agreement; provided further that nothing in this paragraph shall

prevent the Committee from incurring up to $10,000 in fees and disbursements that may be

reimbursed with proceeds of the DIP Loans for purposes of investigation of any claims against (i)

the DIP Lender or their claims or Liens whether under the DIP Credit Agreement or any other

DIP Loan Document, and (ii) under the Existing WF Credit Facility or instruments entered into in

connection with the foregoing.

20.     Release of Claims and Defenses.

(a)     Except as to claims, causes of action and defenses arising

hereunder, the Debtors hereby release and discharge the DIP Lender, Suchman, LLC, the

Existing WF Facility Lenders, the Existing Factor and the Existing WF Facility Agent, together

with their respective affiliates, agents, attorneys, officers, directors and employees, and successors

and assigns (collectively, the "Released Parties") in all capacities, from any and all claims and

causes of action arising out of, based upon or related to, in whole or in part, (i) any of the Existing

WF Credit Facility or instruments entered into in connection with the foregoing or the Existing

Factor Lien Claims, (ii) any aspect of the prepetition relationship between the Debtors, on the one

hand, and any or all of the Released Parties, on the other hand, relating to any transaction

contemplated thereby, (iii) the negotiation of the DIP Loan Documents or any transaction

contemplated thereby, or (iv) any other acts or omissions by any or all of the Released Parties in

connection with the Existing WF Credit Facility or the Existing Factor Lien Claims or

PAGE 48
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

instruments entered into in connection or their prepetition relationship with such Debtors or any

Affiliate (as defined in the Bankruptcy Code) thereof relating to the Existing WF Credit Facility

or instruments entered into in connection with the foregoing or any transaction contemplated

thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or

enforceability of the Existing Factor Lien Claims or of the Existing WF Credit Facility or

instruments entered into in connection with the foregoing, any claims or defenses under Chapter 5

of the Bankruptcy Code or any other causes of action (collectively, the "Claims and Defenses").

    (b)    Notwithstanding anything contained herein to the contrary (but in

all events subject to the restrictions applicable to the Debtors set forth in this Interim Order), the

extent, validity, priority, perfection and enforceability of the Existing WF Credit Facility or

instruments entered into in connection with the foregoing are for all purposes subject to the rights

of any party in interest, other than the Debtors, to file a complaint pursuant to Bankruptcy Rule

7001, seeking to invalidate, subordinate or otherwise challenge any of the Existing WF Credit

Facility or instruments entered into in connection with the foregoing; provided, however, that

such complaint must be filed in this Court before the earlier to occur of (i) five (5) Business Days

prior to the first day on which a hearing to consider confirmation of a plan of reorganization is

scheduled by this Court, (ii) sixty (60) days after appointment of a statutory committee of

unsecured creditors, or (iii) if no statutory committee of unsecured creditors is appointed, seventy-

five (75) days after entry of this Interim Order.  If no such complaint is timely filed within the

period set forth in the preceding sentence (or such timely filed complaint does not result in a final

PAGE 49
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

and non-appealable order of this Court that is inconsistent with clauses (i) through (iv) of

paragraph 20(c)), then all Claims and Defenses against the Released Parties shall be, without

further notice or order of the Court, deemed to have been forever relinquished, released and

waived as to such committee and other person or entity, and if such complaint is timely filed on or

before such date, all Claims and Defenses shall be deemed, immediately and without further

action, to have been forever relinquished, released and waived as to such committee and other

person or entity, except with respect to Claims and Defenses that are expressly asserted in such

complaint.

(c)      If no such complaint is timely filed within the period described

above in paragraph 20(b), or such timely filed complaint does not result in a final and non-

appealable order of this Court that is inconsistent with clauses (i) through (iv) of this paragraph,

then, without the requirement or need to file any proof of claim with respect thereto, (i) the

Existing WF Credit Facility shall constitute allowed claims for all purposes in the Chapter 11

Cases and any Successor Case, (ii) the Existing WF Credit Facility Liens shall be deemed legal,

valid, binding, enforceable, perfected, not subject to subordination or avoidance for all purposes

in the Chapter 11 Cases and any Successor Case, (iii) the Existing Factor Lien Claims shall

constitute allowed, first-priority secured claims for all purposes in the Chapter 11 Cases and any

Successor Case and shall be deemed valid, binding, enforceable, perfected and not subject to

subordination or avoidance for all purposes in the Chapter 11 Cases and any Successor Case, (iv)

the release of the Claims and Defenses shall be binding on all parties in interest in the Chapter 11

PAGE 50
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

Cases and any Successor Case, and (v) the Existing WF Credit Facility, the Obligations

thereunder and the Liens associated therewith, the releases of the Claims and Defenses, and prior

payments relating thereto shall not be subject to any other or further claim, cause of action,

objection, contest, setoff, defense or challenge by any party in interest for any reason, including,

without limitation, any successor to or estate representative of the Debtors.

21.    Termination of DIP Loans and Use of Cash Collateral; Term of DIP Credit

Agreement.  The Debtors' authorization to use the Existing Factor's and Suchman LLC's Cash

Collateral shall immediately and automatically terminate (except as the Existing Factor or the DIP

Lender, as applicable, may otherwise agree in writing), and all amounts owed pursuant to the

Existing Factor Lien Claims and the Postpetition Obligations shall be immediately due and

payable in cash (except as the Existing Factor or the DIP Lender, as applicable, may otherwise

agree in writing) upon the first date on which any of the following occur (the "Termination

Date"):

        (a)    the occurrence of the Final Maturity Date;

        (b)    any of the Events of Default described herein or in the DIP Credit

Agreement occurs;

        (c)    the Existing Factor or the DIP Lender provides notice to the

Debtors or their counsel of any other Event of Default herein or under the DIP Credit Agreement

or any other DIP Loan Document;

PAGE 51
DEBTORS:      MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.     14-16484 (CMG)
CAPTION:      INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
              POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
              CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
              CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
              FINAL HEARING

(d)     the Existing Factor or the DIP Lender provides notice to the

Debtors or their counsel of any breach by the Debtors of any terms or conditions of this Interim

Order, including, without limitation, those terms and conditions specified in this Interim Order

regarding compliance with any Approved DIP Budget and timely repayment of the Existing

Factor Lien Claims and the Postpetition Obligations;

(e)     any of the Debtors shall assert that any of the terms or conditions of

this Interim Order are not valid and binding; or

(f)     this Interim Order expires, unless the Final Order shall have been

entered and become effective by such date.

Upon the maturity (whether by acceleration or otherwise) of any of the Existing Factor

Lien Claims or the Postpetition Obligations or any of the DIP Loan Documents, the Existing

Factor and/or the DIP Lender, as applicable, shall be entitled to immediate payment of such

obligations without further application to or order of this Court.  Notwithstanding anything herein

or in the other DIP Loan Documents, on the Termination Date, the Debtors shall no longer,

pursuant to this Interim Order, the other DIP Loan Documents or otherwise, be authorized to

borrow funds or incur indebtedness hereunder or under the DIP Loan Documents or to use Cash

Collateral (subject to the proviso below) or any proceeds of the Postpetition Obligations already

received (and any obligations of the DIP Lender to make loans or advances hereunder or under

the other DIP Loan Documents automatically shall be terminated); provided, however, the

Debtors may within three (3) business days of receipt of notice of an Event of Default set the

PAGE 52
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

matter for hearing before the Court for the sole purpose of disputing whether an Event of Default

has occurred and shall be permitted to continue to use Cash Collateral solely in accordance with

the Approved DIP Budget until the Court rules.

   22. <u>No Requirement to Accept Title to Collateral</u>.  The Existing Factor and DIP

Lender shall not be obligated to accept title to any portion of the Cash Collateral or the DIP

Collateral in payment of any of the Existing Factor Lien Claims or the Postpetition Obligations, in

lieu of payment in cash or cash equivalents, nor shall the Existing Factor or DIP Lender be

obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any

person or entity other than the Existing Factor or DIP Lender, as applicable.

   23. <u>Authorized Signatories</u>.  The signature of the Debtors' attorneys, appearing

on any one or more of the DIP Loan Documents shall be sufficient to bind the Debtors. No board

of directors or other approval shall be necessary.

   24. <u>Survival</u>.  Any Liens and claims granted hereunder shall survive the

Termination Date and shall continue until payment in full in cash of the Obligations.  Any actions

taken pursuant hereto shall survive entry of any order which may be entered converting these

Chapter 11 Cases to Chapter 7 cases, or dismissing these Chapter 11 Cases, or any order which

may be entered confirming or consummating any plan(s) of reorganization or liquidation, and the

terms and provisions of this Interim Order, as well as the priorities in payment, Liens granted

pursuant to this Interim Order shall continue in this or any superseding case under the Bankruptcy

Code.

PAGE 53
DEBTORS:   MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:   INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

25.   <u>Interim Order Binding; Successors</u>.  The provisions of this Interim Order

shall be binding upon and inure to the benefit of the DIP Lender, the Existing WF Facility Agent,

the Existing WF Facility Lenders, the Existing Factor, the Debtors and their respective successors

and assigns (including any trustee or other estate representative appointed as a representative of

the Debtors' Estates or of any estate in any Successor Case).  Except as otherwise explicitly set

forth in this Interim Order, no third parties are intended to be or shall be deemed third party

beneficiaries of this Interim Order or the DIP Loan Documents.

26.   <u>Section 364(e); Effect of Modification of Interim Order</u>.  Having been

found to be making Loans and other financial accommodation to, and permitting the use of Cash

Collateral by, the Debtors in good faith, the Existing Factor, the DIP Lender and Suchman LLC

(in its capacity as the DIP Lender and as successor to the Existing WF Facility Agent and the

Existing WF Facility Lenders under the Existing WF Credit Facility) shall be entitled to the full

protection of Section 364(e) of the Bankruptcy Code with respect to the Obligations under the

Existing Factor Lien Claims, the DIP Credit Agreement, the Existing WF Credit Facility and the

Liens and priorities created or authorized by this Interim Order in the event that this Interim Order

or any authorization contained herein is stayed, vacated, reversed or modified on appeal.  Each of

the terms and conditions set forth in this Interim Order constitutes a part of the authorization

under Section 364, and is therefore, subject to the protections contained in Section 364(e) of the

Bankruptcy Code.  Any stay, modification, reversal or vacatur of this Interim Order shall not

affect the validity of any Postpetition Obligations outstanding immediately prior to the effective

PAGE 54
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

time of such stay, modification or vacatur, or the validity or enforceability of any Lien, priority,

right, privilege or benefit authorized hereby. Notwithstanding any such stay, modification or

vacatur, any Postpetition Obligations outstanding immediately prior to the effective time of such

modification, stay or vacatur shall be governed in all respects by the original provisions of this

Interim Order, and the Existing Factor and the DIP Lender shall be entitled to all of the rights,

privileges and benefits, including, without limitation, the Liens and priorities granted herein, with

respect to all such Postpetition Obligations.

27.   _Effect of Plan_.  The Liens, rights and remedies granted to the Existing

Factor and the DIP Lender pursuant to this Interim Order and the DIP Loan Documents (and

granted to Suchman, LLC as successor to the Existing WF Facility Agent and the Existing WF

Facility Lenders under the Existing WF Credit Facility) shall not be modified, altered or impaired

in any manner by any plan of reorganization for the Debtors except to the extent that (a) it

contains a provision for termination of the Commitments and repayment in full in cash of all of

the Postpetition Obligations under the DIP Credit Agreement on or before the effective date of

such plan, or (b) with the consent of the Existing Factor and the DIP Lender.

28.   _No Waiver_.  The rights and obligations of the Debtors and the rights,

claims, Liens, and priorities of the Existing Factor and Suchman, LLC as successor to the

Existing WF Facility Agent and the Existing WF Facility Lenders under the Existing WF Credit

Facility arising under this Interim Order are in addition to, and not intended as a waiver or

substitution for, the rights, obligations, claims, Liens, and priorities granted by Debtors under the

PAGE 55
DEBTORS:     MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

Existing Factoring Agreements and the Existing Factoring Facility and any related agreements

and obligations and the Existing WF Credit Facility.  The failure, at any time or times hereafter,

by either the Existing Factor, Suchman, LLC or the DIP Lender to require strict performance by

the Debtors (or by any Chapter 7 or Chapter 11 trustee or representative of the Estates hereinafter

appointed in these Chapter 11 Cases or any Successor Cases) of any provision of this Interim

Order, the Existing Factoring Agreements and the Existing Factoring Facility and any related

agreements and obligations, the Existing WF Credit Facility, or the DIP Loan Documents shall

not waive, affect or diminish any right of the Existing Factor, Suchman, LLC or the DIP Lender

hereafter to demand strict compliance and performance therewith. No delay on the part of the

Existing Factor, Suchman, LLC or the DIP Lender in the exercise of any right or remedy under

this Interim Order, the Existing Factoring Agreements and the Existing Factoring Facility and any

related agreements and obligations, the Existing WF Credit Facility or DIP Loan Documents shall

preclude any other or further exercise of any such right or remedy or the exercise of any other

right or remedy.  None of the rights or remedies of the Existing Factor, Suchman, LLC or the DIP

Lender under this Interim Order, the Existing Factoring Agreements and the Existing Factoring

Facility and any related agreements and obligations, the Existing WF Credit Facility or DIP Loan

Documents shall be deemed to have been suspended or waived by the Existing Factor, Suchman,

LLC in its capacity as successor to the Existing WF Facility Agent and the Existing WF Facility

Lenders under the Existing WF Credit Facility or the DIP Lender unless such suspension or

PAGE 56
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

waiver is in writing, signed by a duly authorized officer of the Existing Factor, Suchman, LLC or

the DIP Lender, as applicable, and directed to the Debtors  specifying such suspension or waiver.

29.    <u>No Dismissal</u>.  Until all Existing Factor Lien Claims and Postpetition

Obligations shall have been indefeasibly paid in full in cash and satisfied in the manner provided

herein and in the DIP Loan Documents, or upon the written consent of the Existing Factor and the

DIP Lender, no Debtor shall seek an order dismissing any of the Chapter 11 Cases.  If an order

dismissing any of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise

is at any time entered, such order shall provide (in accordance with Sections 105 and 349(b) of

the Bankruptcy Code) that (i) the claims and Liens granted pursuant to this Interim Order to or for

the benefit of the Existing Factor and/or the DIP Lender shall continue in full force and effect and

shall maintain their priorities as provided in this Interim Order until all Existing Factor Lien

Claims and Postpetition Obligations shall have been indefeasibly paid in full in cash and satisfied

in the manner provided herein and in the DIP Loan Documents (and that such claims and Liens

shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the claims and

Liens granted pursuant to this Interim Order to or for the benefit of the Existing Factor, Suchman,

LLC in its capacity as successor to the Existing WF Facility Agent and the Existing WF Facility

Lenders under the Existing WF Credit Facility the Prepetition Agent and Prepetition Credit

Facility Lenders shall continue in full force and effect and shall maintain their priorities as

provided in this Interim Order (and that such claims and Liens shall, notwithstanding such

PAGE 57
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.   14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
            POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
            CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
            CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
            FINAL HEARING

dismissal, remain binding on all parties in interest), and (iii) this Court shall retain jurisdiction,

notwithstanding such dismissal, for the purposes of enforcing such claims and Liens.

      30.    <u>Discharge Waiver</u>.  Except with respect to a Suchman Sale (in which case

the Existing Factor Claims shall be assumed and the Postpetition Obligations and some or all of

the Prepetition Obligations used to credit bid with respect to purchase of the Debtors' assets), the

Postpetition Obligations and the Prepetition Obligations shall not be discharged by the entry of an

order (a) confirming a chapter 11 plan in any Case (and, pursuant to section 1141(d)(4) of the

Bankruptcy Code, the Debtors hereby waive such discharge) or (b) converting any Case to a Case

under chapter 7 of the Bankruptcy Code.  Except with respect to a Suchman Sale, under no

circumstances shall any chapter 11 plan in any of the Cases be confirmed or become effective

unless such plan provides that any unpaid Postpetition Obligations shall be indefeasibly paid in

full in cash and satisfied in the manner provided herein on or before the effective date of such

plan.

      31.    <u>Access to Debtor</u>.  The Debtors shall permit on reasonable notice

representatives, agents and/or employees of the Existing Factor and the DIP Lender, including

professionals retained by the Existing Factor and DIP Lender, to have reasonable access to their

premises and records during normal business hours and shall cooperate, consult with and provide

to such persons all such non-privileged information as they may reasonably request

PAGE 58
DEBTORS:    MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS.  14-16484 (CMG)
CAPTION:    INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

32.    <u>Intercreditor Agreement</u>.  Pursuant to Section 510 of the Bankruptcy Code,

except as otherwise set forth herein and subject to the consents set forth and described herein, the

Prepetition Intercreditor Agreement remains in full force and effect.

33.    <u>Interim Order Effective</u>.  The Interim Order shall be effective immediately

as of the date of signature by the Court.

34.    <u>Procedure of Objections; Final Hearing</u>.  The Debtors shall, on or before

April ___, 2014, serve by United States mail, first class postage prepaid, on the Interim Notice

Parties copies of the Motion, this Interim Order and a notice of the Final Hearing (the "Final

Hearing Notice") to be held on April ____, 2014 at ____ __.m. to consider entry of the Final

Order.  Copies of the Motion, this Interim Order and the Final Hearing Notice also shall be served

upon all persons requesting service of papers pursuant to Bankruptcy Rule 2002 by United States

mail, first class postage prepaid, within the later of one Business Day following the receipt of

such request and April ____, 2014.  The Final Hearing Notice shall state that any party in interest

objecting to the entry of the Final Order shall file written objections with the Court no later than

4:00 p.m. ET April ____, 2014, which objections shall be served so that the same are received on

or before such date and time by:  (a) counsel for the Debtors: Cole, Schotz, Meisel, Forman &

Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, NJ 07602-0800

(Attn: Michael D. Sirota, Esq.); (b) counsel to the DIP Lender: Venable LLP, 2049 Century Park

East, Suite 2100, Los Angeles, CA 90067 (Attn: Ronn S. Davids, Esq.); (c) counsel to any official

committee; (d) counsel to the Existing Factor: McElroy, Deutsch, Mulvaney & Carpenter, LLP,

PAGE 59
DEBTORS: MEE APPAREL LLC and MEE DIRECT LLC
CASE NOS. 14-16484 (CMG)
CAPTION: INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (2) AUTHORIZING THE USE OF
CASH COLLATERAL, (3) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (4) MODIFYING THE AUTOMATIC STAY, AND (5) SETTING
FINAL HEARING

300 Delaware Avenue, Suite 770, Wilmington, DE 19801 (Attn: Aaron S. Applebaum, Esq.); and

(e) Office of the United States Trustee, One Newark Center, 1085 Raymond Boulevard, Suite

2100, Newark, NJ 07102 (Attn: Mitchell B. Hausman); and shall be filed with the Clerk of the

United States Bankruptcy Court for the District of New Jersey. Replies to such objections shall

be filed with the Court no later than 5:00 p.m. ET on April ____, 2014, and served so that the

same are received on or before such date and time by the objecting party and the parties identified

above.

     35. <u>Retention of Jurisdiction</u>. The Bankruptcy Court shall retain jurisdiction to

hear and determine all matters arising from this Order and its implementation.

     36. <u>Findings of Fact; Conclusions of Law</u>. This Interim Order shall constitute

findings of fact and conclusions of law. To the extent any findings may constitute conclusions,

and vice versa, they are hereby deemed as such.

# EXHIBIT A

*Execution Version*

**FINANCING AGREEMENT**

**Dated as of April 2, 2014**

**by and among**

**MEE APPAREL LLC
AND
MEE DIRECT LLC,**
each as a debtor and debtor-in-possession,
as Borrowers,

**and**

**SUCHMAN, LLC,**
as Lender

## TABLE OF CONTENTS

Page

ARTICLE I            DEFINITIONS; CERTAIN TERMS ...............................................................1

    Section 1.01            Definitions.....................................................................1

    Section 1.02            Terms Generally..............................................................18

    Section 1.03            Accounting and Other Terms..........................................18

    Section 1.04            Time References ............................................................18

ARTICLE II           THE LOANS ..................................................................................19

    Section 2.01            Commitments.................................................................19

    Section 2.02            Making the Loans ..........................................................19

    Section 2.03            Repayment of Loans; Evidence of Debt .........................20

    Section 2.04            Interest...........................................................................20

    Section 2.05            Termination of Commitment; Prepayment of Loans...........................21

    Section 2.06            Taxes..............................................................................22

    Section 2.07            Administrative Borrower; Joint and Several Liability of the Borrowers........................23

    Section 2.08            Payments; Computations ...............................................24

ARTICLE III          SECURITY AND ADMINISTRATIVE PRIORITY.......................................25

    Section 3.01            Collateral; Grant of Lien and Security Interest....................25

    Section 3.02            Administrative Priority ..................................................26

    Section 3.03            Grants, Rights and Remedies .........................................26

    Section 3.04            No Filings Required........................................................26

    Section 3.05            Survival .........................................................................26

    Section 3.06            Further Assurances.........................................................27

ARTICLE IV           CONDITIONS TO LOANS .............................................................28

    Section 4.01            Conditions Precedent to Interim Facility Effectiveness...................28

i

Section 4.02        Conditions Precedent to Final Facility Effectiveness ..........................30

Section 4.03        Conditions Precedent to All Loans .......................................32

ARTICLE V        REPRESENTATIONS AND WARRANTIES...............................................33

Section 5.01        Representations and Warranties...........................................33

ARTICLE VI        COVENANTS OF THE BORROWERS...............................................39

Section 6.01        Affirmative Covenants...........................................39

Section 6.02        Negative Covenants ...........................................46

Section 6.03        Financial Covenants ...........................................53

ARTICLE VII        MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS
AND OTHER COLLATERAL ...........................................53

Section 7.01        Accounts Receivable...........................................53

Section 7.02        Deposit Accounts, Securities Accounts and Investment
Accounts ...........................................54

ARTICLE VIII        EVENTS OF DEFAULT ...........................................55

Section 8.01        Events of Default ...........................................55

ARTICLE IX        MISCELLANEOUS ...........................................60

Section 9.01        Notices, Etc...........................................60

Section 9.02        Amendments ...........................................61

Section 9.03        No Waiver; Remedies, Etc...........................................61

Section 9.04        Expenses; Attorneys' Fees ...........................................61

Section 9.05        Right of Set-off ...........................................62

Section 9.06        Severability ...........................................62

Section 9.07        Assignments...........................................62

Section 9.08        Counterparts ...........................................63

Section 9.09        GOVERNING LAW...........................................63

ii

Section 9.10     CONSENT TO JURISDICTION; SERVICE OF PROCESS
                 AND VENUE ...................................................................................63

Section 9.11     WAIVER OF JURY TRIAL, ETC ................................................64

Section 9.12     Consent by the Lender ........................................................64

Section 9.13     No Party Deemed Drafter ....................................................64

Section 9.14     Reinstatement; Certain Payments ........................................64

Section 9.15     Indemnification ..................................................................65

Section 9.16     Records ..............................................................................66

Section 9.17     Binding Effect ....................................................................66

Section 9.18     Interest ..............................................................................66

Section 9.19     Confidentiality ....................................................................67

Section 9.20     Public Disclosure ................................................................67

Section 9.21     Integration ........................................................................68

Section 9.22     Parties Including Trustees; Bankruptcy Court Proceedings ...............68

7709782-v8

## SCHEDULE AND EXHIBITS

| | | |
|---|---|---|
| Schedule 1.01(A) | — | Store Cash Accounts |
| Schedule 5.01(f) | — | Litigation; Commercial Tort Claims |
| Schedule 5.01(q) | — | Environmental Matters |
| Schedule 5.01(t) | — | Intellectual Property |
| Schedule 5.01(y) | — | Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office |
| Schedule 5.01(z) | — | Locations of Collateral |
| Schedule 6.02(a) | — | Existing Liens |
| Schedule 6.02(e) | — | Existing Investments |
| Schedule 7.02 | — | Cash Management Banks |
| Exhibit A | — | Form of Notice of Borrowing |
| Exhibit B | — | Form of Interim Bankruptcy Court Order |

iv

## FINANCING AGREEMENT

This Financing Agreement, dated as of April 2, 2014, is made by and among MEE Apparel LLC, a New Jersey limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined below) ("Apparel"), MEE Direct LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Direct" and, together with Apparel, each a "Borrower" and, collectively, the "Borrowers"), and Suchman, LLC (the "Lender").

## RECITALS

The Borrowers have commenced or will commence cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), and the Borrowers have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

The Borrowers have asked the Lender to make post-petition loans and advances to the Borrowers consisting of revolving credit loans in an aggregate principal amount not to exceed $7,000,000 at any time outstanding as provided herein. The proceeds of the revolving credit loans shall be used (a) for working capital and general corporate purposes of the Borrowers and (b) to pay fees and expenses related to this Agreement and the Chapter 11 Cases. The Lender is willing to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth.

In consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS; CERTAIN TERMS

Section 1.01   Definitions. As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"Account Debtor" means each debtor, customer or obligor in any way obligated on or in connection with any Account Receivable.

"Account Receivable" means, with respect to any Person, any and all rights of such Person to payment for goods sold and/or services rendered, including accounts, general intangibles and any and all such rights evidenced by chattel paper, instruments or documents, whether due or to become due and whether or not earned by performance, and whether now or hereafter acquired or arising in the future, and any proceeds arising therefrom or relating thereto.

"Action" has the meaning specified therefor in Section 9.12.

"Administrative Borrower" means Apparel in its capacity as administrative Borrower pursuant to the provisions of Section 2.07.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding the foregoing, neither the Lender nor any of its Affiliates (other than the Borrowers themselves) shall be deemed an "Affiliate" of the Borrowers for purposes of this Agreement and the other Loan Documents.

"Agreed Administrative Expense Priorities" means that administrative expenses with respect to the Borrowers and, with respect to sub-clause (ii) of clause "first", any official committee appointed by the Bankruptcy Court, shall have the following order of priority:

first, (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees due to the clerk of the Bankruptcy Court and (ii) amounts payable in respect of Carve-Out Expenses; provided that the amount entitled to priority under this sub-clause (ii) of this clause first ("Priority Professional Expenses") during any Carve-Out Expense Reduction Period shall not exceed (x) the amount of unpaid Carve-Out Expenses actually incurred on or after the Petition Date and prior to the commencement of the Carve-Out Expense Reduction Period, plus (y) the amount of Carve-Out Expenses actually incurred during such Carve-Out Expense Reduction Period in an aggregate sum not to exceed the lesser of (A)(x) $50,000, in the case of Carve-Out Expenses for professionals retained by the Borrowers and (y) $25,000, in the case of Carve-Out Expenses for professionals retained by any statutory committee, and (B) the amounts provided for such Carve-Out Expenses in the Budget during the Carve-Out Reduction Period (the "Professional Expense Cap"); provided, however, that (1) during any Carve-Out Expense Reduction Period, any payments actually made in respect of Carve-Out Expenses (other than from fee retainers or advances held by such professionals), shall reduce the Professional Expense Cap on a dollar-for-dollar basis, and (2) for the avoidance of doubt, so long as no Carve-Out Expense Reduction Period shall be continuing, the payment of Carve-Out Expenses shall not reduce the Professional Expense Cap;

second, all Obligations in accordance with Section 3.02, and

third, all other allowed administrative expenses.

"Agreement" means this Financing Agreement, including all amendments, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to the Agreement as the same may be in effect at the time such reference becomes operative.

"Apparel" has the meaning specified therefor in the preamble hereto.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief financial officer, chief restructuring officer, president or executive vice president of such Person.

2

"Avoidance Actions" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. § 101, *et seq.*), as amended, and any successor statute.

"Bankruptcy Court" has the meaning specified therefor in the recitals hereto, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"Bankruptcy Court Orders" means the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order.

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" means, (a) with respect to any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) with respect to a partnership, the board of directors of the general partner of the partnership, (c) with respect to a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" and "Borrowers" have the meanings specified therefor in the preamble hereto.

"Budget" means (a) the thirteen (13) week cash requirements forecast setting forth cash receipts and disbursements and Loans of the Borrowers for the period covered thereby, delivered by the Borrowers to the Lender on or before the Interim Facility Effective Date pursuant to Section 4.01(e)(viii) and (b) any updated Budget delivered to the Lender pursuant to Section 6.01(a)(vi), in each case, which shall be in form and substance satisfactory to the Lender in its sole and absolute discretion.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed and including all Capitalized Lease Obligations paid or payable during such period.

"Capitalized Lease" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is (a) required under GAAP to be capitalized on the balance sheet of such Person or (b) a transaction of a type commonly known as a "synthetic lease" (i.e., a lease transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes).

3

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out Expenses" means any payments permitted to be made by the Bankruptcy Court in respect of (i) fees and expenses of attorneys, accountants and other professionals retained in the Chapter 11 Cases pursuant to Sections 326, 327, 328, 330, 331 and 1103 of the Bankruptcy Code and (ii) expenses of members of any statutory committee (excluding the fees and expenses of professional persons employed by such committee members individually), in each case in an amount not to exceed the amount set forth in the Budget for such attorneys, accountants, other professionals and committee members, respectively.

"Carve-Out Expense Reduction Period" means any period following the delivery of a Carve-Out Notice.

"Carve-Out Notice" means a notice delivered by the Lender to the Borrower indicating that an Event of Default under this Agreement or a default by Borrower in any of its obligations under any of the Bankruptcy Court Orders, in either case, has occurred and is continuing.

"Change of Control" means the acquisition, directly or indirectly, by any person or group (within the meaning of Section 13(d)(3) of the Exchange Act) of beneficial ownership of more than 50.1% of the aggregate outstanding voting power of the Equity Interests of any Borrower.

"Chapter 11 Cases" has the meaning specified therefor in the recitals hereto.

"Collateral" has the meaning specified therefor in Section 3.01(a), and includes all of the property and assets and all interest therein and proceeds thereof now owned or hereafter acquired by any other Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of

4

such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Direct" has the meaning specified therefor in the preamble hereto.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Borrower or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person, excluding (i) any sales of Inventory, (ii) any sales of fixtures, equipment and related assets in connection with the closing of stores, and (iii) Dispositions from a Borrower to another Borrower, in each case in the ordinary course of business on ordinary business terms and in the case of clause (ii), in an amount not to exceed $250,000 in the aggregate.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date which is one year after the Final Maturity Date, (b) is convertible into or exchangeable for (i) debt securities or (ii) any Equity Interests referred to in clause (a) above, in each case at any time prior to the date which is one year after the Final Maturity Date, (c) contains any repurchase obligation that may come into effect either (i) prior to payment in full of all Obligations or (ii) prior to the date that is one year after the Final Maturity Date or (d) provides for scheduled payments or the payment of cash dividends or distributions prior to the date that is one year after the Final Maturity Date.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the six (6) calendar years preceding the date of any borrowing hereunder) for employees of any Borrower or any of its ERISA Affiliates.

5

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Borrower or any of its Subsidiaries or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Borrower or any of its Subsidiaries or any predecessor in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, *et seq.*), the Federal Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*) and the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), as such laws may be amended or otherwise modified from time to time, and any other present or future federal, state, local or foreign statute, ordinance, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, deposit or migration of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (i) any property presently or formerly owned by any Borrower or any of its Subsidiaries or (ii) any facility which received Hazardous Materials generated by any Borrower or any of its Subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interest" means (a) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, and (b) with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which

6

would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Event of Default" means any of the events set forth in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Existing Factor" means Rosenthal & Rosenthal, Inc., as factor under the Existing Factoring Agreements.

"Existing Factoring Agreements" means (a) that certain Factoring Agreement, dated as of September 24, 2013, by and between the Existing Factor and Apparel and (b) that certain Factoring Agreement, dated as of September 24, 2013, by and between the Existing Factor and Direct, in each case, as the same may be amended, restated, modified or supplemented from time to time.

"Existing Factoring Facility" means the Existing Factoring Agreements and all documents, agreements, and certificates entered into and/or delivered in connection therewith.

"Existing WF Credit Facility" means that certain Credit Agreement, dated as of July 6, 2011, by and among Apparel, the other borrowers named therein, the guarantors named therein and Suchman, LLC, as successor-in-interest to Wells Fargo Bank, National Association, as the same may be amended, restated, modified or supplemented from time to time, and all documents, agreements and certificates entered into and/or delivered in connection therewith, including, without limitation, the "Loan Documents" as such term is defined therein.

"Existing WF Facility Agent" means the "Agent," as such term is defined in the Existing WF Credit Facility.

"Existing WF Facility Lenders" means the "Lenders," as such term is defined in the Existing WF Credit Facility.

"Extraordinary Receipts" means any cash received by any Borrower or any of their Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.05(c)(ii) hereof), including, without limitation, (a) proceeds of insurance, (b) condemnation awards (and payments in lieu thereof) and (c) proceeds of Avoidance Actions.

"Final Bankruptcy Court Order" means the final order of the Bankruptcy Court with respect to the Borrowers, substantially in the form of the Interim Bankruptcy Court Order and otherwise in form and substance satisfactory to the Lender in its sole and absolute discretion, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Lender and the Borrower.

"Final Bankruptcy Court Order Entry Date" means the date on which the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Final Facility Effective Date" has the meaning specified therefor in Section 4.02.

7

"Final Maturity Date" means the date which is the earliest of (a) the date which is 40 days following the date of entry of the Interim Bankruptcy Court Order if the Final Bankruptcy Court Order has not been entered by the Bankruptcy Court on or prior to such date, (b) the date that is six (6) months from the date of this Agreement or such later date to which the Lender consent in writing in their sole and absolute discretion, (c) the earlier of effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (d) the date of a sale or liquidation of substantially all of the Equity Interests or assets of the Borrowers; and (e) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Final Maturity Date.

"Financial Statements" means (a) the unaudited consolidated balance sheet of the Borrowers for the 2013 Fiscal Year, and the related consolidated statements of operations and cash flows for the Fiscal Year then ended, and (b) the unaudited consolidated balance sheet of the Borrowers, and the related consolidated statements of operations and cash flows for each of the fiscal months of November 2013, December 2013 and January 2014.

"Fiscal Year" means the fiscal year of the Borrowers ending on December 31 of each year.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; provided that for the purpose of Section 8.03 hereof and the definitions used therein, "GAAP" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements, provided, further, that if there occurs after the date of this Agreement any change in GAAP that affects in any respect the calculation of any covenant contained in Section 8.03 hereof, the Lender and the Borrowers shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lender and the Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 6.03 hereof shall be calculated as if no such change in GAAP has occurred.

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture agreement, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

8

"Governmental Authority" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Hazardous Material" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Highest Lawful Rate" means, with respect to the Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to the Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) [intentionally omitted]; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) liabilities incurred under Title IV of ERISA with respect to any plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained for employees of such Person or any of its ERISA Affiliates; (k) withdrawal liability incurred under ERISA by such Person or any of its ERISA Affiliates with respect to any Multiemployer Plan; (l) all Disqualified Equity Interests; and (m) all obligations referred to in clauses (a) through (l)

9

of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Matters" has the meaning specified therefor in Section 9.15.

"Indemnitees" has the meaning specified therefor in Section 9.15.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Interim Bankruptcy Court Order" means the order of the Bankruptcy Court with respect to the Borrowers, substantially in the form of Exhibit B and otherwise in form and substance satisfactory to the Lender in its sole and absolute discretion, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Lender and the Borrower.

"Interim Bankruptcy Court Order Entry Date" means the date on which the Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Interim Facility Effective Date" means the date on which all of the conditions precedent set forth in Section 4.01 are satisfied or waived in accordance with Section 4.01.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Final Maturity Date.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies, materials and finished goods of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account Receivable or cash.

"Knowledge" means, with respect to the Borrowers, as to a particular matter, the actual knowledge as of the date of inquiry or verification, and without independent verification or investigation, of the Chief Restructuring Officer of the Borrowers.

"Lease" means any lease of real property to which any Borrower or any of its Subsidiaries is a party as lessor or lessee.

"Lender" has the meaning specified therefor in the preamble hereto.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease, and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Loan" means any Revolving Loan made by the Lender to the Borrowers pursuant to Article II hereof.

"Loan Account" means an account maintained hereunder by the Lender on its books of account with respect to the Borrowers, in which the Borrowers will be charged with all Loans made to, and all other Obligations incurred by, the Borrowers.

"Loan Document" means this Agreement, any guaranty, any mortgage, any security agreement, any pledge agreement, any account control agreement, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, business, assets, properties or condition (financial or otherwise) of the Borrowers taken as a whole (except for the commencement of the Chapter 11 Cases and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code), (b) the ability of any Borrower to perform any of its obligations under any Loan Document to which it is a party, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of the Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Lender on any of the Collateral.

"Material Contract" means, with respect to any Person, (a) each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $100,000 or more in any Fiscal Year (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or premium) and (b) all other contracts or agreements material to the business, operations, condition (financial or otherwise), performance or properties of such Person or such Subsidiary.

"Measurement Period" means the trailing four-week period ending on Saturday of each week; provided, that, with respect to the Measurement Periods ending on each of the first three Saturdays following the Interim Facility Effective Date, the Measurement Period shall mean the trailing one-, two- or three-week period, as applicable.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

11

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Borrower or any of its ERISA Affiliates has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years.

"Net Cash Flow" means, for any period, total cash receipts for such period minus total cash disbursements for such period.

"Net Cash Proceeds" means, with respect to any Disposition by any Borrower or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Agreement), (ii) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (iii) transfer taxes paid to any taxing authorities by such Person or such Subsidiary in connection therewith, and (iv) income and franchise taxes to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case, to the extent, but only to the extent, that the amounts so deducted are (x) actually paid or required to be paid (and reserved for such purpose) to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Borrower to the Lender arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 8.01. Without limiting the generality of the foregoing, the Obligations of each Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that the Lender (in its sole and absolute discretion) may elect to pay or advance on behalf of such Person.

"Operating Lease Obligations" means all obligations for the payment of rent for any real or personal property under leases or agreements to lease, other than Capitalized Lease Obligations.

"Other Taxes" has the meaning specified therefor in Section 2.06(b).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Period" means the Interim Period or the Final Period, as the context requires.

12

7709782-v8

"Permitted Indebtedness" means:

(a)    any Indebtedness owing to the Lender under this Agreement and the other Loan Documents;

(b)    any Indebtedness existing on the Petition Date;

(c)    Indebtedness evidenced by Capitalized Lease Obligations entered into after the Petition Date in order to finance Capital Expenditures made by the Borrowers in accordance with the provisions of Section 6.02(g), which Indebtedness, when aggregated with the principal amount of all Indebtedness incurred under this clause (c) and clause (d) of this definition, does not exceed $1,000,000 at any time outstanding;

(d)    Indebtedness permitted by clause (e) of the definition of "Permitted Lien";

(e)    Indebtedness permitted under Section 6.02(e); and

(f)    Indebtedness consisting of guarantees of leases of the Borrowers (i) in existence on the Petition Date or (ii) entered into, modified or extended on or after the Petition Date with the prior written consent of the Lender in its sole and absolute discretion.

"Permitted Investments" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof, (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000; and (f) marketable tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within six months from the date of acquisition thereof.

"Permitted Liens" means:

(a)    Liens securing the Obligations;

(b)    Liens for taxes, assessments and governmental charges the payment of which is not required under Section 6.01(c);

(c)    Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising (provided they are subordinate to the Lender's Liens on Collateral) in the ordinary course of business and securing obligations (other than

13

Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, or as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)      Liens existing on the Petition Date, as described on <u>Schedule 6.02(a)</u> (other than the Liens described in clause (i) below), but not the extension of coverage thereof to other property or the extension of maturity, refinancing or other modification of the terms thereof or the increase of the Indebtedness secured thereby;

(e)      purchase money Liens on equipment acquired or held by any Borrower or any of its Subsidiaries after the Petition Date in the ordinary course of its business to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition of such equipment; <u>provided</u>, <u>however</u>, that (i) no such Lien shall extend to or cover any other property of any Borrower or any of its Subsidiaries and (ii) the aggregate principal amount of Indebtedness secured by any or all such Liens shall not exceed, when aggregated with the principal amount of all Indebtedness incurred under clause (c) of the definition of Permitted Indebtedness, $1,000,000 at any one time outstanding;

(f)      deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)      easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Borrower or any of its Subsidiaries in the normal conduct of such Person's business;

(h)      Liens on real property or equipment securing Indebtedness permitted by subsection (c) of the definition of Permitted Indebtedness; and

(i)      Liens securing the Indebtedness outstanding pursuant to the Existing Factoring Facility; and

(j)      Liens securing the Indebtedness outstanding pursuant to the Existing WF Credit Facility; <u>provided</u> that, such Liens are junior and subordinate in all respects to the Liens securing the Obligations with respect to all Collateral pursuant to the Bankruptcy Court Orders.

"<u>Permitted Priority Liens</u>" means valid, perfected, enforceable and non-avoidable Permitted Liens (a) existing on the Petition Date that are senior to the Liens securing the Existing Factoring Facility by operation of law, (b) securing the Existing Factoring Facility and (c) arising after the Petition Date but only to the extent such Permitted Liens would be senior to the Liens granted to the Lender pursuant to this Agreement and the Bankruptcy Court Orders by operation

of law; provided, for the avoidance of doubt, that the Liens in clause (j) of the definition of "Permitted Liens" shall not be Permitted Priority Liens.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petition Date" means April 2, 2014.

"PIK Interest" has the meaning specified in Section 2.04(a).

"Plan" means any Employee Plan or Multiemployer Plan.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00% per annum or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2.00% per annum.

"Pre-Petition Credit Facilities" means the Existing Factoring Facility and the Existing WF Credit Facility.

"Pre-Petition Obligations" means all indebtedness, obligations (including obligations in respect of any letters of credit) and liabilities of the Borrowers incurred prior to the Petition Date plus fees, expenses, and indemnities due thereunder and interest thereon accruing both before and after the Petition Date to the extent allowable under the Bankruptcy Code, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Priority Professional Expenses" means those Carve-Out Expenses entitled to a priority as set forth in sub-clause (ii) of the clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Professional Expense Cap" has the meaning specified in subclause (ii) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"Reportable Event" means an event described in Section 4043 of ERISA (other than the commencement of the Chapter 11 Cases and any event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Revolving Credit Commitment" means $7,000,000, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Revolving Loan" means a loan made by the Lender to the Borrowers pursuant to Section 2.01(a).

"Rolling Stock" means all trucks, trailers, tractors, service vehicles, vans, pickup trucks, forklifts, wheel loaders and other registered mobile equipment and vehicles, wherever located; excluding any of the foregoing that constitutes Inventory.

"Sale Milestones" means the following milestones with respect to the sale of all or substantially all of the Borrowers' assets or equity interests pursuant to Section 363 of the Bankruptcy Code, in each case, in a manner satisfactory to the Lender in its sole and absolute discretion:

(a)    entry of an order, satisfactory to the Lender in its sole and absolute discretion, approving the Borrowers' retention of an investment banking firm acceptable to the Lender, no later than ten (10) days after the Petition Date;

(b)    completion of an offering memorandum, teaser and nondisclosure agreement no later than ten (10) days after the Petition Date;

(c)    entry of an order, satisfactory to the Lender in its sole and absolute discretion, approving sale procedures (the "Sale Procedures Order") no later than fifteen (15) days after the Petition Date;

(d)    conduct an auction (the "Auction"), if more than one bona fide offer meeting the conditions established by the Borrowers with the approval of the Lender is received, no later than

forty-five (45) days after the Petition Date or such later date as may be consented to by the Lender in its sole and absolute discretion;

(e)      entry of a final order of the Bankruptcy Court, satisfactory to the Lender in its sole and absolute discretion, approving the sale (the "Sale Order") no later than two (2) days after the Auction, or such later date as may be consented to by the Lender in its sole and absolute discretion; and

(f)      close the sale no later than two (2) days after entry of the Sale Order.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Stalking Horse APA" means that certain Asset Purchase Agreement, dated as of April 2, 2014, by and among the Borrowers and Suchman, LLC.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. and any successor thereto.

"Store Cash" means all cash held in the Borrowers' retail store locations and all cash and cash equivalents held in the bank accounts set forth on Schedule 1.01(A).

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.

"Taxes" has the meaning specified therefor in Section 2.06(a).

"Termination Event" means (a) a Reportable Event with respect to any Employee Plan, (b) any event that causes any Borrower or any of its ERISA Affiliates to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any

17

Employee Plan; provided, however, no Termination Event shall be deemed to have occurred as a result of the commencement of the Chapter 11 Cases.

"Uniform Commercial Code" has the meaning specified therefor in Section 1.03.

"WARN" has the meaning specified therefor in Section 5.01(w).

Section 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.  References in this Agreement to "determination" by the Lender include good faith estimates by the Lender (in the case of quantitative determinations) and good faith beliefs by the Lender (in the case of qualitative determinations).

Section 1.03    Accounting and Other Terms.  Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP applied on a basis consistent with those used in preparing the Financial Statements.  All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Lender may otherwise determine.

Section 1.04    Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to the Lender, such period shall in any event consist of at least one full day.

18

## ARTICLE II
## THE LOANS

Section 2.01   Commitments.

(a)   Subject to the terms and conditions and relying upon the representations and warranties herein set forth, the Lender agrees to make Revolving Loans to the Borrowers at any time and from time to time from the Interim Facility Effective Date to the Final Maturity Date, or until the earlier reduction of its Revolving Credit Commitment to zero in accordance with the terms hereof, in an aggregate principal amount of Revolving Loans at any time outstanding not to exceed the amount of the Revolving Credit Commitment.

(b)   Notwithstanding the foregoing:

(i)   The aggregate principal amount of Revolving Loans outstanding at any time to the Borrowers shall not exceed the Revolving Credit Commitment in effect at such time; provided, that prior to the Final Facility Effective Date, the aggregate principal amount of Revolving Loans outstanding at any time shall not exceed the aggregate amount set forth in the Budget for the period from the Interim Facility Effective Date until the Final Facility Effective Date.

(ii)   The Revolving Credit Commitment shall automatically and permanently be reduced to zero on the Final Maturity Date. Within the limits set forth herein, the Borrowers may borrow, repay and reborrow, on or after the Interim Facility Effective Date and prior to the Final Maturity Date, subject to the terms, provisions and limitations set forth herein.

Section 2.02   Making the Loans.

(a)   The Administrative Borrower shall give the Lender prior telephonic notice (immediately confirmed in writing, in substantially the form of Exhibit A hereto (a "Notice of Borrowing")), not later than 12:00 noon (New York City time) on the date which is three (3) Business Days prior to the date of the proposed Loan (or such shorter period as the Lender is willing to accommodate from time to time, but in no event later than 12:00 noon (New York City time) on the borrowing date of the proposed Loan). Such Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Loan, (ii) the use(s) of the proposed Loan, in reasonable detail, and (ii) the proposed borrowing date, which must be a Business Day. The Lender may act without liability upon the basis of written, telecopied or telephonic notice believed by the Lender in good faith to be from the Administrative Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Administrative Borrower to the Lender). Each Borrower hereby waives the right to dispute the Lender's record of the terms of any such telephonic Notice of Borrowing. The Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Administrative Borrower until the Lender receives written notice to the contrary. The Lender shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

19

(b)     Each Notice of Borrowing pursuant to this <u>Section 2.02</u> shall be irrevocable and the Borrowers shall be bound to make a borrowing in accordance therewith.

Section 2.03     <u>Repayment of Loans; Evidence of Debt</u>.

(a)     The outstanding principal of all Revolving Loans shall be due and payable on the Final Maturity Date.

(b)     The Lender shall maintain an account in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to the Lender hereunder and (iii) the amount of any sum received by the Lender.

(c)     The entries made in the accounts maintained pursuant to paragraph (b) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement.

(d)     The Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to the Lender a promissory note payable to the order of the Lender (or, if requested by the Lender, to the Lender and its registered assigns) in a form reasonably acceptable to the Borrowers and the Lender. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to <u>Section 9.07</u>) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04     <u>Interest</u>.

(a)     <u>Revolving Loans</u>.  Subject to the terms of this Agreement, each Revolving Loan shall bear interest at a rate per annum equal to six percent (6%), which interest shall be paid-in-kind (the "<u>PIK Interest</u>").

(b)     <u>Default Interest</u>.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Borrowers under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.  All interest at the Post-Default Rate shall be paid in cash.

(c)     <u>Interest Payment</u>.  Interest on each Loan shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which such Loan is made and at maturity (whether upon demand, by acceleration or otherwise) by being added to the principal amount of the Loans at such date.  Interest at the Post-Default Rate shall be payable on demand.

(d)    General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

(e)    If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 2.05    Termination of Commitment; Prepayment of Loans.

(a)    Termination of Revolving Credit Commitment.  The Revolving Credit Commitment shall terminate on the Final Maturity Date.

(b)    Optional Prepayment.

(i)    Revolving Loans.  The Borrowers may, at any time and from time to time, prepay the principal of any Revolving Loan, in whole or in part, without premium or penalty.

(ii)    Termination of Commitment.  The Borrowers may, upon at least thirty (30) days prior written notice to the Lender of the Borrowers' intention to terminate the Revolving Credit Commitment, terminate this Agreement by paying to the Lender, in cash, the Obligations, in full.  If the Administrative Borrower has sent a notice of termination pursuant to this clause (ii), then the Lender's obligation to extend credit hereunder shall terminate and the Borrowers shall be jointly and severally obligated to repay the Obligations, in full, on the date set forth as the date of termination of this Agreement in such notice.

(c)    Mandatory Prepayment.

(i)    If at any time, the aggregate principal amount of all Revolving Loans exceeds the Revolving Credit Commitment, other than any such excess consisting of PIK Interest, the Borrowers shall immediately prepay the Loans to the full extent of any such excess.

(ii)    Immediately upon any Disposition by any Borrower or any of its Subsidiaries (other than sales of Inventory in the ordinary course of business), the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with clause (d) below in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition.  Nothing contained in this subsection (iii) shall permit any Borrower or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 6.02(c).

(iii)    Upon the receipt by any Borrower or any of its Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal of the Loans in accordance with clause (d) below in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts and any taxes paid or required to be paid (and reserved for such purpose) in connection with such Extraordinary Receipts.  Except during the continuance of a Default or an Event of Default, proceeds of Extraordinary Receipts described in clause (a) of the definition of Extraordinary Receipts up to $500,000 in the aggregate shall not be required to be applied in mandatory

21

prepayment of the Loans to the extent that such proceeds are used to replace, repair or restore the properties or assets in respect of which such proceeds were paid or to acquire other assets which are useful to the Borrowers in the ordinary course of its business, consistent with past practices.

(iv)    Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of the Loans in whole or in part, the Borrowers shall prepay the Loans in full on the date which is forty (40) days following the entry of the Interim Facility Bankruptcy Court Order in the event that that Final Bankruptcy Court Order shall not have been entered on or before such date.

(d)    Application of Payments.  Each prepayment pursuant to subsections (c)(ii) and (c)(iii) above shall be applied to the Revolving Loans, together with a dollar-for-dollar reduction of the Revolving Credit Commitments.

(e)    Interest.  Any prepayment made pursuant to this Section 2.05 (other than prepayments made pursuant to subsection (c)(i) of this Section 2.05) shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment.

(f)    Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05.

Section 2.06    Taxes.

(a)    Except to the extent required by law, any and all payments by any Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding franchise taxes, branch profits taxes and taxes imposed on or measured by the income of the Lender (or any transferee or assignee thereof), in the case of all of the foregoing, by the jurisdiction in which such Person is organized or has its principal lending office or applicable lending office (all such nonexcluded taxes, levies, imposts, deductions, charges withholdings and liabilities, collectively or individually, "Taxes").  If any Borrower shall be required to deduct any Taxes from or in respect of any sum payable hereunder to the Lender, (i) the sum payable shall be increased by the amount necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.06) the Lender shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) such Borrower shall make such deductions and (iii) such Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, each Borrower agrees to pay to the relevant Governmental Authority in accordance with applicable law any present or future stamp, documentary, transfer, recording or filing taxes or fees or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document ("Other Taxes").  Each Borrower shall deliver to the Lender official receipts in respect of any Taxes or Other Taxes payable hereunder, copies of such receipts or any other evidence of the payment of such Taxes or

22

Other Taxes personally acceptable to the Lender, within thirty (30) Business Days after payment of such Taxes or Other Taxes.

(c)      The Borrowers hereby jointly and severally indemnify and agree to hold the Lender and each Lender harmless from and against Taxes and Other Taxes (including, without limitation, Taxes and Other Taxes imposed on any amounts payable under this Section 2.06) paid by such Person, whether or not such Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefor specifying in reasonable detail the nature and amount of such Taxes or Other Taxes.

(d)      The obligations of the Borrowers under this Section 2.06 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(e)      If the Lender receives a refund that it determines, in its sole discretion, is allocable to any amount paid by a Borrower pursuant to this Section 2.06, it shall promptly notify the applicable Borrower of such refund and shall, within fifteen (15) days after receipt, repay such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower) to such Borrower net of all out-of-pocket expenses of the Lender; provided, however, that such Borrower, upon the request of the Lender, agrees to repay the amount paid over to such Borrower to the Lender (plus any penalties, interest or other charges imposed by the relevant Governmental Authority), within ten (10) days after receipt of written request by the Lender in the event the Lender is required to repay such refund. This paragraph shall not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to any Borrower or any other Person.

Section 2.07    Administrative Borrower; Joint and Several Liability of the Borrowers.

(a)      Each Borrower hereby irrevocably designates Administrative Borrower to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers.

(b)      The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Borrowers and at their request. The Lender shall not incur liability to Borrowers as a result thereof. To induce the Lender to do so and in consideration thereof, each Borrower hereby indemnifies the Lender and holds the Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against the Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by the Lender on any request or instruction from Administrative Borrower or any other action taken by the Lender with respect to this Section 2.07 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

23

(c)      Notwithstanding anything in this Agreement or any other Loan Document to the contrary, each of the Borrowers hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations. Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.07), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them. If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation. Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 2.07 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(d)      The provisions of this Section 2.07 are made for the benefit of the Lender and its successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Lender or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.07 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

(e)      Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Lender with respect to any of the Obligations or any Collateral, until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

Section 2.08   Payments; Computations. The Borrowers will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the account designated by the Lender. All payments received by the Lender after 12:00 noon (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day. All payments shall be made by the Borrowers without set-off, counterclaim,

24

deduction or other defense to the Lender.  The Borrowers hereby authorize the Lender to, and the Lender may, from time to time, charge the Loan Account of the Borrowers with any amount due and payable by the Borrowers under any Loan Document.  Each of the Borrowers agrees that the Lender shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in <u>Section 4.03</u> have been satisfied.  Any amount charged to the Loan Account of the Borrowers shall be deemed a Revolving Loan hereunder made by the Lender to the Borrowers.  The Borrowers confirm that any charges which the Lender may so make to the Loan Account of the Borrowers as herein provided will be made as an accommodation to the Borrowers and solely at the Lender's discretion.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.  All computations of fees shall be made by the Lender on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such fees are payable.  Each determination by the Lender of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

## ARTICLE III
## SECURITY AND ADMINISTRATIVE PRIORITY

Section 3.01   <u>Collateral; Grant of Lien and Security Interest</u>.

(a)       As security for the full and timely payment and performance of all of the Obligations, each of the Borrowers hereby, as of the Interim Bankruptcy Court Order Entry Date, assigns, pledges and grants (or causes the assignment, pledge and grant in respect of any indirectly owned assets) to the Lender, a security interest in and to, and Liens on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of such Borrower, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor (including all goodwill associated therewith), general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the Equity Interests of each Subsidiary of such Borrower, all of the Equity Interests of all other Persons directly owned by such Borrower, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, but subject to entry of the Final Bankruptcy Court Order, all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above (all property of the Borrowers subject to the security interest referred to in this <u>Section 3.01(a)</u> being hereafter collectively referred to as the "<u>Collateral</u>").

(b)       Upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order, as the case may be, the Liens and security interests in favor of the Lender referred to in <u>Section 3.01(a)</u> shall be valid and perfected Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than

25

Permitted Priority Liens. Such Liens and security interests and their priority shall remain in effect until the Revolving Credit Commitment shall have been terminated and all Obligations shall have been repaid in cash in full.

(c)     Notwithstanding anything herein to the contrary, all proceeds received by the Lender from the Collateral subject to the Liens granted in this Section 3.01(a) or in any other Loan Document or by the Bankruptcy Court Orders shall be subject to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" and the payment in full of the Existing Factoring Facility; provided, that no Person entitled to such Carve-Out Expenses shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

Section 3.02   Administrative Priority. Each of the Borrowers agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" and any other superpriority claim which is granted priority senior to the priority granted in respect of the Obligations in the Bankruptcy Court Orders.

Section 3.03   Grants, Rights and Remedies. The Liens and security interests granted pursuant to Section 3.01 and the administrative priority granted pursuant to Section 3.02 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Bankruptcy Court Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

Section 3.04   No Filings Required. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, and entry of the Interim Bankruptcy Court Order shall have occurred on or before the date of any Revolving Loan. The Lender shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, or any other Loan Document; provided, that the Lender shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office and to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, or any other Loan Document.

Section 3.05   Survival. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Bankruptcy Court Orders and the other Loan Documents (specifically including, without limitation, the existence,

perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)      except for the Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" and any other superpriority claim which is granted priority senior to the priority granted in respect of the Obligations in the Bankruptcy Court Orders, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Lender against any Borrower in respect of any Obligation;

(b)      upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order, as the case may be, the Liens in favor of the Lender set forth in Section 3.01 shall constitute valid and perfected first priority Liens and security interests to which other Liens and security interests shall be subordinate and junior, subject only to Permitted Priority Liens, and which Liens and security interests shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)      the Liens in favor of the Lender set forth herein, in the Bankruptcy Court Orders and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Lender file financing statements, mortgages, certificates of title, notices of Lien or other similar instruments or otherwise perfect its Lien under applicable non-bankruptcy law.

Section 3.06   Further Assurances. The Borrowers shall take any other actions reasonably requested by the Lender and consistent with the Loan Documents from time to time to cause the attachment, perfection and first priority of, and the ability of the Lender to enforce, the security interest of the Lender in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Borrower's signature thereon is required therefor, (c) causing the Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, and (e) obtaining the consent and approval of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other Person obligated on Collateral, and taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

27

## ARTICLE IV
## CONDITIONS TO LOANS

Section 4.01   Conditions Precedent to Interim Facility Effectiveness.  This Agreement shall become effective as of the Business Day (the "Interim Facility Effective Date") when each of the following conditions precedent shall have been satisfied or waived in a manner satisfactory to the Lender in its sole and absolute discretion:

(a)   Interim Bankruptcy Court Order.  The Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent prior written consent of the Lender and the Borrowers.  The Interim Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Lender is entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, during the Interim Period, the Liens and security interests in favor of the Lender referred to in Section 3.01 hereof shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens.

(b)   Payment of Fees, Etc.  The Borrowers shall have paid on or before the Interim Facility Effective Date (which payment may be made from the proceeds of the initial Loans hereunder), all fees, costs, expenses and taxes then due and payable pursuant to Section 9.04.

(c)   Representations and Warranties; No Event of Default.  The following statements shall be true and correct:  (i) the representations and warranties contained in Article V and in each other Loan Document, certificate or other writing delivered to the Lender pursuant hereto or thereto on or prior to the Interim Facility Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Interim Facility Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Interim Facility Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(d)   Legality.  The making of the initial Loans under the Interim Facility shall not contravene any law, rule or regulation applicable to the Lender.

28

(c)     Delivery of Documents.  The Lender shall have received on or before the Interim Facility Effective Date the following, each in form and substance satisfactory to the Lender and, unless indicated otherwise, dated the Interim Facility Effective Date:

(i)     a certified listing of all effective financing statements which name as debtor any Borrower and which are filed in the offices of such Borrower's jurisdiction of organization;

(ii)     a copy of the resolutions of each Borrower, certified as of the Interim Facility Effective Date by an Authorized Officer thereof, authorizing (A) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Borrower is or will be a party, and (B) the execution, delivery and performance by such Borrower of each Loan Document to which such Borrower is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith;

(iii)     [intentionally omitted];

(iv)     a certificate of the appropriate official(s) of the jurisdiction of organization of each Borrower, certifying as of a recent date not more than thirty (30) days prior to the Interim Facility Effective Date, as to the subsistence in good standing of such Borrower in such jurisdictions;

(v)     a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Borrower certified as of the Interim Facility Effective Date by an Authorized Officer thereof which shall set forth the same complete name of such Borrower as is set forth herein and the organizational number of such Borrower, if an organizational number is issued in such jurisdiction;

(vi)     a copy of the Governing Documents of each Borrower, together with all amendments thereto, certified as of the Interim Facility Effective Date by an Authorized Officer of such Borrower;

(vii)     a certificate of an Authorized Officer of the Administrative Borrower, certifying as to the matters set forth in subsection (c) of this Section 4.01;

(viii)     a copy of the Budget, together with a certificate of an Authorized Officer of the Administrative Borrower stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrowers to be reasonable at the time made and from the best information then available to the Borrowers, which Budget shall be in form and substance satisfactory to the Lender in its sole and absolute discretion;

(ix)     [intentionally omitted]; and

(x)     such other agreements, instruments, approvals, opinions and other documents, each satisfactory to the Lender in form and substance, as the Lender may reasonably request.

(f)     Material Adverse Effect. The Lender shall have determined, in its sole judgment, that no event or development shall have occurred since March 1, 2014 (other than the commencement of the Chapter 11 Cases and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code) which could reasonably be expected to have a Material Adverse Effect.

(g)     Priority. The Lender shall be satisfied that it has been granted a perfected, first priority Lien on, and security interest in, all of the Collateral, subject only to Permitted Priority Liens.

(h)     Approvals. All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans or the conduct of the Borrowers' business shall have been obtained and shall be in full force and effect.

(i)     First Day Motions and Orders. The Lender shall have received on or before the Petition Date, copies of the first day motions to be filed by the Borrowers with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance satisfactory to the Lender, and the orders of the Bankruptcy Court approving such motions shall have been entered by the Bankruptcy Court.

(j)     Litigation. There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority and which is not stayed by the automatic stay which relates to the Loans or which, in the opinion of the Lender, has any reasonable likelihood of having a Material Adverse Effect.

(k)     Commencement of Chapter 11 Cases. The Borrowers shall have commenced the Chapter 11 Cases and no trustee, examiner or receiver shall have been appointed or designated with respect to the Borrowers' business, properties or assets and no motion shall be pending seeking any relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral with an aggregate value in excess of $100,000.

(l)     Compliance with Laws. The Borrowers shall be in compliance with all applicable requirements of law, including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System.

(m)     Proceedings; Receipt of Documents. All proceedings in connection with the making of the initial Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Lender and its counsel, and the Lender and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Lender or such counsel may reasonably request.

Section 4.02   Conditions Precedent to Final Facility Effectiveness. The obligation of the Lender to make any Loan during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") when each of the following conditions precedent shall have been satisfied or waived in a manner satisfactory to the Lender in its sole and absolute discretion:

30

(a)      <u>Final Bankruptcy Court Order, Etc</u>.  The Final Bankruptcy Court Order shall have been signed and entered by the Bankruptcy Court on a date that is within forty (40) days following the date of the entry of the Interim Facility Bankruptcy Court Order, and the Lender shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent the prior written consent of the Lender and the Borrowers.  The Final Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Lender is entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, on the Final Facility Effective Date, the Liens and security interests in favor of the Lender referred to in <u>Section 3.01</u> shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens.

(b)      <u>Payment of Fees, Etc</u>.  The Borrowers shall have paid on or before such date all fees, costs, expenses and taxes then due and payable pursuant to <u>Section 9.04</u>.

(c)      <u>Representations and Warranties; No Event of Default</u>.  The following statements shall be true and correct:  (i) the representations and warranties contained in <u>Article V</u> and in each other Loan Document, certificate or other writing delivered to the Lender pursuant hereto or thereto on or prior to the Final Facility Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Final Facility Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Final Facility Effective Date or would result from the making of Loans on such date.

(d)      <u>Liens; Priority</u>.  The Lender shall be satisfied that it has been granted a perfected, first priority Lien on and security interest in all of the Collateral, subject only to Permitted Priority Liens.

(e)      <u>Material Adverse Effect</u>.  The Lender shall have determined that no event or development shall have occurred since the Interim Facility Effective Date which could reasonably be expected to have a Material Adverse Effect.

(f)      <u>Litigation</u>.  There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority and which is not stayed by the automatic stay which relates to the Loans or which, in the opinion of the Lender, has any reasonable likelihood of having a Material Adverse Effect.

31

Section 4.03    Conditions Precedent to All Loans. The obligation of the Lender to make any Loan after the Interim Facility Effective Date is subject to the fulfillment, in a manner satisfactory to the Lender, of each of the following conditions precedent:

(a)    Payment of Fees, Etc. The Borrowers shall have paid all fees, costs, expenses and taxes then due and payable pursuant to this Agreement and the other Loan Documents, including, without limitation, Section 9.04 hereof.

(b)    Representations and Warranties; No Event of Default. The following statements shall be true and correct, and the submission by the Administrative Borrower to the Lender of a Notice of Borrowing with respect to each such Loan, and the Borrowers' acceptance of the proceeds of such Loan, shall each be deemed to be a representation and warranty by each Borrower on the date of such Loan that: (i) the representations and warranties contained in Article V and in each other Loan Document, certificate or other writing delivered to the Lender pursuant hereto or thereto on or prior to the date of such Loan are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of such Loan as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date), (ii) at the time of and after giving effect to the making of such Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made on such date and (iii) the conditions set forth in this Section 4.03 have been satisfied as of the date of such request.

(c)    Legality. The making of such Loan shall not contravene any law, rule or regulation applicable to the Lender.

(d)    Notices. The Lender shall have received a Notice of Borrowing pursuant to Section 2.02 hereof.

(e)    Delivery of Documents. The Lender shall have received such other agreements, instruments, approvals, opinions and other documents, each in form and substance satisfactory to the Lender, as the Lender may reasonably request.

(f)    Proceedings; Receipt of Documents. All proceedings in connection with the making of such Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Lender and its counsel, and the Lender and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents, in form and substance satisfactory to the Lender, as the Lender or such counsel may reasonably request.

32

# ARTICLE V
# REPRESENTATIONS AND WARRANTIES

Section 5.01    Representations and Warranties.  Each Borrower hereby represents and warrants to the Lender as follows:

(a)    Organization, Good Standing, Etc.  Each Borrower (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) subject to the entry and the terms of the Bankruptcy Court Orders, has all requisite power and authority to conduct its business as now conducted and as presently contemplated and to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(b)    Authorization, Etc.  The execution, delivery and performance by each Borrower of each Loan Document to which it is or will be a party, (i) subject to the entry and terms of the Bankruptcy Court Orders, have been duly authorized by all necessary action, (ii) do not and will not contravene any of its Governing Documents or any applicable Requirement of Law or any Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties (other than conflicts, breaches and defaults, the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases).

(c)    Governmental Approvals.  Except for the entry of the Bankruptcy Court Orders, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Borrower of any Loan Document to which it is or will be a party.

(d)    Enforceability of Loan Documents.  Subject to the entry of the Bankruptcy Court Orders, this Agreement is, and each other Loan Document to which any Borrower is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms.

(e)    Capitalization; Subsidiaries.  All of the issued and outstanding Equity Interests of the Borrowers have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  All such Equity Interests are free and clear of all Liens other than Permitted Priority Liens and Liens securing the Obligations.  There are no outstanding debt or equity securities of Borrowers and no outstanding obligations of the Borrowers convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Borrowers, or other obligations of Borrowers to issue, directly or indirectly, any Equity Interests of Borrowers.  Neither Borrower has any Subsidiaries.

7709782-v8

(f)    <u>Litigation; Commercial Tort Claims</u>.  Except for pre-petition litigation that is stayed by 11 U.S.C. § 362, the Chapter 11 Cases or as otherwise set forth in <u>Schedule 5.01(f)</u>, (i) there is no pending or, to the Knowledge of any Borrower, threatened action, suit or proceeding affecting any Borrower or any of its properties before any court or other Governmental Authority or any arbitrator that (A) if adversely determined, could have a Material Adverse Effect or (B) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby and (ii) as of the Interim Facility Effective Date, none of the Borrowers holds any commercial tort claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

(g)    <u>Financial Condition</u>.

(i)    The Financial Statements, copies of which have been delivered to the Lender, fairly present the consolidated financial condition of the Borrowers as at the respective dates thereof and the consolidated results of operations of the Borrowers for the fiscal periods ended on such respective dates, all in accordance with GAAP, and since March 1, 2014, no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(ii)    The Budget, when delivered, and as from time to time updated, shall be believed by the Borrowers at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Borrowers and their advisors, and shall have been based on assumptions believed by the Borrowers and their advisors to be reasonable at the time made and upon the best information then reasonably available to the Borrowers, and the Borrowers shall not be aware of any facts or information that would lead it to believe that such Budget, as so updated, is incorrect or misleading in any material respect.

(h)    <u>Compliance with Law, Etc</u>.  No Borrower or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any domestic or foreign Requirement of Law, including, without limitation, any statute, legislation or treaty, any guideline, directive, rule, standard, requirement, policy, order, judgment, injunction, award or decree of any Governmental Authority, in each case, applicable to it or any of its property or assets, or (iii) any material term of any Contractual Obligation (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties, except for violations the enforcement of which are stayed by virtue of the filing of the Chapter 11 Cases.  No Default or Event of Default has occurred and is continuing.

(i)    [Intentionally omitted].

(j)    <u>Taxes, Etc</u>.  All Federal, state and local tax returns and other reports required by applicable Requirements of Law to be filed by any Borrower have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Borrower or any property of any Borrower and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

34

(k)    Regulations T, U and X.  No Borrower is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(l)    Nature of Business.  No Borrower is engaged in any business other than the wholesale and retail sale of clothing and accessories and any business reasonably related or ancillary thereto.

(m)    Adverse Agreements, Etc.  No Borrower or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)    Permits, Etc.  Each Borrower has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect.

(o)    Properties.

(i)    Each Borrower has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business free and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(ii)    As of the Interim Facility Effective Date, each Borrower has valid leasehold interests in the Leases to which it is a party.  Each such Lease is valid and enforceable in accordance with its terms in all material respects and is in full force and effect.  To the Knowledge of any Borrower, no other party to any such Lease is in default of its obligations thereunder, and, as of the Interim Facility Effective Date, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default under any such Lease, except any such default, the enforcement of which is stayed by virtue of the filing of the Chapter 11 Cases.

(p)    Full Disclosure.  Each Borrower has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could result in a Material Adverse Effect.  None of the other reports, financial statements, certificates or other information furnished by or on behalf of any Borrower to the Lender in connection with the negotiation of this

35

Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading; provided that, with respect to projected financial information, each Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time prepared.  There is no contingent liability or fact that could have a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto.

(q)    Environmental Matters.  Except as set forth on Schedule 5.01(q), (i) the operations of each Borrower are in compliance with all Environmental Laws; (ii) there has been no Release at any of the properties owned or operated by any Borrower or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Borrower or any predecessor in interest which could have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Borrower or any predecessor in interest nor does any Borrower have Knowledge or notice of any threatened or pending Environmental Action against any Borrower or any predecessor in interest which could have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Borrower or any predecessor in interest which could have a Material Adverse Effect; (v) no property now or formerly owned or operated by a Borrower has been used as a treatment or disposal site for any Hazardous Material; (vi) no Borrower has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which could have a Material Adverse Effect; (vii) each Borrower holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Borrower's failure to maintain or comply with could not have a Material Adverse Effect; and (viii) no Borrower has received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not have a Material Adverse Effect.

(r)    Insurance.  Each Borrower keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law or as may be reasonably required by the Lender (including, without limitation, against larceny, embezzlement or other criminal misappropriation).

(s)    Use of Proceeds.  The proceeds of the Loans shall be used in accordance with the Budget (within the variances from budgeted amounts permitted under this Agreement) (i) for working capital and general corporate purposes of the Borrower and its subsidiaries and

36

(ii) to pay fees and expenses related to this Agreement and the Chapter 11 Cases; provided, that amounts set forth in any line item in the Budget may not be utilized for any other line item in the Budget. None of the proceeds of the Loans may be used to challenge, as opposed to investigate, the validity, perfection, priority, extent or enforceability of the Existing Factoring Facility or the Existing WF Credit Facility, or the liens or security interests securing the obligations under the Existing Factoring Facility or the Existing WF Credit Facility, or to pursue any causes of action of any kind against the Lender, or the Existing Factor, the Existing WF Facility Agent or the Existing WF Facility Lenders solely in their respective capacities as agents or lenders under the Existing Factoring Facility or the Existing WF Credit Facility, as applicable. No more than $25,000 of any proceeds or cash collateral shall be used by counsel to the official creditors' committee appointed in the Chapter 11 Cases to investigate the validity, perfection, priority, extent or enforceability of the Existing Factoring Facility or the Existing WF Credit Facility or the liens or security interests securing the obligations under the Existing Factoring Facility or the Existing WF Credit Facility.

(t)  Intellectual Property. Except as set forth on Schedule 5.01(t), each Borrower owns or licenses or otherwise has the right to use all licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not have a Material Adverse Effect. No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Borrower infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not have, individually or in the aggregate, a Material Adverse Effect. To the Knowledge of each Borrower, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code is pending or proposed, which, individually or in the aggregate, could have a Material Adverse Effect.

(u)  Material Contracts. Each Material Contract of each Borrower (i) is in full force and effect and is binding upon and enforceable against each Borrower that is a party thereto and, to the Knowledge of such Borrower, all other parties thereto in accordance with its terms and (ii) is not in default due to the action of any Borrower or, to the Knowledge of any Borrower, any other party thereto, except any such default, the enforcement of which is stayed by virtue of the filing of the Chapter 11 Cases.

(v)  Investment Company Act. None of the Borrowers is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(w)  Employee and Labor Matters. There is (i) no unfair labor practice complaint pending or, to the Knowledge of any Borrower, threatened against any Borrower

37

before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Borrower which arises out of or under any collective bargaining agreement, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened against any Borrower or (iii) to the Knowledge of each Borrower, no union representation question existing with respect to the employees of any Borrower and no union organizing activity taking place with respect to any of the employees of any Borrower. No Borrower or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of any Borrower have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements. All material payments due from any Borrower on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Borrower.

(x)     Interrelated Business. The Borrowers make up a related organization of various entities constituting a single economic and business enterprise so that the Borrowers share an identity of interests such that any benefit received by any one of them benefits the others. From time to time each Borrower may render services to or for the benefit of the other Borrower, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Borrowers (including *inter alia,* the payment by such Borrower of creditors of the other Borrowers and guarantees by such Borrower of indebtedness of the other Borrowers and provides administrative, marketing, payroll and management services to or for the benefit of the other Borrowers).

(y)     Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office. Schedule 5.01(y) sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of each Borrower, (ii) the jurisdiction of organization of each Borrower, (iii) the organizational identification number of each Borrower (or indicates that such Borrower has no organizational identification number), (iv) each place of business of each Borrower, and (v) the chief executive office of each Borrower.

(z)     Locations of Collateral. There is no location at which any Borrower has any Collateral (except for Inventory in transit and Rolling Stock) other than (i) those locations listed on Schedule 5.01(z) and (ii) any other locations approved in writing by the Lender from time to time. Schedule 5.01(z) hereto contains a true, correct and complete list, as of the Interim Facility Effective Date, of the legal names and addresses of each warehouse at which Collateral of each Borrower is stored.

(aa)    Administrative Priority; Lien Priority.

(i)     After the Interim Bankruptcy Court Order Entry Date or the Final Bankruptcy Court Order Entry Date, as the case may be, the Obligations of the Borrowers will constitute allowed administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326,

38

328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in the Agreed Administrative Expense Priorities and any other superpriority claim which is granted priority senior to the priority granted in respect of the Obligations in the Bankruptcy Court Orders.

(ii)    Upon entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, the Liens and security interests of the Lender on the Collateral referred to in <u>Section 3.01</u> hereof shall be valid and perfected first priority Liens, subject only to Permitted Priority Liens and the Carve-Out Expenses to the extent set forth in the definition of "Agreed Administrative Expense Priorities."

(iii)    On and after the Interim Bankruptcy Court Order Entry Date and prior to the Final Bankruptcy Court Order Entry Date, the Interim Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed, vacated or subject to appeal, absent the written consent of the Lender and the Borrowers, and on and after the Final Bankruptcy Court Order Entry Date, the Final Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed, vacated or subject to appeal absent the written consent of the Lender and the Borrowers.

(bb)    <u>Appointment of Trustee or Examiner; Liquidation</u>.  No order has been entered in any Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) to convert any Chapter 11 Case to a Chapter 7 case or to dismiss any Chapter 11 Case.

(cc)    <u>Schedules</u>.  All of the information which is required to be scheduled to this Agreement is set forth on the Schedules attached hereto, is correct and accurate and does not omit to state any information material thereto.

## ARTICLE VI
## COVENANTS OF THE BORROWERS

Section 6.01    <u>Affirmative Covenants</u>.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Revolving Credit Commitment hereunder, each Borrower will, unless the Lender shall otherwise consent in writing:

(a)    <u>Reporting Requirements</u>.  Furnish to the Lender:

(i)    as soon as available and in any event within sixty (60) days after the end of each fiscal quarter of the Borrowers commencing with the first fiscal quarter of the Borrowers ending after the Interim Facility Effective Date, consolidated balance sheets, consolidated statements of operations and consolidated statements of cash flows of the Borrowers as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending at the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Administrative Borrower as fairly presenting, in all

39

material respects, the financial position of the Borrowers as of the end of such quarter and the results of operations and cash flows of the Borrowers for such quarter, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Borrowers furnished to the Lender, subject to the absence of footnotes and normal year-end adjustments;

(ii)     as soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year of the Borrowers, consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows of the Borrowers as at the end of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Borrowers and satisfactory to the Lender (which opinion shall be without (A) any qualification other than a "going concern" or like qualification or exception, (B) any qualification or exception as to the scope of such audit, or (C) any qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of Section 6.03 or the Budget);

(iii)    [intentionally omitted];

(iv)    simultaneously with the delivery of the financial statements of the Borrowers required by clauses (i) and (ii) of this Section 6.01(a), a certificate of an Authorized Officer of the Administrative Borrower stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Borrowers during the period covered by such financial statements with a view to determining whether the Borrowers were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no Knowledge of, the existence during such period of an Event of Default or Default or, if an Event of Default or Default existed, describing the nature and period of existence thereof and the action which the Borrowers propose to take or have taken with respect thereto;

(v)     no later than thirty (30) days prior to the commencement of each Fiscal Year, financial projections displayed on a fiscal month by fiscal month basis and otherwise in form and substance satisfactory to the Lender in its sole and absolute discretion for such Fiscal Year for the Borrowers, all such financial projections to be prepared on a reasonable basis and in good faith, and to be based on assumptions believed by the Borrowers to be reasonable at the time made and from the best information then available to the Borrowers;

(vi)    on the date that is six (6) weeks after the Interim Facility Effective Date and on each subsequent six-week anniversary of such date, an updated Budget for the next succeeding 13-week period, supplementing and superseding the Budget previously delivered, prepared in form and substance satisfactory to the Lender in its sole and absolute discretion

40

showing actual performance from projected performance and any variances of actual performance (in each case, against the immediately-preceding Budget), which updated Budget, when delivered and as so updated, shall be (1) consistent with the Budget delivered to the Lender on or prior to the Interim Facility Effective Date, (2) believed by the Borrowers at the time furnished to be reasonable, (3) prepared on a reasonable basis and in good faith, and (4) based on assumptions believed by the Borrowers to be reasonable at the time made and upon the best information then reasonably available to the Borrowers, and shall be accompanied by a certificate of an Authorized Officer of the Administrative Borrower certifying as to the matters set forth in subclauses (1), (2), (3) and (4) above;

        (vii)    not later than 5:00 p.m. on Wednesday of each week:

        (A)    a report showing (with respect to the immediately preceding calendar week) weekly collections, revenues and expenses and weekly and cumulative (for the prior four-week period) variances from expected collections, revenues and expenses under the Budget; and

        (B)    simultaneously with the delivery of the report required by clause (A) of this Section 6.01(a)(vii), a certificate showing the calculation of the financial covenants specified in Section 6.03;

        (viii)    promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Borrower other than routine inquiries by such Governmental Authority;

        (ix)    as soon as possible, and in any event within three (3) days after the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Administrative Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Borrower proposes to take with respect thereto;

        (x)    (A) as soon as possible and in any event within ten (10) days after any Borrower or any ERISA Affiliate thereof knows or has reason to know that (1) any Reportable Event with respect to any Employee Plan has occurred, (2) any other Termination Event with respect to any Employee Plan has occurred, or (3) an accumulated funding deficiency has been incurred or an application has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including installment payments) or an extension of any amortization period under Section 412 of the Internal Revenue Code with respect to an Employee Plan, a statement of an Authorized Officer of the Borrower setting forth the details of such occurrence and the action, if any, which such Borrower or such ERISA Affiliate proposes to take with respect thereto, (B) promptly and in any event within three (3) days after receipt thereof by any Borrower or any ERISA Affiliate thereof from the PBGC, copies of each notice received by any Borrower or any ERISA Affiliate thereof of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan, (C) promptly and in any event within ten (10) days after the filing thereof with the Internal Revenue Service if requested by the Lender, copies of each Schedule B (Actuarial Information)

41

to the annual report (Form 5500 Series) with respect to each Employee Plan and Multiemployer Plan, (D) promptly and in any event within ten (10) days after any Borrower or any ERISA Affiliate thereof knows or has reason to know that a required installment within the meaning of Section 412 of the Internal Revenue Code has not been made when due with respect to an Employee Plan, (E) promptly and in any event within 3 days after receipt thereof by any Borrower or any ERISA Affiliate thereof from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Borrower or any ERISA Affiliate thereof concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (F) promptly and in any event within ten (10) days after any Borrower or any ERISA Affiliate thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Borrower or such ERISA Affiliate thereof;

(xi)   promptly after the commencement thereof but in any event not later than five (5) days after service of process with respect thereto on, or the obtaining of Knowledge thereof by, any Borrower, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator, other than the initial filing of the Chapter 11 Cases, which, if adversely determined, could have a Material Adverse Effect;

(xii)   as soon as possible and in any event within five (5) days after execution, receipt or delivery thereof, copies of any material notices that any Borrower executes or receives in connection with any Material Contract;

(xiii)   as soon as possible and in any event within five (5) days after execution, receipt or delivery thereof, copies of any material notices that any Borrower executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Borrower;

(xiv)   promptly after the sending or filing thereof, copies of all statements, reports and other information any Borrower sends to any holders of its Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange;

(xv)   promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Borrower by its auditors in connection with any annual or interim audit of the books thereof;

(xvi)   promptly after the filing thereof and to the extent the same is not publicly available on the Bankruptcy Court's electronic docket, copies of all pleadings, motions, applications, financial information and other papers and documents filed by any Borrower in the Chapter 11 Cases, which papers and documents shall also be given or served on the Lender's counsel;

(xvii)   promptly after the sending thereof, copies of all written reports given by any Borrower to any official or unofficial creditors' committee in the Chapter 11 Cases, other than any such reports subject to privilege, provided that, such Person may redact any

42

confidential information contained in any such report if it provides a summary of the nature of the information redacted to the Lender; and

(xviii)  promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Borrower as the Lender may from time to time reasonably request.

(b)    Additional Guaranties and Collateral Security.  Cause:

(i)    any Subsidiary of any Borrower created or acquired after the Interim Facility Effective Date to, at the request of the Lender, execute and deliver to the Lender promptly (A) a guaranty in form and substance satisfactory to the Lender guaranteeing the Obligations, (B) a security agreement, (C) if such Subsidiary has any Subsidiaries, a pledge agreement together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary, (2) undated stock powers executed in blank with signature guaranteed, and (3) such opinion of counsel and such approving certificate of such Subsidiary as the Lender may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares, and (D) such other agreements, instruments, approvals, legal opinions or other documents reasonably requested by the Lender in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such security agreement, pledge agreement or mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

(ii)    each owner of the Equity Interests of any such Subsidiary to, at the request of the Lender, execute and deliver promptly a pledge agreement, together with (A) certificates evidencing all of the Equity Interests of such Subsidiary, (B) undated stock powers or other appropriate instruments of assignment executed in blank with signature guaranteed, (C) such opinion of counsel and such approving certificate of such Subsidiary as the Lender may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares and (D) such other agreements, instruments, approvals, legal opinions or other documents requested by the Lender.

(c)    Compliance with Laws, Etc.  Comply, and cause each of its Subsidiaries to comply, with all material Requirements of Law (including, without limitation, all material Environmental Laws), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), such compliance to include, without limitation, (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, and (ii) paying all lawful claims which if unpaid might become a Lien or charge upon any of its properties, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP or to the extent that such compliance or payment or any enforcement action is stayed as a result of the Chapter 11 Cases.

43

(d)    Preservation of Existence, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(e)    Keeping of Records and Books of Account.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)    Inspection Rights.  Permit, and cause each of its Subsidiaries to permit, the agents and representatives of the Lender at any time and from time to time during normal business hours, at the expense of the Borrowers, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (and, if requested by the Lender based upon the results of any such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.  In furtherance of the foregoing, each Borrower hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of the Lender in accordance with this Section 6.01(f).

(g)    Maintenance of Properties, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, except any non-compliance resulting in a default, the enforcement of which is stayed by the Chapter 11 Cases.

(h)    Maintenance of Insurance.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Lender.  At the request of the Lender, all policies covering the Collateral are to be made payable to the Lender, as its interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Lender may require to fully protect the Lender's interest in the Collateral and to any payments to be made under such policies.  At the request of the Lender, all certificates of insurance are to be delivered to the Lender and the policies are to be premium prepaid, with the loss payable and additional insured

44

endorsement in favor of the Lender and such other Persons as the Lender may designate from time to time, and shall provide for not less than thirty (30) days' prior written notice to the Lender of the exercise of any right of cancellation. If any Borrower or any of its Subsidiaries fails to maintain such insurance, the Lender may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right, in the name of any Borrower and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

       (i)     Obtaining of Permits, Etc. Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business.

       (j)     Environmental. (i) Keep any property either owned or operated by it or any of its Subsidiaries free of any Environmental Liens; (ii) comply, and cause each of its Subsidiaries to comply, with all material Environmental Laws and provide to the Lender any documentation of such compliance which the Lender may reasonably request; (iii) provide the Lender written notice within five (5) days of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it or any of its Subsidiaries and take any Remedial Actions required to abate said Release; and (iv) provide the Lender with written notice within ten (10) days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Borrower or any of its Subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Borrower or any of its Subsidiaries; and (C) notice of a violation, citation or other administrative order which could have a Material Adverse Effect.

       (k)     Further Assurances. Subject to the terms of the Bankruptcy Court Orders, take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Lender may require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Borrower and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto the Lender the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court Orders, each Borrower (A) authorizes the Lender to execute any such agreements, instruments or other documents in such Borrower's name and to file such agreements, instruments or other documents in any appropriate filing office, (B) authorizes the Lender to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any

45

appropriate filing office without the signature of such Borrower, and (C) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Borrower prior to the date hereof. The assurances contemplated by this Section 6.01(k) shall be given under applicable non-bankruptcy law (to the extent not inconsistent with the Bankruptcy Code and the Bankruptcy Court Orders) as well as the Bankruptcy Code, it being the intention of the parties that the Lender may request assurances under applicable non-bankruptcy law, and such request shall be complied with (if otherwise made in good faith by the Lender) whether or not any of the Bankruptcy Court Orders are in force and whether or not dismissal of the Chapter 11 Cases or any other action by the Bankruptcy Court is imminent, likely or threatened.

(l)     Change in Collateral; Collateral Records. (i) Give the Lender not less than 30 days' prior written notice of any change in the location of any Collateral, other than to locations set forth on Schedule 5.01(z) and with respect to which the Lender has filed financing statements and otherwise fully perfected its Liens thereon, (ii) advise the Lender promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or the Lien granted thereon and (iii) execute and deliver, and cause each of its Subsidiaries to execute and deliver, to the Lender from time to time, solely for the Lender's convenience in maintaining a record of Collateral, such written statements and schedules as the Lender may reasonably require, designating, identifying or describing the Collateral.

(m)     Landlord Waivers; Collateral Access Agreements. Upon the request of the Lender at any time following the Final Facility Effective Date, use commercially reasonable efforts to obtain written subordinations or waivers, in form and substance satisfactory to the Lender, of all present and future Liens to which the owner or lessor of any premises at which Collateral is located (whether such real property is now existing or acquired after the Interim Facility Effective Date) may be entitled to assert against the Collateral and providing for access to Collateral located on such premises in order to remove such Collateral from such premises during an Event of Default.

(n)     Fiscal Year. Cause the Fiscal Year of the Borrowers to end on December 31st of each calendar year unless the Lender consents to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(o)     Use of Proceeds. Use the proceeds of the Loans in accordance with Section 5.01(s) and subject to the terms, conditions and limitations of this Agreement and the Bankruptcy Court Orders.

(p)     Sale Milestones. The Borrowers shall comply with and achieve the Sale Milestones.

Section 6.02    Negative Covenants. So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid or the Lender shall have any Revolving Credit Commitment hereunder, each Borrower shall not, unless the Lender shall otherwise consent in writing:

46

(a)      Liens, Etc.  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any Requirement of Law of any jurisdiction, a financing statement (or the equivalent thereof) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof); sell any of its property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable) with recourse to it or any of its Subsidiaries or assign or otherwise transfer, or permit any of its Subsidiaries to assign or otherwise transfer, any account or other right to receive income; other than, as to all of the above, Permitted Liens.

(b)      Indebtedness.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)      Fundamental Changes; Dispositions.  Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or acquire all or any significant part of the assets of any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof) (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that

(i)      any wholly-owned Subsidiary of any Borrower may be merged into such Borrower or another wholly-owned Subsidiary of such Borrower, or may consolidate with another wholly-owned Subsidiary of such Borrower, so long as (A) no other provision of this Agreement would be violated thereby, (B) such Borrower gives the Lender at least thirty (30) days' prior written notice of such merger or consolidation, (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Lender's rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger or consolidation and (E) the surviving Subsidiary, if any, is a party to a guaranty and a security agreement and the Equity Interests of which Subsidiary is the subject of a pledge agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger or consolidation; and

(ii)      any Borrower and its Subsidiaries may (A) sell Inventory in the ordinary course of business, (B) dispose of obsolete or worn-out equipment in the ordinary course of business, (C) sell fixtures, equipment and related assets in connection with the closing of stores in an amount not to exceed $250,000, (D) enter into and perform the agreements necessary to comply with the Sale Milestones and (E) sell, transfer or otherwise convey assets to another Borrower.

47

(d)     Change in Nature of Business.  Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 5.01(l).

(e)     Loans, Advances, Investments, Etc.  Make or commit or agree to make any loan, advance guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Equity Interests, bonds, notes, debentures or other securities of, or make or commit or agree to make any other investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or permit any of its Subsidiaries to do any of the foregoing, except for: (i) investments existing on the date hereof, as set forth on Schedule 6.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof, (ii) loans and advances between the Borrowers and their Affiliates made in the ordinary course of business, and (iii) Permitted Investments.

(f)     Lease Obligations.  Create, incur or suffer to exist, or permit any of its Subsidiaries to create, incur or suffer to exist, any obligations as lessee (i) for the payment of rent for any real or personal property in connection with any sale and leaseback transaction, or (ii) for the payment of rent for any real or personal property under leases or agreements to lease other than those in existence on the Petition Date and except as otherwise agreed by the Lender in its sole and absolute discretion.

(g)     Capital Expenditures.  Make or commit or agree to make, or permit any of its Subsidiaries to make or commit or agree to make, any Capital Expenditure (by purchase or Capitalized Lease) that would cause the aggregate amount of all Capital Expenditures made by the Borrowers and their Subsidiaries to exceed $500,000 in any Fiscal Year.

(h)     Restricted Payments.  Other than pursuant to contractual arrangements among the Borrowers and their Affiliates reasonably satisfactory to the Lender (i) declare or pay any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Borrower or any of its Subsidiaries, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Borrower or any direct or indirect parent of any Borrower, now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Borrower, now or hereafter outstanding, (iv) return any Equity Interests to any shareholders or other equity holders of any Borrower or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such, or (v) pay any management fees or any other fees or expenses (including the reimbursement thereof by any Borrower or any of its Subsidiaries) pursuant to any management, consulting or other services agreement to any of the shareholders or other equityholders of any Borrower or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Borrower.

(i)     Federal Reserve Regulations.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)     Transactions with Affiliates.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) in the ordinary course of business in a manner and to an extent consistent with past practice pursuant to contractual arrangements among the Borrowers and their Affiliates, (ii) transactions with another Borrower and (iii) transactions permitted by Section 6.02(e) or Section 6.02(h).

(k)     Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries.  Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Borrower (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Borrower or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Borrower or any of its Subsidiaries, (iii) to make loans or advances to any Borrower or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Borrower or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iv) of this Section 6.02(k) shall prohibit or restrict compliance with:

(i)     this Agreement and the other Loan Documents;

(ii)     any agreements in effect on the date of this Agreement;

(iii)     any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

(iv)     in the case of clause (iv) any agreement setting forth customary restrictions on the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract of similar property or assets; or

(v)     in the case of clause (iv) any agreement, instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto.

(l)     Limitation on Issuance of Equity Interests.  Issue or sell or enter into any agreement or arrangement for the issuance and sale of, or permit any of its Subsidiaries to issue or sell or enter into any agreement or arrangement for the issuance and sale of, any shares of its Equity Interests, any securities convertible into or exchangeable for its Equity Interests or any warrants.

(m)     Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.

49

(i)      Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lender or the issuer of such Indebtedness in any respect,

(ii)      amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN, except that a Borrower or any of its Subsidiaries may (A) change its name, jurisdiction of organization, organizational identification number or FEIN in connection with a transaction permitted by Section 6.02(c) and (B) change its name upon at least 30 days' prior written notice by the Borrower to the Lender of such change and so long as, at the time of such written notification, such Person provides any financing statements or fixture filings necessary to perfect and continue perfected the Lender's Liens;

(iii)      amend, modify or otherwise change any of its Governing Documents, including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests; or

(iv)      amend any Material Contract or waive any material rights under any Material Contract or agree to do any of the foregoing or reject or terminate, seek to reject or terminate or permit the rejection or termination of any Material Contract.

(n)      Investment Company Act of 1940.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)      Properties.  Permit any property to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the Lender does not have a valid and perfected first priority Lien or has not received a written subordination or waiver in accordance with Section 6.01(m).

(p)      ERISA. (i) Engage, or permit any ERISA Affiliate to engage, in any transaction described in Section 4069 of ERISA; (ii) engage, or permit any ERISA Affiliate to engage, in any prohibited transaction described in Section 406 of ERISA or 4975 of the Internal Revenue Code for which a statutory or class exemption is not available or a private exemption has not previously been obtained from the U.S. Department of Labor; (iii) adopt or permit any ERISA Affiliate to adopt any employee welfare benefit plan within the meaning of Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as

50

required by Section 601 of ERISA or applicable law; (iv) fail to make any contribution or payment to any Multiemployer Plan which it or any ERISA Affiliate may be required to make under any agreement relating to such Multiemployer Plan, or any law pertaining thereto; or (v) fail, or permit any ERISA Affiliate to fail, to pay any required installment or any other payment required under Section 412 of the Internal Revenue Code on or before the due date for such installment or other payment.

(q)    Environmental.  Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by it or any of its Subsidiaries, except in compliance with all Environmental Laws.

(r)    Limitations on Negative Pledges.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Borrower or any Subsidiary of any Borrower to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following:  (i) this Agreement and the other Loan Documents. (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.02(a) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; provided that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, (iv) customary provisions in leases restricting the assignment or sublet thereof, and (v) the Pre-Petition Credit Facilities.

(s)    Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment of Claims.

(i)    At any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Bankruptcy Court Orders, except for modifications and amendments agreed to by the Lender.

(ii)    At any time, suffer to exist a priority for any administrative expense or unsecured claim against the Borrowers (now existing or hereafter arising of any kind or nature whatsoever), including without limitation any administrative expense of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) 726 or 1114 of the Bankruptcy Code equal or superior to the priority of the Lender in respect of the Obligations, except as provided in Section 3.02 and for the Carve-Out Expenses having priority of payment over the Obligations to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" and for any other superpriority claims which are granted priority senior to the priority granted in respect of the Obligations in the Bankruptcy Court Orders.

(iii)    At any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Lender in respect of the Collateral, except for Permitted Priority Liens.

(iv)    Prior to the date on which the Obligations have been paid in full in cash, pay any administrative expense claims except (A) Priority Professional Expenses and other payments pursuant to sub-clauses (i) and (ii) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities", (B) Obligations due and payable hereunder, and (C) other administrative expense and professional claims incurred in the ordinary course of the business of the Borrowers or their respective Chapter 11 Cases, in each case, to the extent and having the order of priority set forth in the definition of the term "Agreed Administrative Expense Priorities".

(t)    Limitation on Prepayments of Certain Prepetition Obligations.  (i) Make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with any trustee with respect thereto money or securities before due for the purpose of paying when due) of any Pre-Petition Obligations of any Borrower, in each case, incurred prior to the Petition Date, (ii) pay any interest on any Pre-Petition Obligations of any Borrower, including, without limitation, obligations under the Pre-Petition Credit Facilities other than the Existing Factoring Facility (whether in cash, in kind securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or apply to the Bankruptcy Court for the authority to do any of the foregoing; provided, however, that the Borrowers may make payments permitted by the "first day" orders, "critical vendor" orders and orders approving the assumption of executory contracts and unexpired leases, in each case, as approved by the Lender.  In addition, no Borrower shall permit any of its Subsidiaries to make any payment, redemption or acquisition which such Borrower is prohibited from making under the provisions of this Section 6.02(t).

(u)    Compliance with Budget.  (i) Make any payment or incur any obligation that is not provided for in the Budget (within the variances from budgeted amounts permitted by this Agreement), (ii) during any weekly budget period, make any payment or incur any obligation for any future weekly period of the Budget (for example, amounts budgeted for week 7 may not be paid in week 5), (iii) make any payment on account of any item in the Budget for any period following the closing of the transactions contemplated by the Stalking Horse APA or (iv) notwithstanding the timing of any such payment as set forth in the Budget, to the extent that the Borrowers are able to obtain credit terms from vendors, pay such vendors more than five (5) days prior to the expiration of such credit terms; provided, however, that the Borrowers may make payments to vendors from time to time as the Borrowers reasonably determine are necessary or desirable to be able to continue to utilize credit extended by or maintain availability with such vendors.

(v)    Requests for Borrowing.  Request any Loans if, after giving effect to such requested Loan and the use of the proceeds thereof (if such proceeds are used within four (4) Business Days after the receipt thereof), the aggregate amount of cash and cash equivalents held by the Borrowers and their Subsidiaries exceeds $2,000,000 (excluding Store Cash and net of any outstanding checks).

52

Section 6.03    Financial Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid or any Lender shall have any Revolving Credit Commitment hereunder, each Borrower shall not, unless the Lender shall otherwise consent in writing:

(a)    Net Cash Flow.  Permit the variance between actual Net Cash Flow and the amount set forth therefor in the Budget, other than any variance attributable to the "Rosenthal Receipts (AR/Inv Sale/Hilco)" and "Payments to Rosenthal" line items, for any Measurement Period to be more than 20%.

(b)    Cash Receipts.  Permit the variance between actual cash receipts and the amount set forth therefor in the Budget, other than any variance attributable to the "Rosenthal Receipts (AR/Inv Sale/Hilco)" line item, for any Measurement Period to be more than 20%.

(c)    Disbursements.  Permit the variance between actual disbursements made with respect to any line item in the Budget in any Measurement Period to exceed the total amount budgeted for such line item for such Measurement Period by more than twenty percent (20%), or permit the total disbursements for all line items in the Budget in any Measurement Period to exceed the total budgeted disbursements for all line items in such Measurement Period by more than twenty-five percent (25%).

# ARTICLE VII
## MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS AND OTHER COLLATERAL

Section 7.01    Accounts Receivable.

(a)    Notification of Assignment of Accounts Receivable.  At any time following the occurrence and during the continuance of an Event of Default, the Lender shall have the right to send notice of the assignment of, and the Lender's security interest in and Lien on, the Accounts Receivable to any and all Account Debtors and any other third party holding Collateral.  At any time after the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right to collect the Accounts Receivable, take possession of the Collateral, or both.  The Lender's actual collection expenses, including, but not limited to, stationery and postage, telephone and facsimile, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to the Loan Account and added to the Obligations.

(b)    Power of the Lender to Act on the Borrowers' Behalf.  At any time following the occurrence and during the continuance of an Event of Default, the Lender shall have the right to receive, endorse, assign and/or deliver in the name of the Lender or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Accounts Receivable, and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Each Borrower hereby constitutes the Lender or the Lender's designee, at any time following the occurrence and during the continuance of an Event of Default, as such Borrower's attorney with power (i) at any time to file financing statements or any other filings deemed reasonably necessary by the Lender to preserve, protect,

53

or perfect the Lender's interest in the Collateral and to file same; and (ii) at any time following the occurrence and during the continuance of an Event of Default:  (A) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (B) to receive, open and dispose of all mail addressed to such Borrower; (C) to demand payment of the Accounts Receivable; (D) to enforce payment of the Accounts Receivable by legal proceedings or otherwise; (E) to exercise all of such Borrower's rights and remedies with respect to the collection of the Accounts Receivable and any other Collateral; (F) to settle, adjust, compromise, extend or renew the Accounts Receivable; (G) to settle, adjust or compromise any legal proceedings brought to collect Accounts Receivable; (H) to prepare, file and sign such Borrower's name on a proof of claim in bankruptcy or similar document against any Account Debtor; (I) to prepare, file and sign such Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Accounts Receivable; and (J) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  The Lender shall have the right at any time following the occurrence and during the continuance of an Event of Default to change the address for delivery of mail addressed to any Borrower.

(c)    No Liability.  The Lender shall not, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts Receivable or any instrument received in payment thereof, or for any damage resulting therefrom other than as a result of the Lender's gross negligence or willful misconduct.  Following the occurrence and during the continuance of an Event of Default, the Lender may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Accounts Receivable or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  The Lender is authorized and empowered to accept following the occurrence and during the continuance of an Event of Default the return of the goods represented by any of the Accounts Receivable, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

Section 7.02    Deposit Accounts, Securities Accounts and Investment Accounts.  All deposit accounts, securities accounts and investment accounts of the Borrowers as of the Interim Facility Effective Date are set forth on Schedule 7.02.  No Borrower shall open any new deposit account, securities account or investment account unless (i) such Borrower shall have given at least five (5) days' prior written notice to the Lender and (ii) the bank, depository institution or securities intermediary, the Borrowers and the Lender shall first have entered into an account control agreement in form and substance reasonably satisfactory to the Lender sufficient to give the Lender "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account; provided, however, notwithstanding anything to the contrary provided for in this Agreement, the Borrowers need not comply with the foregoing requirements of this Section 7.02 with respect to any deposit accounts used exclusively to fund payroll obligations (including

payroll taxes and other employee wage and benefit payments) so long as the Borrowers shall not maintain funds on deposit therein or credited thereto at any time in excess of the amounts necessary to fund such payroll obligations and any related payroll processing expenses routinely paid from such accounts on a current basis.

## ARTICLE VIII
## EVENTS OF DEFAULT

Section 8.01    Events of Default.  If any of the following Events of Default shall occur and be continuing:

(a)    the Borrowers shall fail to pay any principal of or interest on any Loan, or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise);

(b)    any representation or warranty made or deemed made by or on behalf of any Borrower or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered to the Lender or any pursuant to any Loan Document, which representation or warranty is subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any respect when made or deemed made; or any representation or warranty made or deemed made by or on behalf of any Borrower or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered to the Lender pursuant to any Loan Document, which representation or warranty is not subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any material respect when made or deemed made;

(c)    any Borrower shall fail to perform or comply with any covenant or agreement contained in Article VI or Article VII, or any Borrower shall fail to perform or comply with any covenant or agreement contained in any security agreement to which it is a party, any pledge agreement to which it is a party or any mortgage to which it is a party;

(d)    any Borrower shall fail to perform or comply with any other term, covenant or agreement contained in this Agreement or any other Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 8.01, such failure, if capable of being remedied, shall remain unremedied for fifteen (15) days after the earlier of the date a senior officer of any Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Lender to such Borrower;

(e)    any Borrower or any of its Subsidiaries shall fail to pay any principal of or interest or premium on any of its Indebtedness (excluding (x) Indebtedness evidenced by this Agreement and (y) Indebtedness of the Borrowers incurred prior to the Petition Date), to the extent that the aggregate principal amount of all such Indebtedness exceeds $100,000, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument

55

relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)    any Subsidiary of any Borrower (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection;

(g)    any proceeding shall be instituted against any Subsidiary of any Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of 30 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)    the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order shall have been stayed, amended, modified, reversed, vacated or subject to appeal without the express prior written consent of the Lender;

(i)    the Final Bankruptcy Court Order shall not have been entered by the Bankruptcy Court within forty (40) days from the Interim Bankruptcy Court Order Entry Date;

(j)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Borrower shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(k)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

56

(l)    an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not (i) contain a provision for termination of the Revolving Credit Commitment and payment in full in cash of (A) all Obligations of the Borrowers hereunder and under the other Loan Documents and (B) all obligations under the Existing WF Credit Facility on or before the effective date of such plan or plans upon entry thereof and (ii) provide for the continuation of the Liens and security interests granted to the Lender, and the priority thereof until such plan effective date;

(m)    an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Revolving Credit Commitment, and the payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents, upon entry thereof;

(n)    an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Lender, (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrowers equal or superior to the priority of the Lender in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations to the extent set forth in the Agreed Administrative Expense Priorities, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

(o)    an application for any of the orders described in clauses (f) through (n) above shall be made by any Person and (i) such application is not contested by the Borrowers in good faith, or (ii) the relief requested is granted in an order that is not stayed pending appeal;

(p)    an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Borrower with respect to any claim in an amount equal to or exceeding $100,000 in the aggregate;

(q)    (i) any Borrower shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of Lender and/or the Lender's claims or rights against any Borrower or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by this Agreement, the Bankruptcy Court Orders or any other Loan Document shall, for any reason, cease to be a valid first priority Lien, subject only to Permitted Priority Liens or (iii) any action is commenced by any Borrower which contests the validity, perfection, enforceability or priority of any of the Liens and security interests of the Lender created by this Agreement, any of the Bankruptcy Court Orders or any other Loan Document;

(r)    the determination of any Borrower, whether by vote of such manager or otherwise, to suspend the operation of such Borrower's business in the ordinary course, liquidate all or substantially all of such Borrower's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Borrower's assets, or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do any of the foregoing, in each case without the prior written consent of the Lender;

57

(s)    this Agreement, the Bankruptcy Court Orders or any other Loan Document, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Lender on any Collateral purported to be covered thereby;

(t)    any provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Borrower intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Borrower or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Borrower shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(u)    one or more judgments, orders or awards (or any settlement of any claim that, if breached, could result in a judgment, order or award) for the payment of money exceeding $100,000 in the aggregate shall be rendered against any Borrower or any of its Subsidiaries and remain unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement, (ii) there shall be a period of 10 consecutive days after entry thereof during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) at any time during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, is in effect, such judgment, order, award or settlement is not bonded in the full amount of such judgment, order, award or settlement; provided, however, that any such judgment, order, award or settlement shall not give rise to an Event of Default under this subsection (v) if and for so long as (A) the amount of such judgment, order, award or settlement is covered by a valid and binding policy of insurance between the defendant and the insurer covering full payment thereof and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment, order, award or settlement;

(v)    any Borrower is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business for more than fifteen (15) days;

(w)    any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Borrower, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

(x)    any cessation of a substantial part of the business of any Borrower for a period which materially and adversely affects the ability of such Person to continue its business on a profitable basis;

(y)    the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Borrower, if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;

(z)    the indictment of any Borrower under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against any Borrower, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person;

(aa)    any Borrower or any of its ERISA Affiliates shall have made a complete or partial withdrawal from a Multiemployer Plan, and, as a result of such complete or partial withdrawal, any Borrower or any of its ERISA Affiliates incurs a withdrawal liability in an annual amount exceeding $25,000; or a Multiemployer Plan enters reorganization status under Section 4241 of ERISA, and, as a result thereof any Borrower's or any of its ERISA Affiliates' annual contribution requirements with respect to such Multiemployer Plan increases in an annual amount exceeding $25,000;

(bb)    any Termination Event with respect to any Employee Plan shall have occurred, and, 30 days after notice thereof shall have been given to any Borrower by the Lender, (i) such Termination Event (if correctable) shall not have been corrected, and (ii) the then current value of such Employee Plan's vested benefits exceeds the then current value of assets allocable to such benefits in such Employee Plan by more than $25,000 (or, in the case of a Termination Event involving liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, the liability is in excess of such amount);

(cc)    any Borrower shall be liable for any Environmental Liabilities and Costs the payment of which could reasonably be expected to have a Material Adverse Effect;

(dd)    a Change of Control shall have occurred; or

(ee)    an event or development occurs which could reasonably be expected to have a Material Adverse Effect.

then, and in any such event, the Lender may, by notice to the Borrowers, subject to the Bankruptcy Court Orders, (i) terminate or reduce the Revolving Credit Commitment, whereupon the Revolving Credit Commitment shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without further order of, or application to, the Bankruptcy Court, presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Borrower and (iii) exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code and the Uniform Commercial Code), hereunder and under the other Loan Documents.

59

**ARTICLE IX**
**MISCELLANEOUS**

Section 9.01    Notices, Etc.  All notices and other communications provided for hereunder shall be in writing and shall be mailed (certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, or sent by electronic mail:

if to any Borrower, at the following address:

c/o MEE Apparel LLC
501 Tenth Avenue, Floor 7
New York, NY  10018
Attention:  Jeff Gregg, CRO
Telephone:  (917) 262-1000
Email:  jeffg@thecollective.com

with a copy to:

Cole, Schotz, Meisel, Forman & Leonard, P.A.
25 Main Street
Hackensack, New Jersey  07601
Attention:  Michael D. Sirota, Esq.
Telephone:  (201) 525-6262
Telecopier:  (201) 678-6262
Email:  msirota@coleschotz.com

if to the Lender, to it at the following address:

Suchman, LLC
501 Tenth Avenue, Floor 7
New York, NY  10018
Attention:  Gregg Donnenfeld
Telephone:  (917) 262-1000
Email:  gregg@thecollective.com

in each case, with a copy to:

Venable LLP
2049 Century Park East, Suite 2100
Los Angeles, CA  90067
Attention:   Ronn S. Davids
Telephone:  (310) 229-9970
Telecopier:  (310) 229-9901
Email:  RDavids@Venable.com

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 9.01.  All such notices

60

and other communications shall be effective, (a) if mailed (certified mail, postage prepaid and return receipt requested), when received or 3 days after deposited in the mails, whichever occurs first, (b) if telecopied or sent by electronic mail, when transmitted and confirmation received, or (c) if delivered by hand, Federal Express or other reputable overnight courier, upon delivery, except that notices to the Lender pursuant to Article II shall not be effective until received by the Lender. Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Borrowers or any other Person to serve upon the Lender in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Lender pursuant to the Bankruptcy Code.

Section 9.02    Amendments.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 9.03    No Waiver; Remedies, Etc.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Lender provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Lender under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Lender to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 9.04    Expenses; Attorneys' Fees.  The Borrowers will pay on demand, all costs and expenses incurred by or on behalf of the Lender, regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable fees, costs, client charges and expenses of counsel for Lender, accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 6.01(b) or the review of any of the agreements, instruments and documents referred to in Section 6.01(f)), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Lender's rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against the by any Person that arises from or relates to this Agreement, any other Loan Document, the Lender's claims against any Borrower, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by the Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any

61

Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Borrower, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Borrower involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (k) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any facility of any Borrower, (l) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien, (m) the receipt by the Lender of any advice from professionals with respect to any of the foregoing.  Without limitation of the foregoing or any other provision of any Loan Document:  (i) the Borrowers agree to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents, and (ii) if the Borrowers fail to perform any covenant or agreement contained herein or in any other Loan Document, the Lender may itself perform or cause performance of such covenant or agreement, and the expenses of the Lender incurred in connection therewith shall be reimbursed on demand by the Borrowers.  Notwithstanding anything to the contrary, this <u>Section 9.04</u> shall not apply to any tax-related matter, which shall be subject to <u>Section 2.06</u> instead.

Section 9.05    <u>Right of Set-off</u>.  Upon the occurrence and during the continuance of any Event of Default, the Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Borrower (any such notice being expressly waived by the Borrowers) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by the Lender to or for the credit or the account of any Borrower against any and all obligations of the Borrowers either now or hereafter existing under any Loan Document, irrespective of whether or not the Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured.  The Lender agrees to notify such Borrower promptly after any such set-off and application made by the Lender provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Lender under this <u>Section 9.05</u> are in addition to the other rights and remedies (including other rights of set-off) which the Lender may have under this Agreement or any other Loan Documents of law or otherwise.

Section 9.06    <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 9.07    Assignments.

(a)    This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the Borrowers and the Lender and their respective successors and assigns; <u>provided</u>, <u>however</u>, that none of the Borrowers may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of the Lender and any such assignment without the Lender's prior written consent shall be null and void.

      (b)    The Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement and the other Loan Documents with respect to all or a portion of any Loan.

      Section 9.08   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis.

      Section 9.09   <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE AND EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT.

      Section 9.10   <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE</u>. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH BORROWER HEREBY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ADMINISTRATIVE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN <u>SECTION 9.01</u>. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE LENDER TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY BORROWER IN ANY OTHER JURISDICTION. EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF

OR ITS PROPERTY, EACH BORROWER HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 9.11    WAIVER OF JURY TRIAL, ETC.  EACH BORROWER AND THE LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH BORROWER CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  EACH BORROWER HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER ENTERING INTO THIS AGREEMENT.

Section 9.12    Consent by the Lender.  Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "Action") of the Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Borrower is a party and to which the Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by the Lender, in its sole and absolute discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 9.13    No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 9.14    Reinstatement; Certain Payments.  If any claim is ever made upon the Lender for repayment or recovery of any amount or amounts received by the Lender in payment or on account of any of the Obligations, the Lender shall give prompt notice of such claim to the Borrowers, and if the Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by the Lender with any such claimant, then and in such event each Borrower agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.

7709782-v8

Section 9.15    Indemnification.

(a)    General Indemnity.  In addition to each Borrower's other Obligations under this Agreement, each Borrower agrees to, jointly and severally, defend, protect, indemnify and hold harmless the Lender and its officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Interim Facility Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) the Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Borrowers shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(b)    Environmental Indemnity.  Without limiting Section 9.15(a) hereof, each Borrower agrees to, jointly and severally, defend, indemnify, and hold harmless the Indemnitees against any and all Environmental Liabilities and Costs and all other claims, demands, penalties, fines, liability (including strict liability), losses, damages, costs and expenses (including without limitation, reasonable legal fees and expenses, consultant fees and laboratory fees), arising out of (i) any Releases or threatened Releases (x) at any property presently or formerly owned or operated by any Borrower or any Subsidiary of any Borrower, or any predecessor in interest, or (y) of any Hazardous Materials generated and disposed of by any Borrower or any Subsidiary of any Borrower, or any predecessor in interest; (ii) any violations of Environmental Laws; (iii) any Environmental Action relating to any Borrower or any Subsidiary of any Borrower, or any predecessor in interest; (iv) any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure to Hazardous Materials used, handled, generated, transported or disposed by any Borrower or any Subsidiary of any Borrower, or any predecessor in interest; and (v) any breach of any warranty or representation regarding environmental matters made by the Borrowers in Section 5.01(q) or the breach of any covenant made by the Borrowers in Section 6.01(j).  Notwithstanding the foregoing, the Borrowers shall not have any obligation to any Indemnitee under this subsection (b) regarding any potential environmental matter covered hereunder which is caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final judgment of a court of competent jurisdiction.

(c)    The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees are chargeable against the Loan Account.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 9.15 may be unenforceable because it is violative of any law or public policy, each Borrower shall, jointly and

65

severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees. The indemnities set forth in this <u>Section 9.15</u> shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 9.16   <u>Records</u>. The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability and the Revolving Credit Commitment, shall at all times be ascertained from the records of the Lender, which shall be conclusive and binding absent manifest error.

Section 9.17   <u>Binding Effect</u>. This Agreement shall become effective when it shall have been executed by each Borrower and the Lender and when the conditions precedent set forth in <u>Section 4.01</u> hereof have been satisfied or waived in writing by the Lender, and thereafter shall be binding upon and inure to the benefit of each Borrower and the Lender, and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Borrower pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code), except that the Borrowers shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of the Lender.

Section 9.18   <u>Interest</u>. It is the intention of the parties hereto that the Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to the Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under law applicable to the Lender that is contracted for, taken, reserved, charged or received by the Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Lender, as applicable, to the Borrower); and (b) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by the Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by the Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Lender to the Borrowers). All sums paid or agreed to be paid to the Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to the Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans

66

hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (i) the amount of interest payable to the Lender on any date shall be computed at the Highest Lawful Rate applicable to the Lender pursuant to this <u>Section 9.18</u> and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Lender would be less than the amount of interest payable to the Lender computed at the Highest Lawful Rate applicable to the Lender, then the amount of interest payable to the Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to the Lender until the total amount of interest payable to the Lender shall equal the total amount of interest which would have been payable to the Lender if the total amount of interest had been computed without giving effect to this <u>Section 9.18</u>.

For purposes of this <u>Section 9.18</u>, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Lender, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 9.19    <u>Confidentiality</u>. The Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Borrowers pursuant to this Agreement or the other Loan Documents which is identified in writing by the Borrowers as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure of any such information (a) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority, (b) to counsel for the Lender, (c) to examiners, auditors or accountants, (d) in connection with any litigation to which the Lender is a party or (e) to any assignee or participant (or prospective assignee or participant) so long as such assignee or participant (or prospective assignee or participant) first agrees, in writing, to be bound by confidentiality provisions similar in substance to this <u>Section 9.19</u>.

Section 9.20    <u>Public Disclosure</u>. Each Borrower agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of the Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of the Lender, except to the extent that such Borrower or such Affiliate is required to do so under applicable law (in which event, such Borrower or such Affiliate will consult with the Lender before issuing such press release or other public disclosure). Each Borrower hereby authorizes the Lender, after consultation with the Administrative Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into

67

among the parties hereto, as the Lender shall deem appropriate, including, without limitation, announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as the Lender shall deem appropriate.

Section 9.21    Integration.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 9.22    Parties Including Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Borrower, the estate of each Borrower, and any trustee or successor in interest of any Borrower in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender and its assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Borrower to a case under Chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender file financing statements or otherwise perfect their security interests or Liens under applicable law.

*[Remainder of this page intentionally left blank]*

7709782-v8

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**Borrowers:**

**MEE APPAREL LLC**

By: _____

    Name:   Jeffrey L. Gregg

    Title:    Chief Restructuring Officer

**MEE DIRECT LLC**

By: _____

    Name:   Jeffrey L. Gregg

    Title:    Chief Restructuring Officer

[SIGNATURE PAGE TO FINANCING AGREEMENT]

**Lender:**

**SUCHMAN, LLC**

By: _____

Name: _____Seth Gersteyberg_____

Title: _____Member_____

[SIGNATURE PAGE TO FINANCING AGREEMENT]

# EXHIBIT B

**DIP Budget Forecast**
7 Week

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # in Bankruptcy | | | | | | | | | | | | | | |
| Week Ending | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Rosenthal Receipts (AR/Inv Sale/Hilco) | $ - | $ 980,000 | $ - | $ 700,000 | $ - | $ 286,000 | $ - | | | | | | | $ 1,966,000 |
| Receipts | 1,008,548 | 953,333 | 958,753 | 1,432,423 | 983,797 | 1,611,507 | 1,063,732 | | | | | | | 8,012,094 |
| **Total Cash Receipts** | 1,008,548 | 1,933,333 | 958,753 | 2,132,423 | 983,797 | 1,897,507 | 1,063,732 | - | - | - | - | - | - | 9,978,094 |
| **Cash Payments** | | | | | | | | | | | | | | |
| Payments to Rosenthal | - | 980,000 | - | 700,000 | - | 286,000 | - | | | | | | | 1,966,000 |
| Inventory Purchases | 200,000 | 200,000 | 820,000 | 820,000 | 415,000 | 415,000 | 415,000 | | | | | | | 3,285,000 |
| Payroll | 132,500 | 458,187 | - | 458,187 | 132,500 | 458,187 | - | | | | | | | 1,639,561 |
| Restructuring | 10,000 | 35,000 | 10,000 | 755,000 | 10,000 | 10,000 | 2,200,000 | | | | | | | 3,030,000 |
| Operating Expenses | 1,533,884 | 655,292 | 727,933 | 726,085 | 1,519,665 | 725,367 | 1,020,639 | | | | | | | 6,908,864 |
| **Total Cash Payments** | 1,876,384 | 2,328,479 | 1,557,933 | 3,459,272 | 2,077,165 | 1,894,554 | 3,635,639 | - | - | - | - | - | - | 16,829,425 |
| **Net Cash Flow** | (867,835) | (395,146) | (599,180) | (1,326,849) | (1,093,368) | 2,953 | (2,571,907) | - | - | - | - | - | - | (6,851,331) |
| **Liquidity** | | | | | | | | | | | | | | |
| Beginning Cash | 400,000 | (0) | 0 | (0) | (0) | (0) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 400,000 |
| Net Cash Flow | (867,835) | (395,146) | (599,180) | (1,326,849) | (1,093,368) | 2,953 | (2,571,907) | - | - | - | - | - | - | (6,851,331) |
| Ending Cash | (467,835) | (395,146) | (599,179) | (1,326,849) | (1,093,368) | 2,953 | (2,571,907) | 0 | 0 | 0 | 0 | 0 | 0 | (6,451,331) |
| DIP | | | | | | | | | | | | | | |
| **Available Cash** | (467,835) | (395,146) | (1,326,849) | (1,326,849) | (1,093,368) | 2,953 | (2,571,907) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | |
| DIP Revolver Drawdown/(Payback) | 467,835 | 395,146 | 599,179 | 1,326,849 | 1,093,368 | (2,953) | 2,571,907 | | | | | | | 6,451,331 |
| **Available Cash After DIP** | (0) | 0 | (0) | (0) | (0) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **DIP Balance** | | | | | | | | | | | | | | |
| **Beginning Balance** | - | 467,835 | 865,320 | 1,468,826 | 2,803,019 | 3,910,402 | 3,927,001 | - | - | - | - | - | - | - |
| Interest @ 6% | - | 2,339 | 4,327 | 7,344 | 14,015 | 19,552 | 19,635 | | | | | | | 67,212 |
| Draw/(Payback) | 467,835 | 395,146 | 599,179 | 1,326,849 | 1,093,368 | (2,953) | 2,571,907 | - | - | - | - | - | - | 6,451,331 |
| **Ending DIP Balance** | 467,835 | 865,320 | 1,468,826 | 2,803,019 | 3,910,402 | 3,927,001 | 6,518,543 | - | - | - | - | - | - | 6,518,543 |